1
2
3
4
5
6
7
8               UNITED STATES DISTRICT COURT

9               CENTRAL DISTRICT OF CALIFORNIA

10              WESTERN DIVISION

11

12   KATIE A., etc., et al,                )    CASE NO. CV-02-05662 AHM (SHx)
                                           )
13                        Plaintiffs,      )    STIPULATED JUDGMENT
                                           )    PURSUANT TO    CLASS ACTION
14   v.                                    )    SETTLEMENT AGREEMENT
                                           )
15   TOBY DOUGLAS, etc., et al,            )    Date:      December 1, 2011
                                           )    Time:      2:00 p.m.
16                        Defendants.      )    Courtroom: 14
                                           )    Judge:     A. Howard Matz
17                                         )
                                           )
18   _____       )

19

20

21

22        Plaintiffs and Defendants, the Director of the California Department of

23   Health Care Services (CDHCS), the Director of the California Department of

24   Social Services (CDSS), as well as non-party (Real Party in Interest) the Director

25   of the California Department of Mental Health (CDMH) (collectively "State

26   Defendants") have entered into a settlement agreement for resolution of this class

27   action matter.  Defendant Los Angeles County previously entered into a settlement

28   agreement with plaintiffs which this court approved and entered judgment pursuant

     thereto on July 17, 2003.

                                           1

Plaintiffs and the State Defendants (the Parties) have submitted the proposed Settlement Agreement to the Court for final approval pursuant to, and in compliance with Federal Rules of Civil Procedure, Rule 23, subdivision (e).

The Court found that the Parties gave notice of the proposed Settlement Agreement to the Plaintiff class and others thereby affected in a reasonable manner.   Fed. R. Civ. P. 23(e)(1).  On December 1, 2011, the Court conducted a fairness hearing pursuant to Fed.R. Civ. P. 23(e)(2), affording the parties and all other interested persons the opportunity to be heard in support of and in opposition to the proposed settlement agreement.  After reviewing and considering the papers filed in support of the settlement agreement, the evidence, argument, comments and objections submitted at the fairness hearing, the Court has made a finding that the settlement agreement is fair, reasonable and adequate to bind class members.

The Court having fully considered the matter and good cause appearing, hereby ORDERS, ADJUDGES AND DECREES as follows:

1.      The Court has jurisdiction over the claims for injunctive and declaratory relief against State Defendants pursuant to 28 U.S.C. §§ 1331, 1343 and 1367.  Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b).

2.      This case has been certified as a class action for purposes of all claims against State Defendants on behalf of a class of children in California who:

(a)      Are in foster care or are at imminent risk of foster care placement, and

(b)      Have a mental illness or condition that has been documented or, had an assessment already been conducted, would have been documented, and

(c)      Who need individualized mental health services, including but not limited to professionally acceptable assessments, behavioral support and case management services, family support, crisis support, therapeutic foster care, and

2

other medically necessary services in the home or in a home-like setting, to treat or ameliorate their illness or condition.

For the purposes of this case, "imminent risk of foster care placement" means that within the last 180 days a child has been participating in voluntary family maintenance services or voluntary family reunification placements and/or has been the subject of either a telephone call to the Child Protective Services hotline or some other documented communication made to a local Child Protective Services agency regarding suspicions of abuse, neglect or abandonment.

3.      Judgment is entered pursuant to the terms of the Settlement Agreement incorporated herein, as though fully set forth, and attached as Exhibit A to this Judgment.

4.      The Court orders the parties to the Settlement Agreement to perform all of their obligations thereunder.

5.      The Court will retain jurisdiction over this lawsuit until 36 months after court approval of the Settlement Agreement, at which time the Court's jurisdiction will expire.  Pursuant to Paragraph 30 of the Settlement Agreement, this expiration of jurisdiction shall not be extended, for any reason, beyond the 36-month period following approval of the Settlement Agreement.

6.      Pursuant to Paragraph 15 of the Settlement Agreement, the Settlement Agreement settles all claims against the State Defendants in this lawsuit.

7.      The Court finds that no just reason exists for delay in entering this Judgment pursuant to the Settlement Agreement.  Accordingly, the Clerk is hereby directed to enter this Final Judgment.

8.      This Judgment is binding against State Defendants, their successors in office, CDHCS, CDSS, CDMH[1], the respective officers, agents and employees of these state agencies.

9.      The Court will subsequently dismiss this lawsuit against the State Defendants in accordance with the terms of the Settlement Agreement.

DATED: December 05, 2011

_____
A.  HOWARD MATZ
United States District Judge

---

[1] Because of the possible restructuring of CDMH, at this time it is uncertain as to whether CDMH will be the State agency responsible for performing the obligations assigned to CDMH pursuant to this Agreement.  State Defendants agree that the State will perform CDMH's obligations under this Agreement.

4

# EXHIBIT A

# EXHIBIT A

## SETTLEMENT AGREEMENT

### Background

1.      Plaintiffs brought this lawsuit entitled *Katie A. et al. v. Diana Bontá et al.* (the "*Katie A.*
Litigation"), filed July 18, 2002, case no. 02-05662, seeking certification of a class and
declaratory and injunctive relief against Diana Bontá, Director of California Department of Health
Services; Rita Saenz, Director of the California Department of Social Services, (hereinafter
collectively referred to as "the State" or "State Defendants") and against Los Angeles County; Los
Angeles County Department of Children and Family Services ("DCFS"); Anita Bock, Director of
the Los Angeles County Department of Children and Family Services (hereinafter collectively
referred to as "the County" or "County Defendants") and Does 1 through 100, inclusive.

2.      Plaintiffs filed the First Amended Complaint on December 20, 2002.  The First Amended
Complaint is the operative pleading in this action.

3.      On June 18, 2003, this case was certified as a class action for purposes of all causes of
action in Plaintiffs' First Amended Complaint against the State Defendants on behalf of a class of
children in California who:

(a)      Are in foster care or are at imminent risk of foster care placement, and

(b)      Have a mental illness or condition that has been documented or, had an assessment
already been conducted, would have been documented, and

(c)      Who need individualized mental health services, including but not limited to
professionally acceptable assessments, behavioral support and case management services, family
support, crisis support, therapeutic foster care, and other medically necessary services in the home
or in a home-like setting, to treat or ameliorate their illness or condition.

For the purposes of this case, "imminent risk of foster care placement" means that within the last 180 days a child has been participating in voluntary family maintenance services or voluntary family reunification placements and/or has been the subject of either a telephone call to the Child Protective Services hotline or some other documented communication made to a local Child Protective Services agency regarding suspicions of abuse, neglect or abandonment.

4.      Members of the class include children living with their parents or relatives or in any of a variety of placements, such as group homes or foster homes.

5.      Plaintiffs entered into a settlement agreement (hereinafter "County Settlement") with County Defendants regarding all claims in the First Amended Complaint, which County Settlement was approved by the Court on July 16, 2003.

6.      On March 14, 2006, the District Court granted Plaintiffs' motion for preliminary injunction in this case. *Katie A. v. Bonta*, 433 F.Supp.2d 1065 (C.D.Cal. 2006). On March 23, 2007, the Ninth Circuit Court of Appeals vacated the preliminary injunction and remanded for further proceedings consistent with its opinion. *Katie A. ex rel Ludin v. Los Angeles County*, 481 F.3d 1150 (9th Cir. 2007).

7.      California Department of Health Care Services (DHCS) is the successor in interest to California Department of Health Services, Toby Douglas is the successor-in-interest to Diana Bontá as Director of DHCS, and Will Lightbourne is the successor-in-interest to Rita Saenz as the Director of the California Department of Social Services (CDSS) and both have assumed the roles and are substituted in their respective official capacities as State Defendants herein by operation of law.

8.     The State Defendants deny all wrongdoing alleged in this action and deny any liability whatsoever to Plaintiffs and the Plaintiff Class.

9.     State Defendants assert that they have meritorious defenses which they have asserted in this action, and assert that they have entered into this Settlement Agreement ("Agreement")  with the accompanying proposed Stipulated Judgment (a copy of which is attached hereto, marked as Appendix  "A" and incorporated herein by reference) solely for the purpose of settling and compromising the claims of the Plaintiffs, in order to avoid the expense and diversion of its personnel caused by protracted litigation, and to terminate the claims asserted against State Defendants.

10.     The Court appointed a Special Master on April 3, 2009, to facilitate the parties' efforts to reach agreement on the legal issues and/or narrow the differences between the parties in the case. The parties, along with a small group of other interested and significant stakeholders (hereafter "negotiation workgroup") engaged in a lengthy and intensive negotiation process over a year and a half, under the direction of the Special Master, utilizing an interest based decision making process, which required consensus of the negotiation workgroup in order to make recommendations.

11.     The best interests of the class will be substantially advanced by the settlement of the *Katie A.* litigation based on the commitments reflected in this Agreement, rather than by a trial on the merits.

12..     In consideration of the covenants and undertakings set forth herein and intending to be legally bound thereby, it is stipulated and agreed by the Plaintiffs and the State Defendants, represented by their undersigned counsel, that all of Plaintiffs' claims for relief against the State Defendants which were asserted in the Complaint filed on July 18, 2002, or First Amended

Complaint filed on December 20 2002, including any claims against employees and officers of State Defendants, shall be resolved on the following terms as set forth in this Agreement:

I.      Jurisdiction and Authority of the Court.

13.     The United States District Court has jurisdiction over the claims against all Defendants pursuant to 28 U.S.C. §§ 1331, 1343 and 1367.   Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b).

14.     After notice of and an opportunity to comment on this Agreement has been provided to the Plaintiff class and others thereby affected, the Court shall determine whether to approve this Agreement as being a fair, reasonable and adequate settlement of the *Katie A.* Litigation and to enter the accompanying Stipulated Judgment.   Except as otherwise noted, the terms of this Agreement shall not take effect until the Court issues its order approving this Agreement.

15.     This Agreement settles all claims against the State Defendants in this lawsuit.

16.     State Defendants agree that this Agreement is binding on the California Department of Mental Health ("CDMH"), a non-party to the Agreement.

17.     The parties to this Agreement acknowledge that notice of, and an opportunity to comment on, this Agreement must be provided to the Plaintiff class and others thereby affected. Immediately following the execution of the Agreement, the parties shall jointly develop the content of the written notice to be given to the Plaintiff class, as well as negotiate the terms of how notice shall be given to the Plaintiff class.

18.     Promptly upon execution of this Agreement and completion of the activities described in Paragraph 17 above, Plaintiffs shall apply to the Court by application and/or motion for

preliminary approval of the Agreement.  Plaintiffs shall apply to the Court for entry of an order substantially in the following form:

(a)    Giving its preliminary approval of the Agreement (which includes the Stipulated Judgment) as being fair, reasonable and adequate as to members of the Class;

(b)    Approving the proposed procedures for giving notice to members of the Class of the Agreement; and

(c)    Scheduling a fairness hearing as to whether the Agreement should be finally approved as fair, reasonable and adequate as to members of the Class and the Stipulated Judgment should be entered.

II.    <u>Objectives and Specific Agreements.</u>

19.    The objectives of this Agreement are to:

(a) Facilitate the provision of an array of services delivered in a coordinated, comprehensive, community-based fashion that combines service access, planning, delivery, and transition into a coherent and all-inclusive approach;

(b)  Support the development and delivery of a service structure and a fiscal system that supports a core practices and services model, as described in (a),

(c)  Support an effective and sustainable solution that will involve standards and methods to achieve quality-based oversight, along with training and education that support the practice and fiscal models;

(d)  Address the need for certain class members with more intensive needs (hereinafter referred to as "Subclass members") to receive medically necessary mental health services in their own home, a family setting or the most homelike setting appropriate to their needs, in order to facilitate reunification, and to meet their

needs for safety, permanence, and well-being.

(1)    Subclass Members are children and youth who are full-scope Medi-Cal eligible, meet medical necessity, have an open child welfare services case, and meet either of the following criteria:

A. Child is currently in or being considered for: Wraparound, therapeutic foster care or other intensive services, therapeutic behavioral services, specialized care rate due to behavioral health needs or crisis stabilization/intervention; or

B. Child is currently in or being considered for a group home (RCL 10 or above), a psychiatric hospital or 24 hour mental health treatment facility, or has experienced his/her 3rd or more placements within 24 months due to behavioral health needs.

20.   To fulfill the above objectives, the State Defendants agree to the following:

(a)    CDMH[1] and CDHCS will develop and disseminate a Medi-Cal Specialty Mental Health documentation manual (hereinafter "Documentation Manual") that will inform and instruct providers on:

(1) two arrays of services, Intensive Care Coordination (ICC), as defined in

---

[1] Because of the possible restructuring of CDMH, at this time the parties are uncertain as to whether CDMH will be the State agency responsible for performing the obligations assigned to CDMH pursuant to this Agreement. State Defendants agree that the State will perform CDMH's obligations under this Agreement.

Appendix "E", and Intensive Home Based Services (IHBS), as defined in Appendix "D", to be provided to the subclass, as described in Paragraph 19 (d)(l) of this Agreement;

(2) Therapeutic Foster Care (TFC), as defined in *Katie A. v. Bonta*, 433 F.Supp.2d 1065, 1072 (C.D.Cal. 2006), e.g., Multidimensional Treatment Foster Care (MTFC), Intensive Treatment Foster Care (ITFC).

   A. CDMH, CDSS and DHCS, in collaboration with the negotiation workgroup, including consultants, if needed, will determine:

      1. To what extent the activities and/or components of TFC services are covered under the Medicaid Act, including EPSDT, 42 U.S.C. § 1396 et seq., and its implementing regulations, and

      2. To what extent the activities and/or components are covered under the California Medicaid State Plan;

      3. To what extent, if any, the State Plan needs to be amended to cover TFC services that are covered under the Medicaid Act but are not covered in the State Plan.

(b)(1) The Documentation Manual will describe how ICC and IHBS should be provided consistent with the Core Practice Model Principles and Components (hereinafter referred to as the "Core Practice Model"), as defined in Appendix "B", using a Child and Family Team, as defined in Appendix "C".

(b)(2) The Documentation Manual will be developed by the State Defendants in collaboration with the negotiation work group, and other stakeholders upon

agreement by the parties.  Chapters of this manual may include, but would not be limited to:

- Description of the eligible class

- How to refer a child for IHBS/ICC, and TFC services

- General description of Medi-Cal reimbursable service activities that can comprise the IHBS/ICC arrays of services, and TFC services

- Authorization/utilization

- Claiming

- General description of other non-Medi-Cal reimbursable service activities that can be part of the IHBS/ICC models or arrays of services, and TFC services

- Billing Rules and Requirements

- Documentation Requirements

- Examples of Forms

- Where to call for additional information

(b)(3)  CDMH and CDSS will post the draft Documentation Manual on their Internet sites for a thirty-day public comment period. CDMH and CDSS will post a final copy of the Documentation Manual on the Internet sites of CDMH and DHCS.

(c)  DHCS will draft and submit amendments to the definitions of Targeted Case Management (TCM) services and Rehabilitation services in the California's State

Medicaid Plan through State Plan Amendments, consistent with the Core Practice Model and ICC and IHBS and the Mercer Consulting Report, *Katie A. Phase I and II Analysis*, dated October 6, 2010.

(d)     CDMH and CDSS will establish a shared management structure to develop a shared vision and mission statement, policy and program direction, clear and consistent guidance, and outcomes and accountability measures consistent with the Core Practice Model (Appendix "B"). To this end, in consultation with the negotiation workgroup, CDSS and CDMH will develop a Core Practice Model Guide and establish a joint management task force with representatives from each department and representatives from youth, parent partner, county and provider groups.  CMHDA and CWDA will be consulted on membership of the group and requested to join the task force.  The work of the joint management task force will be focused on the goal of creating joint program management system.  The Task force will consider and report within 12 months after execution of this Agreement on the proposed methods for doing this including:

(1)     Establishment of the shared management structure between CDMH and CDSS through legislation, and/or regulation, or other means to articulate a shared set of goals, vision and mission statements.  Policies and procedures should be prepared and revised jointly as needed to ensure a shared practice is consistent and duplication is avoided, and provide a process for quickly resolving conflicts;

(2)     Building upon existing relationships with all state agencies that serve foster youth with mental health needs including the State Department of

Page 9

Education, the California Department of Drug and Alcohol, and the California Department of Correction and Rehabilitation to coordinate information and services in a manner consistent with the Core Practice Model. Existing venues for developing relationships already exist with State Interagency Team, Child Welfare Council, local blue ribbon commissions, etc.;

(3) Creating a cross-system process and procedures to support and manage the shared responsibility between CDMH and CDSS for delivering services to foster youth that is consistent with the Core Practice Model at the county/local level;

(4) Developing and providing models for local agencies to consider in order to work more effectively together, including, for example, integration of departments or services, specific coordination management models that oversee the departments, and/or Memoranda of Understandings (MOUs) for specific collaboration.

(e) CDSS and CDMH, in consultation with the joint management task force, will develop and endorse practice tools, training curriculum, practice improvement protocols, and quality control systems to support the shared Core Practice Model in order to support service integration and/or coordination for mental health services for class members;

(f) CDSS and CDMH will develop cross system training curriculum and educational materials for child welfare and mental health staff.

(1) CDSS will initiate a request to the Statewide Training and Education

Page 10

Committee (STEC) to develop a process and timeline for curriculum development.

(2) The educational materials are intended to be used by counties and providers to explain the system to children and families including a joint DSS/DMH tool kit for the Child and Family Teams.

(3) The curriculum shall develop and promote structured opportunities for teaming at all levels such as Team Decision Making meetings, Child and Family Teams, Interagency Operations Networks, Interagency Placement Review Teams, Departmental Leadership Team meetings, etc.

(g) CDSS, CDMH and DHCS will clarify and provide guidance on state and federal laws as needed to implement this Agreement so that counties and providers can understand and consistently apply them. Proposed methods may include, but are not limited to:

(1) Providing ongoing technical assistance to include manuals, policy-guidance, education and training, program development and fidelity to program principles to support the Core Practice Model;

(2) Ensuring audit compliance units follow the billing and documentation guidelines developed by the state departments in order to ensure appropriate and consistent audit standards are being utilized to review provider billing claims;

(3) Encouraging local policy and regulatory discretion/variations to be consistent with the Core Practice Model.

(h) Seeking to improve methods and adequacy of data collection, matching, and

Page 11

sharing to support the Core Practice Model at the state, county, and provider levels, CDSS and CDMH will develop a proposal to incorporate into the implementation plan to produce and post data including relevant claims information for the class. Proposed methods may include:

(1)   Improving data exchange and matching among CDSS and CDMH and other state and local departments;

(2)   Developing and disseminating a clear policy on information sharing/privacy issues between child welfare and mental health and other service partners;

(3)   Using existing data collection and existing baseline and performance benchmarks to the greatest extent feasible;

(4)   Determining what will be measured that reflects intended outcomes. Use the measured outcomes to evaluate progress on implementing the Core Practice Model and access to intensive home-based mental health services and intensive care coordination for mental health services. Relevant data may include:

A.   *Clinical status data*, including assessments of symptoms, risks, functioning, strengths, and other information on how the class member is doing in his or her life;

B.   *Utilization data*, including disposition information such as aftercare from hospitals and group homes, etc.

C.   *Treatment facility data* that reflect what is happening within the episode of

treatment.  Monitoring the degree to which CFT and intensive home-based mental health services, and intensive care coordination for mental health services are provided and the extent to which they are provided within the Core Practice Model;

(i)     A process shall be developed to identify class members in order to link them firmly to services.

(j)     DHCS, CDSS and CDMH will establish a Data and Quality Task Force and produce a report with recommended actions and timelines to:

(1)  Establish a method to track the use of ICC and IHBS services arrays and TFC for subclass members.

(2) Utilize the External Quality Review and California Child and Family Services Review (C-CFRS) requirements to develop a plan for the collection of data and information about children in the class who receive mental health services.

(3) Collect data elements in DHCS, CDSS and CDMH data systems specific to the class (and subclass) in order to evaluate utilization (patterns, type, frequency, intensity of services) and timely access to care.

(4) Facilitate a stakeholder meeting to solicit ideas from stakeholders and counties about what data concerning the class the departments should routinely produce and post. Establish a procedure and timeline to produce and post data that is

useful to Counties, stakeholders and State departments in addressing the needs
of children in the class.

(5) All reports and timelines will be posted on the CDMH and CDSS websites.

(k)     Models

(1) The State Departments, in consultation with the Negotiations Workgroup, will
conduct a statewide readiness assessment of counties to develop and model child
welfare and mental health service delivery systems that can be successful in
implementing the Core Practice Model (CPM).

(2) The readiness assessment team will be informed by California Mental Health
Directors' Association (CMHDA), California Welfare Directors Association
(CWDA), providers, family members, and youth serving organizations.

(3) The readiness assessment will specifically focus on:

   A.  the strength of the connectivity and collaboration between child welfare and
       mental health to administer an array of services to support IHBS, and ICC and
       TFC;

   B.  the ability to transfer lessons learned to other programs and counties.  Existing
       monitoring tools utilized by the State will be used to identify the counties; and

   C.  whether the counties have or can build a system that delivers services to scale
       county-wide.

(4) At least one large, medium and small county will be selected by the State for this
purpose to support intensive training and systems development for the CPM.

Page 14

(5) The selected counties will be used to test strategies for providing mental health services according to the CPM.  Second, the sites may serve as the first phase of the statewide effort to deliver services according to the CPM, in accordance with the Implementation Plan.

(6) Selected model counties will receive training, technical assistance and other supportive incentives from the State for their strategies to test the CPM.

(7) Modeling is intended to facilitate adoption of the CPM Model and is not intended to inhibit provision of IHBS, ICC, TFC and the Core Practice Model in counties other than the model counties.

(l)     The implementation plan will address how the CPM and IHBS/ICC and TFC will be brought to scale statewide.

(m)     The State Departments, in consultation with the Negotiations Workgroup and fiscal and technical consultant experts, will establish a CPM Fiscal Task Force.

(1) The CPM Fiscal Task Force will focus on do-able, achievable, and fiscally sound incentives to deliver IHBS, ICC, and TFC within the Core Practice Model framework and reduce use of group homes and other institutional placements.

(2) The CPM Fiscal Task Force will develop a strategic plan or proposal that:

A.  1. Evaluates ways to support counties to implement the IHBS and ICC for the sub-class of children, including improving cash flow to counties that serve youth pursuant to the CPM and improving eligibility reliability for providers and counties; and

2.  Secure alternative resources for services or state/county EPSDT match.

B.  Explores methods and options for reducing reliance on out-of-home

Page 15

placements, including:

1. Using group homes primarily for short-term crisis stabilization;

2. Establishing pilot programs that demonstrate the effectiveness of alternatives to group homes for very high needs and/or very high-risk youth;

3. Developing funding models or resources that facilitate the transformation of existing group home beds to intensive home-based services;

4. Enabling transition services in the community to be provided to group home residents to facilitate discharge;

5. Reconfiguring multi-agency mental health screening committees to provide for timely access to mental health services and supports consistent with the Core Practice Model and to reduce use of, or reliance on, out-of-home care

(3) The parties will incorporate the CPM Fiscal Task Force's plan or proposal into the Implementation Plan to the fullest extent practicable consistent with the time available.

III.   Implementation Plan

21.   The parties agree to develop a specific Implementation Plan to fulfill the obligations of this Agreement. The parties will begin to develop the Implementation Plan once the Court gives its preliminary approval of the Settlement Agreement and will complete the Implementation Plan within six months after the Court gives its final approval of the Settlement Agreement. The Implementation Plan shall be developed with the assistance of the Special Master, as needed, and

shall address all of the following: specific steps, deliverables, and a timeline for implementation. It is understood and agreed by the parties that the implementation timeline will include activities or deliverables that may be completed, or ongoing, after the end of court jurisdiction.

IV.     Special Master's Role.

22.     The parties agree that the appointment of Richard Saletta as Special Master shall continue and be extended for thirty-six months after court approval of the Settlement Agreement. In the event that Mr. Saletta cannot continue to serve in this capacity for the duration of the Agreement, Plaintiffs and the State Defendants shall attempt to determine a mutually agreeable candidate to be his replacement, subject to Court approval.  If Plaintiffs and State Defendants cannot agree upon a mutually agreeable replacement to Mr. Saletta, the parties shall each propose a candidate for the Court's consideration and appointment.

23.     The Special Master may communicate freely with each of the parties or their counsel. The Special Master may hire consultants, as needed, to assist the Special Master and parties in carrying out any duties under this Agreement, if the parties agree.

24.     State Defendants shall pay the reasonable costs of the services of the Special Master and any consultants the Special Master and/or the parties agree are necessary to hire.

25.     The Special Master shall:

(a)     advise and assist the parties in the development of an Implementation Plan pursuant to Paragraph 21; and, if they are unable to reach agreement, shall make recommendations with accompanying findings of fact to the Court; and

(b)     determine whether the Implementation Plan is reasonably calculated to ensure that State Defendants meets the terms of the  Agreement and objectives set forth in Paragraph 19.

26.    The Special Master shall make regular written reports to the parties and the Court regarding the status of State Defendants' progress in meeting the obligations and commitments under the Implementation Plan. The Special Master shall prepare reports on a 120-day basis during the first year of the Agreement, every six months during subsequent years, and one last report no later than 30 days prior to the expiration of the District Court's jurisdiction over this lawsuit.

27.    Thirty days prior to filing each such written report, the Special Master shall provide a draft of the report to counsel for State Defendants and Plaintiffs.   If requested by either State Defendants or Plaintiffs, the Special Master may, in his discretion, convene a meeting with counsel for State Defendants and Plaintiffs, as well as appropriate State officials, to give the parties an opportunity to discuss the Special master's tentative findings and conclusions.

28.    The Special Master shall file the final reports with the Court and provide copies to each party to the lawsuit.  Any party to this Agreement may prepare and file with the Court a response to the Special Master's status report pursuant to FRCP Rule 53(f).  A copy of any responsive reports filed by the parties to this Agreement must be served upon counsel of record for all other parties to this lawsuit on the date of the filing of the responsive report with the Court.

29.    The parties acknowledge that a purpose of this Agreement is to avoid further litigation and disputes between the parties.

V.    <u>Duration of the time period to satisfy the terms of the Agreement and Judgment.</u>

30.    The Court will retain jurisdiction over this lawsuit until 36 months after court approval of the Settlement Agreement, at which time the Court's jurisdiction will expire.  The parties agree that this expiration of jurisdiction shall not be extended, for any reason, beyond the 36-month

period following approval of the Settlement Agreement.  The parties also agree that no provision of the Settlement Agreement will be enforceable beyond the 36-month period following approval of the Settlement Agreement, and the parties will not seek to enforce any provision of the Settlement Agreement beyond the 36-month period following approval of the Settlement Agreement.

VI.     Nullification of the Agreement.

31.     If, for any reason, the Court does not approve this Agreement and the Stipulated Judgment as a fair, reasonable, and adequate settlement of the *Katie A.* Litigation as between the Plaintiffs and State Defendants, or if an order approving this Agreement and the entry of the Stipulated Judgment is not upheld on appeal, if any, this Agreement shall be null and void.

VII.    No Admission of Liability

32.     The State Defendants expressly deny each and all of the claims and contentions alleged against it by the Plaintiffs in this action.  This Agreement, anything contained herein, and any negotiations or proceedings hereunder shall not be construed as or deemed to be an admission, presumption, evidence of, or concession by State Defendants of the truth of any fact alleged or the validity of any claim which has or could have been asserted in this action, or of the deficiency of any defense which has or could have been asserted in this action or of any wrongdoing or liability whatsoever.

33.     This Agreement, the fact of its existence, and any term hereof shall not be construed as an admission by State Defendants or used as evidence against State Defendants in any civil, criminal, or administrative action or proceeding except as described below.  Any reports, recommendations or findings by the Special Master also shall not be construed as an admission by

the State Defendants or used as evidence against State Defendants in any civil, criminal, or administrative action or proceeding except as described below.

34.    This Agreement, the fact of its existence, and any term hereof shall be admissible in evidence in any proceedings in the instant lawsuit.  Any reports, recommendations or findings by the Special Master also shall be admissible in any proceedings in the instant lawsuit and shall be considered prima facie evidence of the conclusions contained therein.

VIII.    Dispute Resolution Process

35.    Before filing any motion to enforce the terms of this Agreement, counsel for the moving party shall contact counsel for the opposing party to discuss thoroughly, preferably in person, the substance of the contemplated motion and any potential resolution. If the parties mutually consent, they may seek to mediate the dispute with the Special Master or any other mutually acceptable mediator.  If the dispute cannot be resolved with the assistance of a mediator, then such motion to enforce shall not be filed until thirty (30) days after the parties have conferred to discuss the motion unless either party is threatened with irreparable harm, in which case the motion can be filed in a shorter period of time.

IX.    Attorneys' Fees.

36.    The State Defendants agree to pay to plaintiffs' counsel a total of $3.75 million as an all-inclusive attorneys' fees sum.   The parties agree that this amount is meant to cover all of plaintiffs' claims for past attorneys' fees and costs, any future attorneys' fees and costs during the implementation period and period of court jurisdiction, and any and all claims by any of plaintiffs' counsel, including but not limited to, claims by or on behalf of, Heller Ehrman and/or its successors.

37.    The parties agree that starting 1 day after the court enters its final order approving this settlement following the fairness hearing, interest shall accrue at the legal rate of seven percent per annum on any outstanding balance of the amount listed in paragraph 36.

X.    <u>Other Provisions.</u>

38.    The parties agree to use their best efforts to carry out the terms of the Agreement. At no time shall any of the parties or their counsel seek to solicit or otherwise advise Class members to submit objections to the Agreement or to appeal from the order giving final approval to the Agreement and entry of the proposed Stipulated Judgment.

39.    This Agreement and the proposed Stipulated Judgment contain all the terms and conditions agreed upon by the parties hereto, and no oral agreement entered into at any time nor any written agreement entered into prior to the execution of this Agreement regarding the subject matter of this proceeding shall be deemed to exist, or to bind the parties hereto, or to vary the terms and conditions contained herein.

40.    Both parties to this Agreement have participated in its drafting and, consequently, any ambiguity shall not be construed for or against either party.

41.    Each of the undersigned attorneys represents that he or she has been duly authorized to enter into this Agreement.

42.    This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by both the State Defendants and the Plaintiffs' counsel and approved by the Court.

43.    The parties recognize and acknowledge that this Agreement and the proposed Stipulated Judgment must be approved by the Court pursuant to paragraph 14 above.  The parties agree to cooperate in good faith in the creation of all papers submitted to the Court to secure such

approval. In the event that the Court does not approve this Agreement and the Stipulated Judgment or the order approving this Agreement and entry of the Stipulated Judgment is reversed on appeal, the parties shall make good faith efforts to modify the Agreement so as to gain judicial approval.

44.    Notice, when due to Plaintiffs or State Defendants, shall be given by delivering it, in person or by United States certified first class mail to the parties' counsel of record in this litigation.

45.    This Agreement shall inure to the benefit of and be binding upon the legal representatives and any successor of Plaintiffs and the State Defendants, including CDMH.

46.    This Agreement may be executed in counterparts, each of which will be deemed to be an original and all of which taken together shall constitute a single instrument. This Agreement may be executed by signature via facsimile transmission or electronic mail which shall be deemed the same as an original signature.

On behalf of State Defendants,              On Behalf of Plaintiffs,

by _____          by _____
Ernest Martinez, Deputy Attorney General        Robert D. Newman
California Department of Justice          Western Center on Law & Poverty

                          by _____
                          Kimberly Lewis
                          National Health Law Program

                          by _____
                          Patrick Gardner
                          National Center for Youth Law

Page 22

approval. In the event that the Court does not approve this Agreement and the Stipulated Judgment or the order approving this Agreement and entry of the Stipulated Judgment is reversed on appeal, the parties shall make good faith efforts to modify the Agreement so as to gain judicial approval.

44.     Notice, when due to Plaintiffs or State Defendants, shall be given by delivering it, in person or by United States certified first class mail to the parties' counsel of record in this litigation.

45.     This Agreement shall inure to the benefit of and be binding upon the legal representatives and any successor of Plaintiffs and the State Defendants, including CDMH.

46.     This Agreement may be executed in counterparts, each of which will be deemed to be an original and all of which taken together shall constitute a single instrument. This Agreement may be executed by signature via facsimile transmission or electronic mail which shall be deemed the same as an original signature.

On behalf of State Defendants,                    On Behalf of Plaintiffs,

by                                                by
_____                  _____
Ernest Martinez, Deputy Attorney General          Robert D. Newman
California Department of Justice                   Western Center on Law & Poverty


                                                  by
                                                  _____
                                                  Kimberly Lewis
                                                  National Health Law Program

                                                  by _____
                                                  Patrick Gardner
                                                  National Center for Youth Law

by _____
Ira Burnim
Bazelon Center for Mental Health Law


by _____
Melinda Bird
Disability Rights California


by _____
Mark Rosenbaum
ACLU of Southern California

by  _____

    Ira Burnim
    Bazelon Center for Mental Health Law

by  _____

    Melinda Bird
    Disability Rights California

by  _____

    Mark Rosenbaum
    ACLU of Southern California

by _____
    Ira Burnim
    Bazelon Center for Mental Health Law

by _____
    Melinda Bird
    Disability Rights California

by _____
    /Mark Rosenbaum
    ACLU of Southern California

Page 23

APPENDIX "A"


IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| **KATIE A. etc., et al,** | Case No. CV-02-05662 AHM (SHx) |
| Plaintiffs, | **[PROPOSED] STIPULATED JUDGMENT PURSUANT TO CLASS ACTION SETTLEMENT AGREEMENT** |
| **v.** | **[Federal Rules of Civil Procedure, Rule 23, subd. (e)]** |
| **DIANA BONTÁ, etc., et al,** | Date:        __ , 2011 |
| | Time:                    a.m. |
| | Crtroom:   14 |
| Defendants. | Judge       Hon.  A. Howard Matz |

Plaintiffs and Defendants, the Director of the California Department of Health
Care Services (CDHCS), the Director of the California Department of Social
Services (CDSS), as well as non-party (Real Party in Interest) the Director of the
California Department of Mental Health (CDMH) (collectively "State Defendants")
have entered into a settlement agreement for resolution of this class action matter.
Defendant Los Angeles County previously entered into a settlement agreement with
plaintiffs which this court approved and entered judgment pursuant thereto on

_____.

Plaintiffs and the State Defendants (the Parties) have submitted the proposed
Settlement Agreement to the Court for final approval pursuant to, and in
compliance with Federal Rules of Civil Procedure, Rule 23, subdivision (e).

The Court found that the Parties gave notice of the proposed Settlement
Agreement to the Plaintiff class and others thereby affected in a reasonable manner.
Fed. R. Civ. P. 23(e)(1).  On _____, 2011, the Court conducted a
fairness hearing pursuant to Fed.R. Civ. P. 23(e)(2), affording the parties and all
other interested persons the opportunity to be heard in support of and in opposition
to the proposed settlement agreement.  After reviewing and considering the papers
filed in support of the settlement agreement, the evidence, argument, comments and
objections submitted at the fairness hearing, the Court has made a finding that the
settlement agreement is fair, reasonable and adequate to bind class members.

The Court having fully considered the matter and good cause appearing ,
hereby ORDERS, ADJUDGES AND DECREES as follows:

1.    The Court has jurisdiction over the claims for injunctive and declaratory
relief against State Defendants pursuant to 28 U.S.C. §§ 1331, 1343 and 1367.
Venue is proper in the Central District of California pursuant to 28 U.S.C. §
1391(b).

2.    This case has been certified as a class action for purposes of all claims
against State Defendants on behalf of a class of children in California who:

    (a)   Are in foster care or are at imminent risk of foster care placement,
and

    (b)   Have a mental illness or condition that has been documented or, had
an assessment already been conducted, would have been documented, and

(c)    Who need individualized mental health services, including but not limited to professionally acceptable assessments, behavioral support and case management services, family support, crisis support, therapeutic foster care, and other medically necessary services in the home or in a home-like setting, to treat or ameliorate their illness or condition."

For the purposes of this case, "imminent risk of foster care placement" means that within the last 180 days a child has been participating in voluntary family maintenance services or voluntary family reunification placements and/or has been the subject of either a telephone call to the Child Protective Services hotline or some other documented communication made to a local Child Protective Services agency regarding suspicions of abuse, neglect or abandonment.

3.    Judgment is entered pursuant to the terms of the Settlement Agreement incorporated herein, as though fully set forth, and attached as Exhibit A to this Judgment.

4.    The Court orders the parties to the Settlement Agreement to perform all of their obligations thereunder.

5.    The Court will retain jurisdiction over this lawsuit until 36 months after court approval of the Settlement Agreement, at which time the Court's jurisdiction will expire.  Pursuant to Paragraph 30 of the Settlement Agreement, this expiration of jurisdiction shall not be extended, for any reason, beyond the 36-month period following approval of the Settlement Agreement.

6.    Pursuant to Paragraph 15 of the Settlement Agreement, the Settlement Agreement settles all claims against the State Defendants in this lawsuit.

7.     The Court finds that no just reason exists for delay in entering this Judgment pursuant to the Settlement Agreement.  Accordingly, the Clerk is hereby directed to enter his Final Judgment.

8.     This Judgment is binding against State Defendants, their successors in office, CDHCS, CDSS, CDMH[2], the respective officers, agents and employees of these state agencies.

9.     The Court will subsequently dismiss this lawsuit against the State Defendants in accordance with the terms of the Settlement Agreement.

Dated _____, 2011

_____

A. Howard Matz

United States District Judge

---

[2] Because of the possible restructuring of CDMH, at this time it is uncertain as to whether CDMH will be the State agency responsible for performing the obligations assigned to CDMH pursuant to this Agreement.  State Defendants agree that the State will perform CDMH's obligations under this Agreement.

**APPENDIX "B"**

**Core Practice Model**

The Core Practice Model, which would be utilized by all agencies or individuals who serve class members and their families, adheres to a prescribed set of family centered values and principles that are driven by a definable process.  The Core Practice Model values and principles are summarized as follows:

- Services are needs-driven, strengths-based, and family-focused from the first conversation with or about the family.
- Services are individualized and tailored to the strengths and needs of each child and family.
- Services are delivered through a multi-agency collaborative approach that is grounded in a strong community base.
- Family voice, choice, and preference are assured throughout the process.
- Services incorporate a blend of formal and informal resources designed to assist families with successful transitions that ensure long-term success.
- Services are culturally competent and respectful of the culture of the children and their families.
- Services and supports are provided in the child and family's community.
- Children are first and foremost protected from abuse and neglect and maintained safely in their own homes.
- Children have permanency and stability in their living situations.

In order to benefit from the full array of services they need, at whatever level appropriate and necessary to meet their needs, class members will be best served through five key practice components that are organized and delivered in the context of an overall child and family plan. These five components include the following:

- *Engagement*:  Engaging families is the foundation to building trusting and mutually beneficial relationships between family members, team members, and service providers. Agencies involved with the child and family work to reach agreement about services, safety, well-being (meeting attachment and other developmental needs, health, education, and mental health), and permanency.
- *Assessing*:  Information gathering and assessing needs is the practice of gathering and evaluating information about the child and family, which includes gathering and assessing strengths as well as assessing the underlying needs.  Assessing also includes determining the capability, willingness, and availability of resources for achieving safety, permanence, and well-being of children.
- *Service Planning and Implementation*:  Service planning is the practice of tailoring supports and services unique to each child and family to address unmet needs.  The plan specifies the goals, roles, strategies, resources, and timeframes for coordinated implementation of supports and services for the child, family, and caregivers.

- *Monitoring and Adapting*:  Monitoring and adapting is the practice of evaluating the effectiveness of the plan, assessing circumstances and resources, and reworking the plan as needed.  The team is responsible for reassessing the needs, applying knowledge gained through ongoing assessments, and adapting the plan in a timely manner.
- *Transition*:  The successful transition away from formal supports can occur when informal supports are in place and providing the support and activities needed to ensure long-term stability.

<u>Child and Family Team</u>:  The Work Group has also reached consensus that a subset of Katie A class members need a more intensive approach and service delivery to address their array of needs and strengths, and that this subset would best be served through a formally organized *Child and Family Team*.

In those instances where intensive or complex needs are identified, a formal Child and Family Team would be created to serve as the primary vehicle delivering services in accord with the Core Practice Model in order to bring significant individual team members together to help the family develop a plan of care that addresses their needs and strengths.  The principle role of the Child and Family team would be as follows:

- The Child and Family Team (CFT) assembles as a group of caring individuals to work with and support the child and family and, in addition to the various agency and provider staff involved in service delivery to the family, includes at a minimum a facilitator and a family support partner or family specialist for youth.
- Team facilitation can be done by a mental health provider, social worker, or probation officer.  The facilitator maintains a committed team and is qualified with the necessary skills to bring resources to the table in support of the child and family.
- An effective CFT continues the process of engagement with the family and or caregivers about their strengths and needs, ensures services are well coordinated, and provides a process for transparent communication.

**APPENDIX "C"**

**The Child And Family Team**

<u>Child and Family Team:</u>  The Work Group has also reached consensus that a subset of Katie A class members need a more intensive approach and service delivery to address their array of needs and strengths, and that this subset would best be served through a formally organized *Child and Family Team.*

In those instances where intensive or complex needs are identified, a formal Child and Family Team would be created to serve as the primary vehicle delivering services in accord with the Core Practice Model in order to bring significant individual team members together to help the family develop a plan of care that addresses their needs and strengths.  The principle role of the Child and Family team would be as follows:

- The Child and Family Team (CFT) assembles as a group of caring individuals to work with and support the child and family and, in addition to the various agency and provider staff involved in service delivery to the family, includes at a minimum a facilitator and a family support partner or family specialist for youth.
- Team facilitation can be done by a mental health provider, social worker, or probation officer.  The facilitator maintains a committed team and is qualified with the necessary skills to bring resources to the table in support of the child and family.
- An effective CFT continues the process of engagement with the family and or caregivers about their strengths and needs, ensures services are well coordinated, and provides a process for transparent communication.

## APPENDIX "D"

### Intensive Home-Based Mental Health Services

Intensive Home-Based Services (IHBS) are individualized, strength-based interventions designed to ameliorate mental health conditions that interfere with a child's functioning.  Interventions are aimed at helping the child build skills necessary for successful functioning in the home and community and improving the child's family's ability to help the youth successfully function in the home and community.

IHBS are delivered according to an individualized treatment plan developed by a care planning team (see Intensive Care Coordination).  The care planning team develops goals and objectives for all life domains in which the child's mental health condition produces impaired functioning, including family life, community life, education, vocation, and independent living, and identifies the specific interventions that will be implemented to meet those goals and objectives.  The goals and objectives should seek to maximize the child's ability to live and participate in the community and to function independently, including through building social, communication, behavioral, and basic living skills.  Providers of intensive home-based services should engage the child in community activities where the child has an opportunity to work towards identified goals and objectives in a natural setting.  Phone contact and consultation may be provided as part of the service.

IHBS includes, but is not limited to:

- Educating the child's family about, and training the family in managing, the child's disorder;
- Medically necessary skill-based remediation of behaviors, including developing and implementing a behavioral plan with positive behavioral supports and modeling for the child's family and others how to implement behavioral strategies;
- Improving self-care, including by addressing behaviors and social skills deficits that interfere with daily living tasks and with avoiding exploitation by others;
- Improving self-management of symptoms, including assisting with self-administration of medications;
- Improving social decorum, including by addressing social skills deficits and anger management;
- Supporting the development and maintenance of social support networks and the use of community resources;
- Supporting employment objectives, by identifying and addressing behaviors that interfere with seeking and maintaining a job;
- Supporting educational objectives, through identifying and addressing behaviors that interfere with succeeding in an academic program in the community; and
- Supporting independent living objectives, by identifying and addressing behaviors that interfere with seeking and maintaining housing and living independently.

IHBS are highly effective in preventing a child being removed from home (biological, foster, or adoptive) through admission to an inpatient hospital, residential treatment facility or other residential treatment setting.

*Settings*: IHBS may be provided in any setting where the child is naturally located, including the home (biological, foster or adoptive), schools, recreational settings, child care centers, and other community settings. *Availability:* IBHS are available wherever and whenever needed, including in evenings and on weekends.  *Providers:* IHBS are typically provided by paraprofessionals under clinical supervision.  Peers, including parent partners, may provide IHBS.  More complex cases may require service delivery by a clinician rather than a paraprofessional.

## APPENDIX "E"

### Intensive Care Coordination

Intensive Care Coordination (ICC) is a service that is responsible for facilitating assessment, care planning and coordination of services, including urgent services [for children/ youth who meet the *Katie A.* class criteria].

Intensive Care Coordination (ICC) provides:

- A single point of accountability for ensuring that medically necessary services are accessed, coordinated, and delivered in a strength-based, individualized, family/youth-driven, and culturally, and linguistically relevant manner;
- Services and supports that are guided by the needs of the youth;
- Facilitation of a collaborative relationship among a youth, his/her family and involved child-serving systems;
- Support the parent/caregiver in meeting their youth's needs;
- A care planning process ensures that a care coordinator organizes and matches care across providers and child serving systems to allow the youth to be served in their home community; and
- Facilitated development of the Child and Family Planning Team (CFT).[3]

*ICC service components consists of:*

**Assessment:** The CFT completes a strength-based, needs driven, comprehensive assessment to organize and guide the development of an Individual Care Plan (ICP) and a risk management/safety plan.   The assessment process determines the needs of the youth for any medical, educational, social, mental health, or other services. ICC may also include the planning and coordination of urgent needs before the comprehensive assessment is completed. The initial assessment will be reviewed as necessary, but at least every 90 days.

**Planning: Development of an Individual Care Plan:** Using the information collected through an assessment, the care coordinator convenes and facilitates the CFT meetings and the CFT develops a child- and family-centered Individual Care Plan (ICP) that specifies the goals and actions to address the medical, educational, social, mental health, or other services needed by the youth and family.  The care coordinator works directly with the youth, the family and others significant to the child to identify strengths and needs of the youth and family, and to develop a plan for meeting those needs and goals.

**Referral, monitoring and related activities:**

- works directly with the youth and family to implement elements of the ICP;
- prepares, monitors, and modifies the ICP in concert with the CFT;  to determine whether services are being provided in accordance with the ICP;  whether services in the ICP are adequate; and whether these are changes in the needs or status of the youth and if so, adjusting the plan of care as necessary, in concert with the CFT;

---

[3] The CFT includes, as appropriate, both formal supports, such as the care coordinator, providers, case managers from child-serving agencies, and natural supports, such as family members, neighbors, friends, and clergy.

- will identify, actively assist the youth and family to obtain and monitor the delivery of available services including medical, educational, mental health, social, therapeutic, or other services.

**Transition:**
- develops with the CFT a transition plan when the youth has achieved goals of the ICP; and
- collaborates with the other service providers and agencies on the behalf of the youth and family.

*Settings*

ICC may be provided to children living and receiving services in the community (including in TFC) as well as to children who are currently in a hospital, group home, or other congregate or institutional placement as part of discharge planning.