1  LOUIS R. MILLER (State Bar No. 54141)
   smiller@millerbarondess.com
2  BRIAN A. PROCEL (State Bar No. 218657)
   bprocel@millerbarondess.com
3  DAVID W. SCHECTER (State Bar No. 296251)
   dschecter@millerbarondess.com
4  MILLER BARONDESS, LLP
   1999 Avenue of the Stars, Suite 1000
5  Los Angeles, California 90067
   Tel.:  (310) 552-4400 / Fax:  (310) 552-8400
6
7  MARY C. WICKHAM (State Bar No. 145664)
   mwickham@counsel.lacounty.gov
8  VICKI KOZIKOUJEKIAN (State Bar No. 171588)
   vkozikoujekian@counsel.lacounty.gov
9  LAURA QUINONEZ (State Bar No. 253862)
   lquinonez@counsel.lacounty.gov
10 OFFICE OF LOS ANGELES COUNTY COUNSEL
   Kenneth Hahn Hall of Administration
11 500 West Temple Street, Suite 648
   Los Angeles, California 90012
12 Tel.:  (213) 974-1811 / Fax:  (213) 626-7446
13
14 Attorneys for The County Defendants
15

16 **UNITED STATES DISTRICT COURT**

17 **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

18 | KATIE A., et al., | **CASE NO. 2:02-cv-05662-JAK-FFMx** |
   |---|---|
19 |           Plaintiffs, | **DEFENDANTS' MOTION TO** |
20 |     | **VACATE 2003 CONSENT DECREE** |
   |     v. | **PURSUANT TO FEDERAL RULE** |
21 |     | **OF CIVIL PROCEDURE 60(b)(5)** |
22 | DIANA BONTA, et al., | Hearing Date:  December 9, 2019 |
23 |           Defendants. | Time:            8:30 a.m. |
24 |     | Assigned to the Hon. John A. Kronstadt |
25 |     | and Magistrate Judge Frederick F. Mumm |
26
27
28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

435743.3

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that, on December 9, 2019, at 8:30 a.m., or as soon thereafter as counsel may be heard, in Courtroom 10B of the above-entitled Court, located at First Street Courthouse, 350 West First Street, Los Angeles, California 90012, before the Honorable John A. Kronstadt, Defendants Los Angeles County ("County"), the Los Angeles County Department of Children and Family Services ("DCFS") and the Director of DCFS (together, the "County Defendants"), through their counsel, will and hereby do move this Court (the "Motion"), pursuant to Federal Rule of Civil Procedure 60(b)(5), to vacate the July 16, 2003 Order and accompanying Settlement Agreement (ECF Dkt. No. 128 (the "2003 Consent Decree").)

The basis for the Motion is that there are no ongoing violations of federal law that could support continued enforcement of the 2003 Consent Decree.  In institutional reform litigation, like this case, the Court must "ascertain whether ongoing enforcement of the original order [is] supported by an ongoing violation of federal law . . . ." *Horne v. Flores*, 557 U.S. 433, 454 (2009).

It has been over 16 years since the 2003 Consent Decree was entered.  Since then, the County Defendants have spent billions of dollars on the Plaintiff class, hired thousands of new social workers, mental health professionals and support staff, and implemented new programs to ensure that the Plaintiff class receive the mental health services that they need.  To the extent they ever existed, the alleged violations of the Medicaid Act, the Americans with Disabilities Act, the Rehabilitation Act and the Substantive Due Process Clause of the Fourteenth Amendment to the U.S. Constitution have been remedied.

This Motion is supported by this Notice of Motion, the accompanying Memorandum of Points and Authorities, the Declarations of Bobby D. Cagle, Dr. Jonathan E. Sherin, Helen Berberian, Anabel Rodriguez, Adrienne Olson, Olivia Celis, Dr. Jay Bartroff, Tina Binda, Mirian Avalos, David Seidenfeld, Laura Andrade and exhibits attached thereto, the papers, pleadings and other records on file in this action,

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  and such further evidence and argument as may be presented at or before the hearing on

2  this Motion.

3

4  DATED:  August 26, 2019          MILLER BARONDESS, LLP

5

6

7                                  By:  _____/s/ Louis R. Miller_____

8                                       LOUIS R. MILLER
                                        Attorneys for The County Defendants

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

## **TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ...............................................................................8

II.  STATEMENT OF FACTS AND PROCEDURAL HISTORY ...................... 10

  A.  The Los Angeles County Foster Care System ..................................... 10

  B.  This Lawsuit .................................................................................. 11

  C.  The Plaintiffs And County Defendants Reach An Early Settlement ....................................................................................... 12

  D.  The County Fundamentally Reforms Its Foster Case System .............. 13

  E.  The County Defendants' Reform Efforts Have Been Successful......... 15

  F.  The Current Dispute ....................................................................... 17

III.  LEGAL STANDARDS ...................................................................... 18

IV.  ARGUMENT ................................................................................... 20

  A.  *Horne* Requires Vacatur Here ......................................................... 20

  B.  There Is No Federal Law Violation ................................................... 23

    1.  There Is No Custom, Policy, Or Practice To Violate Medicaid ............................................................................. 23

      (a)  The County's Screening Exceeds Federal Standards....... 24

      (b)  The County Provides Services Promptly ....................... 24

      (c)  The County Offers A Panoply Of Programs ................... 26

    2.  The County Defendants Comply With The ADA And RA........ 28

    3.  There Is No Custom, Policy Or Practice That Violates The Fourteenth Amendment To The Constitution........................... 29

  C.  The Reforms To The Foster Care System Are Permanent ................... 30

V.  CONCLUSION ................................................................................ 32

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Alexander A. ex rel. Barr v. Novello,*
210 F.R.D. 27 (E.D.N.Y. 2002) ......................................................25

*Alexander v. Choate,*
469 U.S. 287 (1985) ......................................................................29

*All. for Wild Rockies v. Kruger,*
15 F. Supp. 3d 1052 (D. Mont. 2014),
*aff'd sub nom., All. for the Wild Rockies v. Krueger,*
664 F. App'x 674 (9th Cir. 2016)....................................................19

*Boulet v. Cellucci,*
107 F. Supp. 2d 61 (D. Mass. 2000) .............................................25

*Burt v. County of Contra Costa,*
2014 WL 253010 (N.D. Cal. Jan. 22, 2014) ................19, 20, 21, 30

*C.F. v. Lashway,*
2017 WL 2806835 (W.D. Wash. June 29, 2017)...........................25

*Castro v. County of Los Angeles,*
833 F.3d 1060 (9th Cir. 2016) ......................................................30

*Chisholm ex rel. CC v. Gee,*
2017 WL 3730514 (E.D. La. Aug. 30, 2017) ................................25

*Does 1-13 by and Through Doe, Sr. 1-13 v. Chiles,*
136 F.3d 709 (11th Cir. 1998)......................................................25

*Flores v. Arizona,*
2013 WL 10207656 (D. Ariz. Mar. 29, 2013) ...............................22

*Flores v. Huppenthal,*
789 F.3d 994 (9th Cir. 2015)........................................................22

*Frew v. Hawkins,*
540 U.S. 431 (2004) .....................................................................19

*Horne v. Flores,*
557 U.S. 433 (2009) ...............................................................passim

*Hunsaker v. Contra Costa County,*
149 F.3d 1041 (9th Cir. 1998).......................................................29

*Jackson v. Los Lunas Cmty. Program,*
880 F.3d 1176 (10th Cir. 2018)................................................19, 30

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

*John B. v. Emkes,*
    710 F.3d 394 (6th Cir. 2013).................................................................18, 19, 24

*Kadingo v. Johnson,*
    2017 WL 3478494 (D. Colo. Aug. 14, 2017) ...................................................23

*Katie A., ex rel. Ludin v. Los Angeles County,*
    481 F.3d 1150 (9th Cir. 2007)........................................22, 26, 27, 31

*Lipscomb By & Through DeFehr v. Simmons,*
    962 F.2d 1374 (9th Cir. 1992) ..........................................................................29

*Los Angeles County v. Humphries,*
    562 U.S. 29 (2010) ............................................................................................23

*Mark H. v. Lemahieu,*
    513 F.3d 922 (9th Cir. 2008) ............................................................................28

*Missouri v. Jenkins,*
    515 U.S. 70 (1995) ............................................................................................21

*Monell v. Dep't of Soc. Servs. of City of New York,*
    436 U.S. 658 (1978) ..........................................................................................23

*Okla. Chapter of Am. Acad. of Pediatrics v. Fogarty,*
    366 F. Supp. 2d 1050 (N.D. Okla. 2005) .........................................................28

*Olmstead v. L.C. ex rel. Zimring,*
    527 U.S. 581 (1999) ..........................................................................................28

*Rosie D. v. Romney,*
    410 F. Supp. 2d 18 (D. Mass. 2006) ................................................................28

*Rufo v. Inmates of Suffolk Cty. Jail,*
    502 U.S. 367 (1992) ....................................................................................18, 30

*Salazar v. District of Columbia,*
    954 F. Supp. 278 (D.D.C. 1996) ......................................................................24

*Tamas v. Dep't of Soc. & Health Servs.,*
    630 F.3d 833 (9th Cir. 2010).............................................................................30

*Watson v. Weeks,*
    436 F.3d 1152 (9th Cir. 2006) ..........................................................................26

## FEDERAL STATUTES

29 U.S.C. §§ 701 *et seq.* ........................................................................................12

42 U.S.C. § 12132....................................................................................................12

42 U.S.C. § 1983.............................................................................................8, 23, 30

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

42 U.S.C. §§ 1396 *et seq.* ........................................................................................12

42 U.S.C. 1396a(a)(8).................................................................................................24

**<u>FEDERAL RULES</u>**

Fed. R. Civ. P. 60......................................................................................................18

Fed. R. Civ. P. 60(b) ...........................................................................................18, 19

**<u>FEDERAL REGULATIONS</u>**

42 C.F.R. § 435.911...................................................................................................25

42 C.F.R. § 441.56(e) ................................................................................................25

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  **MEMORANDUM OF POINTS AND AUTHORITIES**

2  **I.  INTRODUCTION**

3      Over 17 years ago, Plaintiffs filed this lawsuit alleging that children in Los

4  Angeles County's foster care system who had mental health needs were not being

5  screened or assessed, were not receiving necessary mental health services, and were

6  being "warehoused" in institutions and group homes, such as the MacLaren Children's

7  Center ("MacLaren"). Plaintiffs' principal claim, asserted under 42 U.S.C. § 1983, was

8  that the County "maintained customs, policies, and practices that deprive Plaintiffs" of

9  their right to EPSDT services under Medicaid. Plaintiffs also alleged violations of the

10  Americans with Disabilities Act, the Rehabilitation Act and the 14th Amendment.

11      Without admitting liability, the County Defendants settled in July 2003 shortly

12  after Plaintiffs filed their First Amended Complaint and shut down MacLaren shortly

13  thereafter. Over the next five years, the County Defendants worked with this Court, the

14  Katie A. Advisory Panel, Plaintiffs' counsel, and a third-party consultant to develop

15  new policies and reforms that were then incorporated into a 2008 Strategic Plan

16  approved by this Court.

17      Since 2008, the County Defendants have spent over $2 billion just on

18  implementing the Strategic Plan for the benefit of the Plaintiff class. These funds were

19  deployed (1) to hire thousands more social workers, mental health professionals and

20  support staff, (2) to create new mental health programs and expand existing programs to

21  serve more children in need, and (3) to train and coach DMH and DCFS staff on best

22  practices in the delivery of child welfare and mental health services to foster youth.

23      The reforms were comprehensive and have benefitted abused and neglected

24  children in Los Angeles County. Today, every child with a substantiated allegation of

25  abuse or neglect receives a mental health screen even if they are not a class member.

26  For those children who need mental health treatment, the County and its contracted

27  mental health providers offer a wide variety of individualized services and field-based

28  intensive mental health programs that can be tailored to the child's needs.

435743.3

**8**

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1   In addition to these mental health reforms, the County Defendants have made

2   great strides in reducing the number of children and young adults in group homes.

3   Today, the group home population is about 10% of what it was when this lawsuit was

4   filed, and the County Defendants expect all foster youth will be transitioned out of

5   group homes by the end of this year.

6       The County's reforms have been institutionalized and have helped to change the

7   culture of DCFS and DMH.  The County's reforms served as a model for the California

8   legislature when it enacted comprehensive legislation in 2015 to reform foster care

9   statewide.  Pursuant to these laws, referred to as the Continuum of Care Reform

10  ("CCR"), all counties must eliminate the use of traditional group homes and implement

11  a core practice model like that implemented in Los Angeles County.

12      But Plaintiffs and the Katie A. Advisory Panel do not want this case to end.

13  They value their direct access to top-level officials who operate some of the largest

14  child welfare and mental health county departments in the nation.  Unfortunately, the

15  continued involvement of the Katie A. Advisory Panel and Plaintiffs' counsel has

16  become counterproductive.

17      Perhaps the best example of this is the Qualitative Service Review ("QSR"),

18  which the Katie A. Advisory Panel recommended as a qualitative measure of the

19  services provided by DCFS and DMH.  The County has expended considerable

20  resources in an effort to pass QSR, but the QSR has not captured the progress that has

21  been made.  This inability-to-pass feature appears to be baked into the system, as other

22  child welfare agencies in other litigations were not able to pass yet were permitted to

23  exit.  Importantly for this Motion, the QSR is not part of, or required by, federal law.

24      As the Supreme Court has explained, Rule 60(b)(5) serves a critical function in

25  institutional reform cases involving state and local governments.  Due to federalism

26  concerns, federal courts cannot exercise ongoing jurisdiction unless there exists an

27  ongoing violation of federal law.  This is the central question presented by the Motion.

28      Regardless of whether there were "customs, policies, or practices" in 2002 that

1    deprived Plaintiffs of the services they were entitled to under Medicaid, there is no such

2    custom, policy, or practice today. The evidence shows that, today, foster youth in Los

3    Angeles County who are Medicaid-eligible receive the EPSDT services that they are

4    entitled to under federal law. Foster youth receive appropriate and timely mental health

5    screens, comprehensive mental health assessments, and mental health treatment that is

6    based on their mental health needs.

7        There are no class-wide violations of the Americans with Disabilities Act or the

8    Rehabilitation Act either. The County does not deny treatment on account of mental

9    health disability. In fact, the County offers a wide variety of mental health services and

10   intensive mental health programs that can be tailored to the needs of the child. The

11   County Defendants also do not place children in segregated settings (i.e., congregate

12   care) except under exceptional circumstances and only in short-term facilities that are

13   permissible under the Rehabilitation Act and state law.

14       When there are no ongoing violations of federal law, as is the case here, the

15   federal court must dismiss the case if the evidence shows that the defendant's reform

16   efforts are durable. This standard is easily satisfied here because the County is deeply

17   committed to its reforms, and those reforms are now institutionalized and thus will

18   continue without judicial supervision. In addition, the principal obligations that the

19   County Defendants agreed to, and many of the requirements that the Katie A. Advisory

20   Panel has imposed upon the County Defendants in this case, are now required by state

21   law through the CCR. There simply is nothing left for this Court to oversee.

22   **II.    STATEMENT OF FACTS AND PROCEDURAL HISTORY**

23       **A.    The Los Angeles County Foster Care System**

24       The Los Angeles County Department of Children and Family Services ("DCFS")

25   is one of the largest public child welfare agencies in the country. (Declaration of Helen

26   Berberian ("Berberian Decl.") ¶ 10.) Its mission is to protect the welfare of children

27   and young adults in Los Angeles County. (*Id.* ¶ 11.)

28       With an annual budget of $2.7 billion, DCFS is responsible for investigating over

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1   225,000 reports of child abuse and neglect each year.  (*Id.* ¶¶ 10-13.)  In 2018, DCFS

2   provided child welfare services to over 50,000 children with substantiated allegations of

3   abuse or neglect.  (*Id.* ¶ 13.)  To fulfill these responsibilities, DCFS employs a staff of

4   over 8,600, including approximately 4,250 children's social workers.  (*Id.* ¶¶ 10, 113.)[1]

5          The Los Angeles County Department of Mental Health ("DMH"), with an annual

6   budget of about $2.4 billion, is the largest county-operated mental health department in

7   the United States.  (Declaration of Anabel Rodriguez ("Rodriguez Decl.") ¶ 15.)  DMH

8   operates mental health programs in more than 85 cities and provides mental health

9   services through contract programs and DMH staff at approximately 300 sites co-

10  located with other County departments, schools, courts and various organizations.  (*Id.*

11  ¶ 16.)  Each year, DMH contracts with almost 1,000 organizations and practitioners to

12  provide mental health-related services.  (*Id.* ¶ 17.)  On average, DMH services more

13  than 250,000 County residents of all ages every year.  (*Id.*)

14       **B.    <u>This Lawsuit</u>**

15         In 2002, Plaintiffs filed a lawsuit on behalf of themselves and a putative class of

16  children and young adults in Los Angeles County who (1) were in foster care or were at

17  imminent risk of foster care placement, (2) had a behavioral, emotional or

18  psychological impairment and (3) needed individualized mental health services.  (FAC

19  ¶ 37.)  Plaintiffs alleged that the County Defendants failed to provide comprehensive

20  mental health assessments and mental health services appropriate to meet their needs.

21  (*Id.* ¶¶ 4, 47.)  They alleged that, instead of developing necessary mental health

22  programs, the County Defendants improperly relied on out-of-home, geographically

23  remote, institutions to place children.  (*Id.* ¶ 49.)  In particular, Plaintiffs alleged that

24  the County Defendants improperly relied on congregate care, such as the MacLaren

25  Children's Center ("MacLaren"), as a long-term group home option.  (*Id.* ¶¶ 4, 5, 47,

26  _____

27  [1] The Berberian Declaration explains how children and young adults enter the foster
    care system, and the various services and programs DCFS provides to foster youth,
28  their families and caregivers today.  (*Id.* ¶¶ 9-32.)

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

49.)  MacLaren, which, according to Plaintiffs, had a "sordid history of difficulties and controversies"—came to "epitomize" the County Defendants' "dysfunctional approach towards caring for children with serious mental health needs." (*Id.* ¶ 50.)

Based on these allegations, Plaintiffs asserted three federal law violations against the County Defendants and the directors of two state agencies.  First, Plaintiffs alleged violations of section 1983 based on "customs, policies, and practices" denying Medicaid-eligible children with Early and Periodic Screening, Diagnostic Treatment ("EPSDT") services required by the Medicaid Act, 42 U.S.C. §§ 1396 *et seq.* ("Medicaid"). (*Id.* ¶ 76.)  Second, Plaintiffs alleged violations of section 1983 based on "customs, policies, and practices" denying medically necessary mental health services in violation of their rights under the Substantive Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.   (*Id.* ¶ 79.)   Third, Plaintiffs alleged discrimination on account of mental health disabilities and denial of integrated services in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and the Rehabilitation Act ("RA"), 29 U.S.C. §§ 701 *et seq.* (*Id.* ¶¶ 83-84.)

## C.   <u>The Plaintiffs And County Defendants Reach An Early Settlement</u>

Plaintiffs and the County Defendants settled about six months after Plaintiffs filed their FAC.  (ECF Dkt. No. 128 at 6 (the "Settlement Agreement").)  In the Settlement Agreement, the County Defendants denied liability, but recognized that continued reform of the child welfare system and the best interests of the Plaintiff class would be substantially advanced by the "novel and innovative" resolution reflected in the agreement rather than protracted and costly litigation. (Settlement Agreement at 1.)

The Settlement Agreement obligated the County Defendants to undertake specific reforms, which included closing MacLaren permanently. (*Id.* at 4.)  The Settlement Agreement also obligated the County Defendants to implement a plan or series of plans that would fulfill the objectives of the agreement. (*Id.*)  The County Defendants agreed to create and pay for an advisory panel (the "Katie A. Advisory Panel") to assist with the development of plans to reform its child welfare system. (*Id.*

Miller Barondess, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

at 6-8.)

On July 16, 2003, the Court approved the Settlement Agreement as fair, reasonable and adequate, and the Court retained jurisdiction to enforce its terms. (ECF Dkt. No. 128 (the "2003 Consent Decree").)[2]

## D.    The County Fundamentally Reforms Its Foster Case System

Within three months of settlement, the County Defendants closed MacLaren permanently and diverted resources previously used to maintain the facility towards developing new plans to improve child welfare services and expand mental health services for foster youth. (Declaration of Adrienne Olson ("Olson Decl.") ¶¶ 24-25.)

From 2003 to 2008, the County Defendants implemented a series of reforms to the child welfare system. (*Id.* ¶¶ 22-23, 28, 45; Declaration of Olivia Celis ("Celis Decl.") ¶¶ 16-18.) Their policy initiatives were reviewed and assessed by the Court, the Katie A. Advisory Panel, and a third-party consultant hired by the County, whose guidance and recommendations the County Defendants incorporated into a comprehensive plan for reform titled the 2008 Katie A. Strategic Plan (the "Strategic Plan").

The Strategic Plan was "the product of extensive discussion amongst the parties," and the Plaintiffs and Katie A. Advisory Panel supported it. (ECF Dkt. No. 688.) Plaintiffs agreed that the Strategic Plan was consistent with the County Defendants' obligations in the 2003 Consent Decree. (*Id.*; *see also* ECF Dkt. No. 773 at 2.) The Court approved the Strategic Plan on August 10, 2009. (ECF Dkt. No. 689.)

Beginning June 2008, the County Defendants expended considerable time and resources towards implementing the Strategic Plan, spending over $2 billion just on Katie A. initiatives. (Declaration of David Seidenfeld ("Seidenfeld Decl.") ¶ 4.) As a

---

[2] The Court also certified a plaintiff class, which was later amended by stipulation of the parties, to include children and young adults who:  (1) are in the custody of DCFS in foster care or who are at imminent risk of foster care placement; (2) are eligible for EPSDT services; (3) have a mental illness or condition that is documented or, had an assessment been completed, could have been documented; and (4) need individualized mental health services.  (ECF Dkt. No. 149.)

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

result of this commitment, the County has successfully implemented the Strategic Plan:

- The County Defendants created multidisciplinary Medical Hubs in all DCFS Service Planning areas, funded by DCFS, to provide comprehensive medical exams to children shortly after being assigned a social worker. The Katie A. Advisory Panel has commended the County Defendants for continuing to improve "on what was already good performance in referring newly detained children to a Medical Hub." (ECF Dkt. No. 942 at 62.)

- Medicaid-eligible children newly removed from the home are now assigned a Multidisciplinary Assessment Team ("MAT") who performs a comprehensive wellness assessment, including mental health. In 2018, between 95% and 100% of all MAT-eligible children were assessed. (Berberian Decl., Ex. H at 45.)

- Children who remain in the home (and thus are not MAT-eligible) are given an initial screening directly by the social worker using the County's Mental Health Screening Tool ("MHST"). Virtually 100% of eligible children received a MHST screen in 2018. (Berberian Decl. ¶ 71.)

- The County Defendants expanded the Specialized Foster Care ("SFC") program, co-locating DMH mental health professionals in all DCFS regional offices to conduct a comprehensive wellness assessment of children who screened positive on an MHST. This program conducted over 16,000 mental health assessments just for Katie A. class members in 2018. (Rodriguez Decl. ¶¶ 19-22.)

- The County Defendants created Coordinated Services Action Teams ("CSATs") co-located in all DCFS regional offices to assist social workers in linking children to appropriate services and programs. (Olson Decl. ¶¶ 81, 119.)

- The County Defendants created a Universal Referral Form to simplify the referral process. (Olson Decl. ¶ 83; Celis Decl. ¶ 20.)

- The County Defendants implemented a Referral Tracking System ("RTS") in every regional DCFS office so that DCFS social workers and DMH mental health professionals can track cases as they migrate through the county's system to ensure timely and appropriate provision of services. (Olson Decl. ¶¶ 82, 116.)

- The County Defendants expanded Wraparound and other intensive mental health programs from 1,400 to over 4,200 slots tailored to the individualized need of each child referred for intensive services. (Rodriguez Decl. ¶¶ 35-36, Ex. A.)

- The County Defendants adopted and implemented the Shared Core Practice Model ("SCPM")— a best practices approach recommended by the Katie A. Advisory Panel for the delivery of child welfare and mental health services— as the County's governing practice manual. (Olson Decl. ¶ 92.)

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

The County Defendants have even gone beyond the reforms they agreed to implement in the Strategic Plan. For example, the County has agreed to provide a Child and Family Team ("CFT") meeting to all children with an open DCFS case regardless of whether the child needs mental health services. (*Compare* Olson Decl. ¶ 91 (in the Strategic Plan, the County only agreed to provide CFT meetings to children in Wraparound) *with* Berberian Decl. ¶ 135 (now, the County has implemented a formal policy to provide CFT meetings to all children with an open DCFS case).) In addition, the County has implemented policies to transition all children out of traditional group homes and to stop using such facilities. (*Compare* Olson Decl., Ex. C (the Strategic Plan did not require the elimination of group homes) *with* Berberian Decl. ¶¶ 56-57 (the County will soon transition all children out of traditional group homes).)

Further, the County has created new mental health programs not required by the Strategic Plan that are designed specifically to treat foster youth who need intensive, mental health services in the home or a home-like setting. The leading such new program is Intensive Field Capable Clinical Services ("IFCCS"), which provides individual and family therapy, vocational and education referrals, case management, trauma-informed services, and community resources to children who have had difficulties maintaining a stable placement for an extended period of time. (Rodriguez Decl. ¶¶ 44-46, Ex. C.) The County now offers 765 slots in IFCCS. (*Id.* ¶ 47.)

### E.   The County Defendants' Reform Efforts Have Been Successful

When this lawsuit was filed, Plaintiffs alleged that they were denied necessary mental health screens and assessments. Today, the County Defendants have ensured that virtually all children who have an open DCFS case are screened and assessed for mental health needs. (Berberian Decl. ¶ 66.) In addition, *all* Plaintiff class members received some form of mental health service in 2018. (Rodriguez Decl. ¶ 33; Berberian Decl., Ex. H at 7.)

The County Defendants have also made considerable progress in reducing group home placements. (Berberian Decl. ¶¶ 42-43.) When this lawsuit was filed, there were

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

15

approximately 2,150 children who were placed in a traditional group home, many of whom were under the age of 12.  (Berberian Decl. ¶ 43; ECF Dkt. No. 499 ¶ 37.) Today, only 265 children are placed in traditional group homes.  (Berberian Decl. ¶ 43.)

The County Defendants have also greatly improved placement stability.  When this lawsuit was filed, Plaintiffs alleged that they were subjected to multiple placements at a very young age.  (FAC ¶¶ 12, 18, 23, 27, 52-53.)  Some of the Plaintiffs alleged that they experienced more than 20 placements.  (*Id.* ¶¶ 12, 18, 23, 52.)  Today, the average number of placements for a child in foster care is 2.84 moves per 1,000 days in out-of-home care.  (Berberian Decl., Ex. H at 71.)  This is well below the national standard of 4.12.  (*Id.*)

The County Defendants have coupled their closure of group homes with a concomitant increase in placement of foster youth with family members.  When this lawsuit was filed, Plaintiffs alleged that they were removed from their families, frequently institutionalized and placed in geographically remote areas.  (FAC ¶ 49.)

The County Defendants have also significantly reduced caseloads for social workers.  When this lawsuit was filed, it was typical for emergency response social workers to have 30-40 cases and Family Maintenance & Reunification social workers, which is similar to the continuing services position today, to have upwards of 40 cases. (Olson Decl. ¶¶ 12, 15.)  Today, the average caseload for an emergency response social worker is about 16 cases, and the average caseload for a continuing services social worker is about 24 cases.  (Berberian Decl., ¶¶ 115-116, Ex. H at 40-41.)

The County Defendants have even exceeded the Advisory Panel's own estimates of the Plaintiff class's mental health needs.  Under the Strategic Plan, "[t]he County and the Panel have agreed, for planning purposes, that approximately half of the identified Katie A. class members will require mental health services and that one in three of those [*i.e.*, 16.66%] will need an intensive level of mental health services."  (ECF Dkt. No. 688 at 25.)  In 2018, all 23,370 of the Katie A. class (100%) received mental health services and 4,538 (19.4%) received intensive home-based services ("IHBS") and 4,639

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1  (19.9%) received intensive care coordination ("ICC").  (Rodriguez Decl. ¶¶ 76-77;

2  Berberian Decl., Ex. H at 7, 10.)

3  **F.    The Current Dispute**

4          Despite over $2 billion in investment and top-to-bottom reforms of the foster

5  care system, the County Defendants have been unable to exit the litigation because of

6  certain "exit conditions" that the County Defendants must satisfy in connection with the

7  Strategic Plan.  (*See* Dkt. No. 776 at 3-4 (the "Exit Conditions").)  The first Exit

8  Condition was for the County Defendants to implement the Strategic Plan.  (*Id.*)  The

9  third Exit Condition was for the County Defendants to demonstrate acceptable progress

10 on a discrete set of Data Indicators.  (*Id.*)  Both of these exit conditions have been

11 substantially achieved.  (Olson Decl. ¶¶ 102-164 (describing implementation of the

12 Strategic Plan); Celis Decl. ¶¶ 22-42 (describing implementation of the Strategic Plan);

13 Berberian Decl. ¶¶ 153-162 (explaining that County has passed all Data Indicators but

14 one).)

15         The second Exit Condition is for the County Defendants to achieve a passing

16 score on each component of a Qualitative Service Review ("QSR")—a case review tool

17 that attempts to score the child and family's progress and the effectiveness of care and

18 services provided to children in DCFS' care.[3]  (Andrade Decl. ¶ 23.)  The QSR is *not*

19 part of, and is not required by, federal law.  (*See* Andrade Decl. ¶¶ 4, 23, 42, Ex. E

20 (explaining that the federal government conducts audits using a different review

21 system); *see generally* QSR Protocol (the QSR does not claim to measure compliance

22 ─────────────────

23 [3] QSR scores each DCFS case in two areas:  (i) "status" measures the quality of the conditions in a child's life—including safety, stability, permanency of family setting,

24 suitability of living arrangement, health, physical, and emotional well-being, learning and academics, preparation for adulthood, family functioning and resourcefulness,

25 caregiver functioning, and family connections; and (ii) "practice" measures the quality of services provided by practitioners working with the child (in particular, CFTs)—

26 including engagement, degree of participation by the child, parents, and family members in decision making, teamwork, assessment and understanding of the child's

27 strengths and needs, development of long-term outcomes for the child, planning, availability of support and services, adequacy of intervention when needed, tracking of

28 progress and adjustment of strategies that are not working).  (Andrade Decl. ¶¶ 44-45, Ex. D.)

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1   with federal law).)

2       The County Defendants have made significant progress on QSR, consistently

3   scoring well on the portion of QSR pertaining to child safety, well-being and

4   permanency.  (Berberian Decl., Ex. H at 52; Andrade Decl. ¶¶ 64-65.)  Although the

5   County Defendants have scored well on individual components of the "practice"

6   portion of QSR and are improving overall, they have been unable to obtain a passing

7   score on every component at the same time.  (Berberian Decl. ¶ 172, Ex. H at 54;

8   Andrade Decl. ¶¶ 66-68.)

9       While QSR has kept the County Defendants from exiting this lawsuit, the Katie

10  A. Advisory Panel and Plaintiffs' counsel have engaged in boundless supervision of

11  every aspect of DCFS and the Child Welfare Division of DMH.  (Declaration of Bobby

12  D. Cagle ("Cagle Decl.") ¶¶ 14-29; Declaration of Jonathan E. Sherin ("Sherin Decl.")

13  ¶¶ 15-18.)  This has required mid- to high-level departmental staff to devote significant

14  time to addressing the concerns raised by the Katie A. Advisory Panel and Plaintiffs'

15  counsel, at the expense of providing direct services to foster youth.  (*Id.*)

16      The parties have met and conferred since February 2019 but have been unable to

17  resolve their dispute without Court intervention.  As such, the County Defendants now

18  move to vacate the 2003 Consent Decree under Federal Rule of Civil Procedure

19  60(b)(5) on the grounds that there are no ongoing federal violations permitting

20  continued judicial supervision.

21  **III.  <u>LEGAL STANDARDS</u>**

22      Federal Rule of Civil Procedure 60(b)(5) "permits a party to obtain relief from a

23  judgment or order if, among other things, 'applying [the judgment or order]

24  prospectively is no longer equitable.'"  *Horne v. Flores*, 557 U.S. 433, 447 (2009)

25  (alteration in original).  Consent decrees are subject to vacatur under Rule 60(b).  *Rufo*

26  *v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 378 (1992) (consent decrees are "subject

27  to the rules generally applicable to other judgments and decrees"); *John B. v. Emkes*,

28  710 F.3d 394, 412 (6th Cir. 2013) (consent decrees are subject to Rule 60); *Burt v.*

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  *County of Contra Costa*, 2014 WL 253010, at \*19 (N.D. Cal. Jan. 22, 2014) (same).

2  Rule 60(b)(5) "encompasses the traditional power of a court of equity to modify its

3  decree in light of changed circumstances." *Frew v. Hawkins*, 540 U.S. 431, 441 (2004).

4  Federal courts only have jurisdiction to enforce consent decrees so long as there

5  is a federal violation to remedy. *Horne*, 557 U.S. at 447. Absent an ongoing federal

6  law violation, there is no legal basis for judicial enforcement, and the reins must be

7  returned to state and local officials. *Id.* at 450. This Court thus must "ascertain

8  whether ongoing enforcement of the original order [is] supported by an ongoing

9  violation of federal law . . . ." *Id.* at 454.

10  In considering that question, the courts should look only to the specific

11  allegations on which the consent decree was based. *See John B.*, 710 F.3d at 413

12  (vacating consent decree where defendant was "comply[ing] with the provisions of

13  federal law that the decree was intended to enforce"); *All. for Wild Rockies v. Kruger*,

14  15 F. Supp. 3d 1052, 1057 (D. Mont. 2014), *aff'd sub nom.*, *All. for the Wild Rockies v.*

15  *Krueger*, 664 F. App'x 674 (9th Cir. 2016) (declining to consider alleged new

16  violations in opposition to Rule 60(b)(5) motion because "[p]laintiffs' arguments raise

17  new issues best resolved by a new cause of action . . ."). New purported violations

18  outside the Plaintiffs' allegations cannot justify continued judicial enforcement. *See*

19  *John B.*, 710 F.3d at 413 (refusing to uphold consent decree based on alleged violations

20  of Medicaid provision that "none of the consent decree's provisions were based on").

21  The moving party's compliance with federal law must be "durable." *Horne*, 557

22  U.S. at 450. Courts will grant relief where the moving party displays a good faith

23  commitment to remaining in compliance after the order is vacated. *Jackson v. Los*

24  *Lunas Cmty. Program*, 880 F.3d 1176, 1203 (10th Cir. 2018). If so, "continued

25  enforcement of the order is not only unnecessary, but improper." *Horne*, 557 U.S. at

26  450.

27  Where a party shows durable compliance with the federal laws it originally was

28  alleged to have violated, it is abuse of discretion to deny Rule 60(b) relief. 557 U.S. at

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

447.

## IV.   ARGUMENT

### A.   *Horne* Requires Vacatur Here

The Supreme Court has provided clear direction to district courts enforcing consent decrees in institutional reform litigation:  Courts must "return control to state and local officials as soon as a violation of federal law has been remedied." *Horne*, 557 U.S. at 450-51; *Burt*, 2014 WL 253010, at *1 (vacating consent decree under *Horne* because "there has been no showing of any substantial ongoing violation of law").

At issue in *Horne* was whether the district court had properly denied a motion to vacate a judgment that the State of Arizona was violating the Equal Educational Opportunities Act of 1974 ("EEOA") by failing to take "appropriate action" to overcome language barriers for English Language-Learner ("ELL") students.  557 U.S. at 438-39.  The district court found the defendants liable and entered judgment for the plaintiffs, followed by a series of orders and injunctions that included monetary sanctions for failure to comply with prior orders.  *Id.* at 441-42.  The state legislature subsequently moved to vacate under Rule 60(b)(5) on the ground that continued enforcement was no longer equitable.  *Id.* at 444.  The district court denied the motion because the defendants had not yet complied with the specific requirements of its injunction.  *Id.*  The Ninth Circuit affirmed on the same grounds.  *Id.*

The Supreme Court reversed because both the district court and the Court of Appeals had "paid insufficient attention to federalism concerns" (557 U.S. at 450-51) and the "particularly important function" played by Rule 60(b)(5) "in what we have termed 'institutional reform litigation.'"  *Id.* at 447 (citation omitted).

Institutional reform litigation "raise[s] sensitive federal concerns" because it "commonly involves areas of core state responsibility . . . ."  557 U.S. at 448.  These concerns are "heightened" when a court order "has the effect of dictating state or local budget priorities" or limits "a State's discretionary authority over its own program and budgets and forces state officials to reallocate state resources and funds."  *Id.* (quoting

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

*Missouri v. Jenkins*, 515 U.S. 70, 131 (1995) (Thomas, J., concurring)).

Where, as here, public officials "consent to, or refrain from vigorously opposing, decrees that go well beyond what is required by federal law," they "bind state and local officials to the policy preferences of their predecessors" and can "improperly deprive future officials of their designated legislative and executive powers.'" 557 U.S. at 448-49 (citation omitted); *see also Burt*, 2014 WL 253010, at *18 ("Consent decrees frequently bind the defendant to 'undertake more than federal law requires, or more than a court could order absent settlement, to "save themselves the time, expense, and inevitable risk of litigation."'" (citation omitted)).  "[O]verbroad or outdated" orders entered in institutional reform cases "limit [officials'] ability to respond to the priorities and concerns of their constituents" and hamper "their ability to fulfill their duties as democratically-elected officials."  *Horne*, 557 U.S. at 449.

The Supreme Court explained that it was reversible error to continue judicial enforcement of the injunction solely on the grounds that the defendants had not yet complied with it.  While "[s]atisfaction of an earlier judgment is *one* of the enumerated bases for Rule 60(b)(5) relief—. . . it is not the only basis for such relief."  557 U.S. at 454.  The lower courts "needed to ascertain whether ongoing enforcement of the original order was supported by an ongoing violation of federal law," regardless of whether the original order had been satisfied.  *Id.*  But "rather than inquiring broadly into whether changed conditions in Nogales provided evidence of an ELL program that complied with the EEOA, the Court of Appeals concerned itself only with determining whether [the state] complied with the original declaratory judgment order."  *Id.* at 451.  The court's failure to assess whether the state had remedied the underlying federal law violation in a way other than what the injunction specifically required was error.  *Id.*

The Court remanded for consideration of whether changed circumstances—including the state's implementation of new methodologies, structural and management reforms, and increased funding—"have brought Nogales' ELL programming into compliance with the EEOA even without . . . satisfy[ing] the District Court's original

Miller Barondess, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

1  order." 557 U.S. at 466. If so, "continued enforcement of the District Court's original
2  order is inequitable within the meaning of Rule 60(b)(5), and relief is warranted." *Id.* at
3  470.

4  On remand, the district court determined that the state had meaningfully
5  reformed its ELL system such that it was now in compliance with federal law—even
6  though the defendants were not in compliance with the specific terms of the injunction.
7  *Flores v. Arizona*, 2013 WL 10207656, at *15 (D. Ariz. Mar. 29, 2013). The court thus
8  granted the state's request for relief under Rule 60(b)(5) and released jurisdiction of the
9  case. *Id.*, *aff'd sub nom.*, *Flores v. Huppenthal*, 789 F.3d 994 (9th Cir. 2015).

10  *Horne* governs this Motion and requires that it be granted. This case is
11  institutional reform litigation; the very purpose of Plaintiffs' lawsuit was to bring
12  reforms to the foster care system in the County and the State. (*See* FAC ¶¶ 1, 4-9, 47
13  (alleging "systemic failure to provide Plaintiff children with legally mandated
14  individualized services").) The defendants are state and county agencies responsible
15  for the welfare of children and families within their jurisdiction. (*Id.* ¶¶ 32-36.)

16  As *Horne* predicted would occur in such cases, the County Defendants did not
17  defend against Plaintiffs' claims, and the 2003 Consent Decree undertakes much more
18  than federal law requires. (*Compare* 2003 Consent Decree ¶ 7(c) (requiring expansion
19  of Wraparound services) *and* Strategic Plan at 7 (same) *with, e.g.*, *Katie A., ex rel.*
20  *Ludin v. Los Angeles County*, 481 F.3d 1150, 1159 (9th Cir. 2007) (wraparound
21  services not required under Medicaid).) And, as in *Horne*, the 2003 Consent Decree
22  "has the effect of dictating state or local budget priorities" and limits the County
23  Defendants' discretion over the very programs they are responsible for. 557 U.S. at
24  448. (Cagle Decl. ¶¶ 14-29; Sherin Decl. ¶¶ 15-18.) This case thus presents the height
25  of federalism concerns.

26  As *Horne* dictates, the question before the Court on this Motion is not whether
27  the County Defendants have satisfied every aspect of the 2003 Consent Decree or met
28  Exit Conditions required to exit the 2003 Consent Decree on its own terms. The only

435743.3

THE COUNTY'S MOTION TO VACATE 2003 CONSENT DECREE PURSUANT TO RULE 60(b)(5)

question before this Court is whether—regardless of what the 2003 Consent Decree requires—(i) the County Defendants are currently in compliance with the federal laws that Plaintiffs alleged were violated; and (ii) the County Defendants have made a good faith, prospective commitment to staying in compliance absent judicial enforcement. They are.  And they have.  *Horne* thus requires that the 2003 Consent Decree be vacated.

## B.     There Is No Federal Law Violation

Plaintiffs' FAC asserted federal claims for violation of the Medicaid Act, the Fourteenth Amendment, the ADA, and the RA.  (FAC ¶¶ 76-87.)  The principal factual basis for their claims was that the County Defendants (i) failed to assess children's needs; (ii) did not make available necessary mental health services (including wraparound, therapeutic foster care, and case management services); and (iii) used group homes excessively.  (*See id.*)

Whatever the merit of these allegations in 2002, the facts as they exist *today* do not reflect any violations of federal law as Plaintiffs alleged when they filed this suit.

### 1.     There Is No Custom, Policy, Or Practice To Violate Medicaid

Plaintiffs' claim for violation of Medicaid is asserted under 42 U.S.C. § 1983. (*See* FAC ¶ 76.)  To establish liability for a county under Section 1983, plaintiffs must prove a custom, policy or practice that deprives plaintiffs of their federal rights—here, their right to prompt and appropriate services required by Medicaid.  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978) (plaintiffs suing under Section 1983 must show that injury was caused by a municipal policy or custom); *Los Angeles County v. Humphries*, 562 U.S. 29, 30 (2010) (*Monell* applied to Section 1983 claims brought against County regardless of the form of relief requested); *Kadingo v. Johnson*, 2017 WL 3478494, at *15 (D. Colo. Aug. 14, 2017) (dismissing 1983 suit alleging violations of Medicaid because plaintiff failed to allege a policy or custom).

Plaintiffs alleged in 2002 that the County had "developed and maintained customs, policies, and practices" that failed to provide "Medi-Cal-eligible children with

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

the full range of [EPSDT] services covered by Medicaid when such services are necessary to treat or ameliorate a child's condition . . . ." (FAC ¶ 76.) To the extent it ever existed, there exists no such custom, policy, or practice today.

### (a)   The County's Screening Exceeds Federal Standards

In 2002, there was no formal mechanism to screen children for mental health needs upon entering the custody of DCFS. (Olson Decl. ¶ 15.) Today, the County has a dual-track system to ensure that all children with a substantiated allegation of abuse or neglect receive a mental health screen. (Rodriguez ¶¶ 25-30 (describing first track, MAT); Berberian Decl. ¶¶ 68-73 (describing second track, MHST.) This dual-track system has been in operation for over 10 years and is working well today.

In 2018, 96.37% of eligible children were screened using the MHST and the remaining 3.63% had screens pending. (Berberian Decl. ¶ 71.) Between 95% and 100% of MAT-eligible received a MAT assessment in 2018. (*Id.*, Ex. H at 45.) These screening percentages exceed other cases granting Rule 60(b)(5) relief based on the percentage of children screened. *See, e.g.*, *John B.*, 710 F.3d at 413 (vacating consent decree where movant screened fewer than 80% of EPSDT-eligible children who should have received a screen); *compare Salazar v. District of Columbia*, 954 F. Supp. 278, 304 (D.D.C. 1996) (finding a violation where between 24% and 64% of EPSDT-eligible children were screened).

The Katie A. Advisory Panel itself has recognized that DCFS now provides adequate mental health screening services and has noted that it only "monitors ongoing performance . . . to assure that progress is sustained." (ECF Dkt. No. 940 at 14.)

### (b)   The County Provides Services Promptly

Services provided under Medicaid must be "furnished with reasonable promptness . . . ." 42 U.S.C. 1396a(a)(8). There is no set definition of reasonable promptness; what is reasonable depends on the complexity of the services needed, the unique needs of the children, and whether the children or their parents caused delay or refused services. *See C.F. v. Lashway*, 2017 WL 2806835, at *3 (W.D. Wash. June 29,

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

2017) (beneficiaries' unique needs or refusal or delay in accepting services inform reasonable promptness); *Alexander A. ex rel. Barr v. Novello*, 210 F.R.D. 27, 38 (E.D.N.Y. 2002) (reasonable promptness "requires time and flexibility to match each eligible child and an appropriate treatment program" where children have "mental conditions that are fluctuating in nature and vary in seriousness from child to child").

Courts examining this question have found it reasonable to deliver services between 90 and 180 days from the commencement of a case. *See, e.g.*, *Boulet v. Cellucci*, 107 F. Supp. 2d 61, 81-82 (D. Mass. 2000) (90 days is reasonable under Medicaid services); *Does 1-13 by and Through Doe, Sr. 1-13 v. Chiles*, 136 F.3d 709, 711 (11th Cir. 1998) (90 days); *Chisholm ex rel. CC v. Gee*, 2017 WL 3730514, at *5 (E.D. La. Aug. 30, 2017) (6 months); *see also* 42 C.F.R. § 435.911, 42 C.F.R. § 441.56(e) (agencies "must employ processes to ensure timely initiation of treatment, if required, generally within an outer limit of 6 months after the request for screening services").

Whereas courts have found upwards of 90 days to be a reasonable timeframe to provide services under Medicaid, the County—the country's largest foster system— usually does so in less than 45 days. (Berberian Decl. ¶ 75, Ex. E at 5.) MAT-eligible children are assessed promptly upon referral to a MAT agency, who usually completes its assessment within 45 days of the referral and within the timeframe stated in the County's own policy. (Berberian Decl., Ex. H at 46 (in 2018, 84% of MAT SOF Reports were completed and submitted timely).)

Children who are not MAT-eligible generally receive mental health services from DMH within five days of the referral from DCFS. (Berberian Decl., Ex. E at 4.) Those with acute or urgent needs generally receive services *on the same day as their screening*. (*Id.*)

The County does not just comply with federal law; it goes above and beyond.

/ / /

/ / /

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

**(c)     The County Offers A Panoply Of Programs**

States that opt into Medicaid "have an obligation to cover every type of health care or service necessary for EPSDT corrective or ameliorative purposes that is allowable under [the Medicaid statute]." *Katie A.*, 481 F.3d at 1158.

This is not a case where the plaintiffs allege that they need particular services that are not covered by the state's Medicaid plan or are denied covered services or programs. *E.g.*, *Watson v. Weeks*, 436 F.3d 1152 (9th Cir. 2006) (plaintiffs stated a claim for violation of Medicaid for failure to cover Medicaid-required service). In fact, Plaintiffs have not identified, and the County Defendants are not aware of, a single service or mental health program that the County does not today provide. The County Defendants and the state have agreed to cover all mental health services and programs the Plaintiffs and Katie A. Advisory Panel have asked for in this case.[4]

Plaintiffs suggested previously that there is no evidence that "class members are receiving medically necessary mental health services covered by the Medi-Cal program as required by the EPSDT mandate in federal law." (ECF Dkt. No. 952 at 10.) To the contrary, all Katie A. class members received mental health services in 2018 at a cost of $210 million just in 2018. (Berberian Decl., Ex. H at 4.)

The County currently offers Katie A. class members 15 different types of evidence-based or promising practices ("EBP"), and more class members received such services in 2018 than in the prior year. (*Id.* at 8-9.) The majority of mental health services delivered to the Katie A. class was in the "field" (59%) and not in an office setting (32%) or group home (3%). (*Id.* at 8.)

These mental health services are reasonably effective. Even QSR, despite its

---

[4] Plaintiffs have demanded that the County Defendants expand the treatment foster care program ("TFC") to 300 beds per this Court's 2006 Order. The Ninth Circuit, however, has held that TFC is not a required Medicaid service. *Katie A.*, 481 F.3d at 1161. Nevertheless, the County has tried for years to enlist more foster parents to enroll in the TFC program. But, despite its best efforts, the County has not been able to reach 300 beds. (Rodriguez Decl. ¶ 53.) Today, the County has 93-109 beds, and there are vacancies. (*Id.* ¶ 54.) The County's inability to reach 300 beds thus does not harm the Plaintiff class.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1   onerous requirements, scores the County's children well for emotional well-being.[5]

2   (Berberian Decl., Ex. H at 52 (72% of children demonstrate at least a minimally

3   adequate-to-fair pattern of emotional well-being).)  This score has remained relatively

4   consistent for the past eight years.  (*Id.* at 52-53 (prior scores were 73% from 2015-

5   2017, 80% from 2012-2013, and 70% from 2011-2012).)

6        The evidence also shows that the intensive mental health programs that the

7   County offers to foster youth are reasonably effective.  (Berberian Decl., Ex. K (Panel

8   IHBS Study Report ("IHBS Report") at 3 ("Of the 26 IHBS cases, 19 children are in

9   stable homes . . . ."); *id.* at 17 ("All of the 26 children were attending school, and

10   almost all of their IHBS providers report improved school behavior, academic

11   performance and relationships in school."); *id.* at 18 ("Almost all of the 26 IHBS cases

12   had a therapist, Child and Family Specialist (CFS) and Parent Partner who each provide

13   services once a week."); *id.* at 20 ("Regular team meetings are occurring in all 26 IHBS

14   cases.").)

15        The County Defendants in fact exceed federal law requirements.  Plaintiffs

16   alleged that the County must provide Wraparound and therapeutic foster care services

17   (FAC ¶ 47(b)) and the 2003 Consent Decree requires the County Defendants to

18   "expand Wraparound Services" (2003 Consent Decree ¶ 7(c)) even though neither

19   "wraparound services" nor "therapeutic foster care" is required under Medicaid.  *Katie*

20   *A.*, 481 F.3d at 1161.  Nevertheless, the County Defendants expanded Wraparound to

21   3,000 slots and created new programs, such as IFCCS and Full Service Partnerships

22   ("FSP"),[6] with over 1,500 additional slots.  (Rodriguez Decl. ¶¶ 43, 47-48, 51.)

23

---

24   [5] The QSR emotional well-being component attempts to measure the degree to which
25   the child is displaying an adequate pattern of:  attachment and positive social
     relationships; coping and adapting skills; appropriate self-management of emotions and
26   behaviors; resilience; optimism; a positive self-image; and a sense of satisfaction that
     his/her fundamental needs are being met.  (Andrade, Ex. E at 28.)

27   [6] FSP is an intensive program that provides outreach and engagement services to
     children and families in need.  (Rodriguez Decl. ¶ 49.)  FSP is a DMH program with
28   dedicated slots for foster youth.  (*Id.* ¶ 50, Ex. D.)

1    Today, the County has excess capacity in its intensive mental health programs.

2    (*Id.*)  There are no waitlists.  (*Id.*)[7]  The County does not set artificial time limitations

3    for these programs.  (Berberian Decl. ¶ 92.)  Its policy is that children should receive

4    wraparound services for as long as they are needed.  (*Id.*)  The County has invested so

5    deeply in these wraparound services that it had vacancies every month in 2018.

6    (Berberian Decl. ¶ 90; Rodriguez Decl. ¶ 43; Seidenfeld Decl. ¶ 19.)  And Wraparound

7    services are not declined for lack of funding or staffing reasons.  (*Id.* (denials of

8    Wraparound are rare and usually for good reasons, such as another provider is already

9    providing intensive mental health services in the home and an additional provider could

10   disrupt the fragile progress that has been made).)

## 2.  The County Defendants Comply With The ADA And RA

12   Plaintiffs' FAC also asserted violations of the ADA and RA, alleging that the

13   County Defendants discriminated against Plaintiffs on account of their disability and

14   failed to place foster children in the most integrated setting appropriate to their needs.

15   The ADA and RA prohibit discrimination and denial of services on the grounds

16   of disability.  Where the alleged violation is based on denial of services (*see* FAC

17   ¶ 87(i)), an essential element of the claim is that disabled persons are not receiving the

18   programs and services to which they are entitled under federal law.  *Mark H. v.*

19   *Lemahieu*, 513 F.3d 922, 937 (9th Cir. 2008) (predicate to a claim under the ADA and

20   RA is lack of "meaningful access" to services).  Where the alleged violation is failure to

21   provide community-based placements instead of institutionalization (*see* FAC ¶ 87(ii)),

22   an essential element of the claim is that disabled persons are being institutionalized

23   when a community-based placement could reasonably be accommodated.  *Olmstead v.*

24   *L.C. ex rel. Zimring*, 527 U.S. 581, 607 (1999).

---

26   [7] *Compare Rosie D. v. Romney*, 410 F. Supp. 2d 18, 41-42 (D. Mass. 2006) (extensive
27   waitlists violate Medicaid); *Okla. Chapter of Am. Acad. of Pediatrics v. Fogarty*, 366 F.
     Supp. 2d 1050, 1109 (N.D. Okla. 2005) (failure to cure system-wide delays in treatment
28   violated Medicaid).

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

Plaintiffs' ADA and RA claims do not support continued judicial enforcement because the County Defendants comply with those statutes.  The County has implemented a robust system that ensures that *every* child with a mental health need—disabled or not—is screened, assessed, and treated based on his or her individual needs. For Medi-Cal eligible youth, the reimbursable mental health services are based on the needs of the youth and generally are not time-limited.  (Rodriguez ¶ 31.)  There is no discrimination, and thus no claim under the ADA, where both disabled and non-disabled persons receive the benefits required under law. *See Alexander v. Choate*, 469 U.S. 287, 309 (1985) (no ADA violation where the "State has made the same benefit . . . equally accessible to both handicapped and nonhandicapped persons"); *Hunsaker v. Contra Costa County*, 149 F.3d 1041, 1043 (9th Cir. 1998) (applying *Choate* to the ADA).

Neither is there a violation of the RA, since *no children*—disabled or not—will be housed in traditional group homes going forward.  In their place, the County has implemented STRTPs which can only be used for foster youth who need to receive treatment in a congregate care facility.  (Berberian Decl. ¶ 53.)  The STRTP system complies with the RA.  *See Olmstead*, 527 U.S. at 602 (holding that placement decisions that are based on the needs of the patient comply with the RA).

### 3. There Is No Custom, Policy Or Practice That Violates The Fourteenth Amendment To The Constitution

Plaintiffs also alleged that they were denied necessary mental health services in violation of the Substantive Due Process clause of the Fourteenth Amendment to the U.S. Constitution.  (FAC ¶¶ 77-79.)  The Fourteenth Amendment provides a right to "reasonable safety and minimally adequate care and treatment appropriate to the age and circumstances of the child." *Lipscomb By & Through DeFehr v. Simmons*, 962 F.2d 1374, 1379 (9th Cir. 1992).  A claim asserted under the Fourteenth Amendment requires a showing that officials acted with "such deliberate indifference to the liberty interest that their actions 'shock the conscience.'" *Tamas v. Dep't of Soc. & Health*

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

*Servs.*, 630 F.3d 833, 844 (9th Cir. 2010) (citation omitted).  This standard "requires a showing of an objectively substantial risk of harm and a showing that the officials were subjectively aware of facts from which an inference could be drawn that a substantial risk of serious harm existed and that either the official actually drew that inference or that a reasonable official would have been compelled to draw that inference."  *Id.* at 845.

In addition, Plaintiffs' Fourteenth Amendment claim is asserted under Section 1983, and thus the standard here is whether there is a custom, policy or practice of deliberate indifference to the plaintiff class' constitutional rights.  *Castro v. County of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir. 2016).

There is no serious argument that any such violation exists today.  The Data Indicators show that the County Defendants provide adequate care and ensure that children are reasonably safe while in foster care.  (Berberian, Ex. I.)  There is no evidence of a custom, policy or practice to deny minimally adequate care.

**C.     The Reforms To The Foster Care System Are Permanent**

Where a party moving under Rule 60(b)(5) complies with federal law, the court must grant the motion if the party shows that it will remain in compliance without judicial supervision—the so-called "durable remedy" requirement.  *Horne*, 557 U.S. at 450 ("If a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper.").  Courts "do not read the language in *Horne* too restrictively with respect to what may constitute a durable remedy."  *Jackson*, 880 F.3d at 1203 (declining to give *Horne*'s "durable remedy" requirement a "talismanic quality." (quoting *Rufo*, 502 U.S. at 380)).  A "future commitment to remain in compliance with federal law" is enough.  *Id.*  Compliance is "durable" even where "performance has not been perfect" and "there is more work to be done," so long as the moving party has undertaken meaningful, good faith steps to comply with federal law.  *Burt*, 2014 WL 253010, at *20 (granting Rule 60(b)(5) motion where complaint alleged "pattern of discrimination" even though "[t]he task is not yet done" because there was

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  no showing "such a broad 'ongoing violation of federal law' continues today" (citation

2  omitted)).

3       From fiscal year 2008-09 to fiscal year 2018-19, the County has spent more than

4  $2 billion implementing reforms to improve, expand, create, and, in some cases,

5  completely rebuild, programs for children in its care.  (Seidenfeld Decl. ¶ 4.)  It has

6  hired thousands of staff.  (Berberian Decl. ¶¶ 109-112.)  It has institutionalized the

7  reforms within DCFS and DMH, which are among the largest child welfare and public

8  mental health departments in the country.  The County Defendants have gone above

9  and beyond the requirements of federal law and invested in programs, such as

10  Wraparound, which are not required by law.  (*Id.* ¶¶ 87-93); *see Katie A.*, 481 F.3d at

11  1161.  Many of the Katie A. Advisory Panel's requests and County reforms—including

12  closure of MacLaren, ceasing use of traditional group homes as long-term residences,

13  expanding CFTs, and placing of children with relatives or extended family members

14  where possible—have not only been implemented but are now also required by state

15  law.  (Berberian Decl. ¶¶ 49-57, 94, 119-129, Exs. D, F, G.)  There is simply no going

16  back.

17       It would be inequitable to force the County Defendants to remain in this lawsuit.

18  There are many programs and initiatives that the Directors of DCFS and DMH want to

19  implement to better serve foster youth, but they are limited in their ability to implement

20  these ideas because of this lawsuit.  (Cagle Decl. ¶¶ 14-29; Sherin Decl. ¶¶ 15-18.)

21       Moreover, if the County Defendants were to remain under federal court

22  supervision until all exit conditions are satisfied, it likely would result in *indefinite*

23  judicial supervision until the County could pass the QSR, if that is even possible.  As

24  Dr. Bartroff explains in his accompanying declaration, there are significant problems

25  with QSR:  (1) it has not been validated; (2) it has not been sufficiently tested; (3)

26  experts in the field have found that little is known about it other than it is a "crude

27  tool"; and (4) other governmental systems under federal court supervision have been

28  permitted to exit despite non-passing QSR scores.  (Declaration of Dr. Jay Bartroff

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1   ("Bartroff Decl.") ¶¶ 16-17, 19, 22-35, 45-48.)  Moreover, given the sampling error

2   problems associated with QSR, Dr. Bartroff also explains that, even assuming the

3   County had a QSR-compliant system, it would still take approximately 15 years to exit.

4   (*Id.* ¶¶ 18, 20-21, 36-44, 49-60.)

5       Given that the County Defendants are fully compliant with federal law, it is

6   inequitable to force the County Defendants to remain in this litigation indefinitely and

7   continue to waste county taxpayer money in a futile effort to comply with a scoring

8   system that is flawed, not generally accepted, and not required in other jurisdictions.

9   (Andrade Decl. ¶¶ 40-41 (County spends millions to conduct QSR case reviews each

10  year); Olson Decl. ¶¶ 165-170 (County implemented costly and wasteful initiatives at

11  the recommendation of the Katie A. Advisory Panel in an effort to pass QSR).)

12      *Horne* requires that administration of government programs be returned to state

13  and local officials once the moving party has shown that it complies with federal law

14  and its commitment to remaining in compliance without judicial supervision.  To the

15  extent there were any violations of Medicaid, the Substantive Due Process Clause of

16  the Fourteenth Amendment, or the ADA/RA before, there are certainly no such

17  violations today.  The County Defendants' efforts over the last 17 years make it clear

18  they intend to keep it that way.  The Court should vacate the 2003 Consent Decree.

19  **V.     CONCLUSION**

20      For the foregoing reasons, the Court should grant the Motion and vacate the

21  2003 Consent Decree.

22  DATED:  August 26, 2019              MILLER BARONDESS, LLP

23

24

25                                      By: _____/s/ Louis R. Miller_____

26                                          LOUIS R. MILLER

27                                          Attorneys for The County Defendants

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400