LOUIS R. MILLER (State Bar No. 54141)
smiller@millerbarondess.com
BRIAN A. PROCEL (State Bar No. 218657)
bprocel@millerbarondess.com
DAVID W. SCHECTER (State Bar No. 296251)
dschecter@millerbarondess.com
MILLER BARONDESS, LLP
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
Tel.: (310) 552-4400 / Fax: (310) 552-8400

MARY C. WICKHAM (State Bar No. 145664)
mwickham@counsel.lacounty.gov
VICKI KOZIKOUJEKIAN (State Bar No. 171588)
vkozikoujekian@counsel.lacounty.gov
LAURA QUINONEZ (State Bar No. 253862)
lquinonez@counsel.lacounty.gov
OFFICE OF LOS ANGELES COUNTY COUNSEL
Kenneth Hahn Hall of Administration
500 West Temple Street, Suite 648
Los Angeles, California 90012
Tel.: (213) 974-1811 / Fax: (213) 626-7446

Attorneys for The County Defendants

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| KATIE A., et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>DIANA BONTA, et al.,<br><br>    Defendants. | **CASE NO. 2:02-cv-05662-JAK-FFMx**<br><br>**DECLARATION OF DR. JAY BARTROFF IN SUPPORT OF THE COUNTY DEFENDANTS' RULE 60(b)(5) MOTION**<br><br>Hearing Date: December 9, 2019<br>Time:        8:30 a.m.<br><br>Assigned to the Hon. John A. Kronstadt and Magistrate Judge Frederick F. Mumm |

DECLARATION OF DR. JAY BARTROFF ISO THE COUNTY DEFENDANTS' RULE 60(b)(5) MOTION

# DECLARATION OF DR. JAY BARTROFF

I, Dr. Jay Bartroff, hereby declare as follows:

1. I am a Full Professor, with tenure, in the Department of Mathematics at the University of Southern California ("USC"), where I am the Graduate Vice-Chair for Statistics. I have been retained by counsel for the County of Los Angeles ("County") to provide testimony in this matter. This declaration contains the opinions I have reached and the methodologies and data used to arrive at those opinions. If called upon, I could and would testify to these opinions in Court under oath.

## EXPERT QUALIFICATIONS

2. I have a Bachelor's degree in Applied Mathematics from the University of California, Berkeley and Doctorate of Philosophy ("PhD") in Mathematics with emphasis in Statistics from the California Institute of Technology.

3. I have taught statistics, probability, and mathematics at USC since 2007, first as an Assistant Professor, then as an Associate Professor, and now as a Full Professor. I have published numerous articles in peer-reviewed journals on statistics, probability, and mathematics, and I am frequently retained as a statistics consultant by public and private sector clients, ranging from the U.S. Geological Survey, the U.S. Department of Defense, media clients such as ESPN and Fox Technology Group, and law firms for investigations and litigation. I have testified as an expert witness in over 40 contested litigation or arbitration matters.

4. A true and correct copy of my curriculum vitae is attached hereto as **Exhibit A**.

## MY RETENTION AND WORK ON THE CASE

5. I have been retained by Miller Barondess, LLP, counsel for the County, to evaluate statistical aspects of the Quality Service Review ("QSR") process and its use evaluating the Los Angeles County Department of Children and Family Services ("DCFS") and the Los Angeles County Department of Mental

Health ("DMH") in connection with this lawsuit.

6. I charge an hourly rate for my services. My customary rate for consulting work is $450 an hour. For testimony either at deposition or trial, my rate is $550 an hour.

7. My opinions are based upon documents provided to me by counsel, conversations with counsel, and my own independent research. I have reviewed the following documents:

    a. The First Amended Complaint filed in this action;

    b. The 2003 Katie A. Settlement Agreement;

    c. The stipulation between the County and Plaintiffs regarding exit conditions, filed in this Court on November 23, 2011 ("Exit Conditions");

    d. Materials available on the National Quality Forum website;

    e. The QSR Protocol, "facts sheet," round overviews, case summaries, roll up data tables, sampling protocols and a list of Panel Members and proxies;

    f. Scholarly journal articles concerning QSR generally;

    g. Scholarly journal articles and other materials about QSR implementation in other jurisdictions, such as Alabama, Pennsylvania, Tennessee, Utah, Virginia, and Wisconsin; and

    h. The Katie A. Advisory Panel reports submitted in this action.

## BACKGROUND

8. The QSR as conducted by DCFS and DMH in connection with this case is an interview-based evaluation of the quality of frontline practice based on a sample of cases in each regional DCFS office. The QSR examines the quality of services as well as an assessment of the child's current status.

9. The QSR claims to provide a basis for measuring, promoting and strengthening the Shared Core Practice Model ("SCPM"). The SCPM is a best

practice for the provision of child welfare and mental health services for foster youth.

10. Each regional DCFS office is reviewed on an 18 to 24-month cycle. Three cycles have been completed, and the fourth cycle is in progress.

11. As applied in Los Angeles County, QSR reviewers employed by DCFS and DMH conduct interviews and grade each case. The scoring for QSR is based on a six-point scale. A score of 1, 2 or 3 on a given indicator results in a failing score for that indicator. A score of 4, 5 or 6 results in a passing score for that indicator. The QSR Protocol sets forth an explanation for how to grade on this scale.

12. For each case, there are two overall scores. The first is Overall Status, which is scored on a 1 to 6 scale. Overall Status purports to represent the emotional well-being, safety and permanency of the child.

13. The second is Overall Practice, which is also scored on a 1 to 6 scale. Overall Practice purports to represent the quality of the services provided by DCFS and DMH.

14. Within each overall category there are sub-indicators which are also scored on a 1 to 6 scale.

15. For the County to pass QSR in a given cycle, 85% of the cases reviewed in all regional DCFS offices must have a passing Overall Practice and Overall Status score. In addition, the County must achieve 70% passing scores across all regional DCFS offices in sub-indicators within Overall Practice labeled Engagement, Teaming and Assessment.

## SUMMARY OF OPINIONS

16. Opinion No. 1: The QSR has not been validated as a statistically reliable qualitative review tool.

    a. In my research, I discovered that variants of QSR have been used since 2007 in many child welfare services departments across the nation.

    b. Yet, I have found no published evaluations of QSR's statistical

accuracy, reliability, error rates, replicability, power, robustness, biases or any other statistical properties.

   c. Without such evaluations in peer-reviewed journals, the QSR has not been proven to be a statistically valid review tool.

 17. Opinion No. 2:  The QSR does not meet the standards of the National Quality Forum (NQF) as a valid quality measure tool.

   a. The NQF evaluates quality measures to ensure they are evidence-based, valid, important to improve care quality, and improve outcomes.

   b. The NQF criteria have undergone external review.

   c. The NQF's standards are recognized, and its approved quality measures prioritized, by organizations including the Department of Health and Human Services (HHS), the Centers for Medicare & Medicaid Services (CMS), and researchers in healthcare, mental health, and child health.

   d. According to the NQF, QSR has not been endorsed by NQF nor submitted for evaluation by its designers or users.

 18. Opinion No. 3:  There is a sampling error problem associated with QSR that serves as a significant impediment.  This sampling error problem is illustrated by the following example:  If we assume that the County is compliant with QSR such that, for all open DCFS cases, 85% of those would receive passing scores on Overall Status and Overall Practice and that 70% of those would receive passing scores on practice sub-indicators Assessment, Teaming and Engagement, it will likely take up to 8 rounds, or 15 years, for the County to exit.

   a. This is because the County must pass on five different criteria at the same time, and there is a sampling error problem that arises based on the sample sizes used for QSR.

   b. In round 3, 181 QSR cases were reviewed.  That is a small fraction of the total universe of potential cases that could have been reviewed for round 3.

c. Assuming that the sample size for QSR going forward would be 181 cases, I calculated the sample error associated with that sample size.

d. I then determined the degree to which the five metrics are interconnected.

e. Based on the sample error and the degree of interconnectedness, the likelihood that a fully compliant system would pass QSR is 12.6%. In other words, the system would have about a one-in-eight chance of passing for that given round. Thus, a fully compliant system would not likely exit until the eighth cycle.

f. Each QSR cycle has typically taken about two years to complete. Assuming that each QSR cycle would continue to take two years, the eighth cycle in this case would not be completed for another 15 years.

19. Opinion No. 4: The QSR is not standardized across jurisdictions.

a. QSR was applied in Alabama, but the state child welfare system was not held to a threshold of 85% for practice performance like the County is in the Katie A. litigation.

b. QSR was applied in Wisconsin, but the QSR metrics were modified mid-way through the monitoring process.

20. Opinion No. 5: The County achieves higher Overall Practice scores for children in intensive mental health programs such as Wraparound.

21. Opinion No. 6: The County achieves lower Overall Status scores for children listed as in the Katie A. class. If such cases are overrepresented in the QSR samples, then the County likely has an Overall Status score that is higher than what has been reported.

## SUPPORT FOR MY OPINIONS

### Opinion No. 1

22. QSR is a qualitative review tool that has been used in many states in connection with federal court supervision of the child welfare system.

23. I conducted research to determine whether there is any peer-reviewed

literature that demonstrates whether QSR is statistically valid. I ran searches in the arXiv.org, Google Scholar, JSTOR, LexisNexis, PubMed, and Web of Science databases for scholarly articles on QSR and its statistical properties. These databases are generally relied upon by experts in my field as thorough repositories of scholarly articles on statistics and related fields of application.

24. I only found a few articles that have been written about QSR, and I could not find any published evaluations of QSR's statistical accuracy, reliability, error rates, replicability, power, robustness, biases or any other statistical properties.

    a. Statistical accuracy refers to how, on average, a statistical method reflects the truth of the underlying system being measured. Without knowing QSR's statistical accuracy, I cannot calculate the degree of bias in QSR's results.

    b. In non-technical terms, statistical reliability refers to whether a method produces similar results under similar conditions. Without knowing QSR's reliability, I cannot estimate how far off QSR's results are from the true state of the system being measured.

    c. A statistical procedure's error rates are how often it gives results that differ from the true state of the underlying system being measured. For example, QSR's error rates are how likely it is to conclude that a compliant County does not pass the exit criteria, and how likely it is to pass a non-compliant County out of the exit criteria.

    d. Statistical replicability is the degree of agreement between independent evaluations of the same data or evidence. Without knowing if QSR is replicable, it is impossible to know if the results truly reflect the state of the system being measured, or if the results are driven by the reviewers, time, and other arbitrary parameters of the evaluation round, and would change if any of these factors did.

    e. In non-technical terms, statistical power is how often a statistical

1 procedure correctly identifies the true state of the system being measured.  In terms
2 of QSR, this is how often QSR would identify a compliant system as compliant, or
3 how often QSR would identify a non-compliant system as non-compliant.  Without
4 an understanding of QSR's statistical power, it is impossible to know how
5 trustworthy its results are.  In addition, statistical power is often used to determine
6 the correct sample size in a study, so without understanding its power it is
7 impossible to calculate the correct sample size for a QSR evaluation to achieve a
8 desired level of power.

9          f.     Statistical robustness is how well a method performs when the
10 data differs from the expected form in some way.  Without knowledge of QSR's
11 robustness it is impossible to know or control how susceptible it is to unexpected,
12 errant, mis-recorded, or missing data.

13          g.     The bias of a statistical method refers to a systematic difference
14 from the method's results to the true state of the system being measured.  Without
15 understanding QSR's biases, it is impossible to know its accuracy, even on average.

16     25.    Without knowledge of these properties, it is impossible for me to
17 answer the most basic statistical questions about QSR.  Critically, without
18 knowledge of its statistical properties, QSR is not statistically valid.

19     26.    By "statistically valid" I mean an understanding of, and desirable status
20 of, the above statistical properties.

21     27.    The only scholarly articles that I could find demonstrate that little is
22 known about QSR.

23     28.    Mollen *et al.* ("Qualitative Review as a Tool for Systems Improvement:
24 The Quality Service Review". In: *Social Work Research* 42.3 (2018), pp. 267–272)
25 write that "little formal assessment of QSR has been performed," and its evidence is
26 limited to "anecdotal accounts from individuals and experts in the field," which
27 could be statistically problematic "given the varied adaptations of the instrument in
28 different jurisdictions."

29. The Mollen *et al.* paper is the only attempt at beginning a statistical evaluation of QSR that I could locate, and was published only in 2018. The statistical analysis is restricted to exploring redundancies of certain covariates measured in QSR in a certain data set via factor analysis. These authors write that theirs is the "first step in systematically evaluating this widely used tool" and that "it is important to perform systematic assessments to ensure that the tools will provide appropriate, useful information to teams in the field." For a qualitative review tool to have been used in so many jurisdictions for over a decade, it is very surprising to not see published evaluations of QSR's statistical properties.

**Opinion No. 2**

30. QSR is an example of a tool that attempts to measure the quality of healthcare processes, outcomes, perceptions, and organizational structure and the related goals of effective, safe, efficient, patient-centered, equitable, and timely care.

31. The primary body in the U.S. for quality measure evaluation and endorsement is the National Quality Forum (NQF), a nonpartisan public-private organization that evaluates existing measures and works with organizations developing and improving measures to ensure they are evidence-based, valid, important to making significant gains in care quality, and improving outcomes for specific high-priority aspects of care.

32. The NQF endorsement criteria "represent a national multistakeholder consensus and have undergone external review." (Naomi S. Bardach *et al.* "Hospital-Based Quality Measures for Pediatric Mental Health Care". In: *Pediatrics* 141.6 (2018), p. 2.)

33. The Department of Health and Human Services (HHS) and the Centers for Medicare & Medicaid Services (CMS) prioritize the use of NQF-endorsed measures and work to improve other measures they use in order to obtain NQF approval. NQF has performed substantial work evaluating and improving quality measures related to mental health, and child health and mental health in particular.

34. QSR does not appear on NQF's database of evaluated quality measures, indicating QSR has not been endorsed or submitted for evaluation by NQF.

35. Two of NQF's criteria are reliability and validity. Given that I could not find any previous studies of statistical reliability or validity, and the substantial variations in its applications in different states that I have observed, it is likely that QSR would not meet NQF's reliability and validity criteria, if not other criteria.

**Opinion No. 3**

36. Sampling error and the compound nature of the exit criteria, in which 5 metrics are all required to exceed thresholds simultaneously, combine to make it highly unlikely that the County would be able to exit soon, even if all the open DCFS cases actually exceed the nominal thresholds of 85% for Overall Status and Overall Practice and 70% for the practice sub-indicators Assessment, Teamwork and Engagement.

37. In order to calculate the expected time for the County to exit QSR when it is achieving these thresholds, I first calculated the sample error. To do this, I assumed that the 181 cases that were reviewed in round 3 is a fair representation of the sample size that would continue to be used going forward. This is a small fraction of the universe of potential cases that could have been reviewed for QSR.

38. I then considered the positive association among the 5 metrics. I did this by analyzing the results for the 181 cases reviewed in round 3.

39. For the 181 focus children in the round 3 QSR roll ups that I reviewed, all pairs of these 5 metrics have positive correlation coefficients.[1]

40. Using the round 3 sample size of 181 focus cases as an example, under

---

[1] These correlation coefficients are .430 for Status/Practice, .453 for Status/Assessment, .257 for Status/Engagement, .211 for Status/Teamwork, .772 for Practice/Assessment, .731 for Practice/Engagement, .699 for Practice/Teamwork, .594 for Assessment/Engagement, .468 for Assessment/Teamwork, and .502 for Engagement/Teamwork.

1 a joint distribution for the 5 metrics' scores with the same positive correlations and standard deviations as observed in the round 3 data, if we assume that the County is compliant with QSR such that 85% of all open DCFS cases would receive passing scores on Overall Status and Overall Practice and that 70% would receive passing scores on Assessment, Teamwork and Engagement, then the probability that a sample of 181 cases from the County would exceed all 5 of these thresholds in a given round is 12.6%.

41. In other words, in more than 87 out of 100 QSR rounds, the County will fail these exit criteria even if the population of open DCFS cases actually meets the thresholds.

42. This means that, even if the County is compliant with QSR, it is expected that the County will take nearly eight rounds to exit.

43. It has typically taken about two years for each QSR cycle to be complete in this case.

44. Thus, if we assume that each round takes 2 years, it is expected that the County would take more than 15 years to exit even if it were fully compliant under QSR.

**Opinion No. 4**

45. The QSR is not standardized across jurisdictions. To arrive at this conclusion, I reviewed scholarly articles pertaining to QSR and QSR like tools in the Alabama and Wisconsin litigation and background materials related to the litigation.

46. QSR was implemented in Wisconsin in connection with the Jeanine B. litigation brought against the Wisconsin Department of Health and Family Services Division of Children and Family Services ("Wisconsin DCFS"). To determine how QSR was applied in that case, I reviewed the Wisconsin Program Enhancement Plan Progress Report for Quarter 6, February 2006 – April 2006 that was submitted on or about June 1, 2006 by Wisconsin DCFS.

47. In this report, Wisconsin DCFS reports that the QSR metrics were modified mid-way through the process. Wisconsin DCFS also reports that they observed a "case selection" effect that impeded its ability to achieve improved scores.

48. QSR was also implemented in Alabama in connection with the R.C. litigation brought against the Commissioner of the Alabama Department of Human Resources, among other defendants. I reviewed the scholarly work of Kathleen G. Noonan, Charles F. Sabel and William H. Simon (together "Noonan") entitled "Legal Accountability in the service-based welfare state: Lessons from child welfare reform" that was published in *Law & Social Inquiry* 34.3 (2009). Noonan writes that the defendants were allowed to exit with a QSR overall system performance score of 57%.

**Opinion No. 5**

49. I evaluated the QSR scores on Overall Status, Overall Practice, Engagement, Teamwork, and Overall Assessment of the 267 focus children cases made available to me from rounds 3 and 4.

50. The Teamwork scores of QSR focus children listed as in any type of special program (FP, FSP, IFCCS, SFC, TFC, Wrap, or "other") were highly statistically significantly larger than those focus children not in special programs.

    a. Only 11% of the round 3 Teamwork scores are in the "acceptable" range (scores of 4-6 out of 6); if only the cases in special programs are considered, this percent rises to 19.1%, an increase of nearly three quarters.

    b. Considering both rounds 3 and 4, 20.6% of Teamwork scores are in the "acceptable" range, while 30.3% of the cases in special programs are, an increase of almost half.

51. The Overall Practice scores of focus children listed as in any type of special program were also statistically significantly larger than those focus children not in special programs.

52. The Overall Status scores of focus children listed as in any type of special program were also larger, but less significantly so, than those focus children not in special programs.

53. The Engagement and Overall Assessment scores were not significantly different for children inside and outside special programs.

54. Focusing on cases listed as in the Wrap program, the Teamwork scores of focus children listed as in Wrap were highly statistically significantly larger than those focus children not listed in Wrap. The other four metrics were not significantly different for children inside and outside Wrap.

55. Given the differences found in the Teamwork and other metrics' scores for focus children in Wrap and other special programs, if these cases are sampled disproportionately (either intentionally or unintentionally) in the QSR then this could be a source of bias in the QSR results and would prevent the results of the QSR from being accurately applied to the population of children receiving DCFS services as a whole.

**Opinion No. 6**

56. I evaluated the QSR scores on Overall Status, Overall Practice, Engagement, Teamwork, and Overall Assessment of the 267 focus children cases made available to me from rounds 3 and 4.

57. The Overall Status scores of focus children listed as in the Katie A. class were highly statistically significantly smaller than those focus children listed as not in the class.

58. The other four metrics were not significantly different for children designated as inside versus outside the Katie A. class.

59. Given the difference found in the Overall Status scores for children listed as in the class, if such cases are sampled disproportionately (either intentionally or unintentionally) in the QSR then this could be a source of bias in the QSR results and would prevent the results of the QSR from being accurately applied

to the population of children receiving DCFS services as a whole.

60. I understand that the Katie A. class designation listed in the QSR roll ups may have been used to signify not just class status but also receipt of mental health services, regardless of class status. If this is the case and children with this designation represent more severe cases and hence lower actual status, then the bias from disproportionate sampling of this group would bias the Overall Status scores downward.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on this 23rd day of August, 2019 at Manhattan Beach, California.

_____
Dr. Jay Bartroff

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

435758.2

14

Case No. 2:02-cv-05662 JAK(FFMx)
DECLARATION OF DR. JAY BARTROFF ISO THE COUNTY DEFENDANTS' RULE 60(b)(5) MOTION

**INDEX OF EXHIBITS TO THE DECLARATION OF DR. JAY BARTROFF**

| Ex. No. | Description | Pg. No. |
|---|---|---|
| A. | Curriculum Vitae of Dr. Jay Bartroff | 16-27 |