1  LOUIS R. MILLER (State Bar No. 54141)
   smiller@millerbarondess.com
2  BRIAN A. PROCEL (State Bar No. 218657)
   bprocel@millerbarondess.com
3  DAVID W. SCHECTER (State Bar No. 296251)
   dschecter@millerbarondess.com
4  MILLER BARONDESS, LLP
5  1999 Avenue of the Stars, Suite 1000
   Los Angeles, California 90067
6  Tel.:  (310) 552-4400 / Fax:  (310) 552-8400
7
8  MARY C. WICKHAM (State Bar No. 145664)
   mwickham@counsel.lacounty.gov
9  VICKI KOZIKOUJEKIAN (State Bar No. 171588)
   vkozikoujekian@counsel.lacounty.gov
10 LAURA QUINONEZ (State Bar No. 253862)
   lquinonez@counsel.lacounty.gov
11 OFFICE OF LOS ANGELES COUNTY COUNSEL
   Kenneth Hahn Hall of Administration
12 500 West Temple Street, Suite 648
   Los Angeles, California 90012
13 Tel.:  (213) 974-1811 / Fax:  (213) 626-7446
14
15 Attorneys for the County Defendants
16
17            **UNITED STATES DISTRICT COURT**
18      **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| 19 KATIE A., et al., | **CASE NO. 2:02-cv-05662-JAK-FFMx** |
| 20       Plaintiffs, | **JOINT STIPULATION RE: FILING SUPPLEMENTAL DECLARATION IN SUPPORT OF COUNTY DEFENDANTS' RULE 60(b)(5) MOTION** |
| 21       v. | |
| 22 DIANA BONTA, et al., | |
| 23       Defendants. | Filed Concurrently with [Proposed] Order |
| 24 | |
| 25 | Assigned to the Hon. John A. Kronstadt and Magistrate Judge Frederick F. Mumm |
| 26 | |

27
28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL:(310) 552-4400    FAX:(310) 552-8400

**JOINT STIPULATION**

The Plaintiffs and Defendants County of Los Angeles, Department of Child and Family Services, and the Director of the Department of Child and Family Services (collectively, the "County Defendants"), by and through their respective counsel of record, hereby stipulate as follows:

**WHEREAS**, the County Defendants filed a Rule 60(b)(5) Motion (the "Motion") on August 26, 2019;

**WHEREAS**, the County Defendants intend to submit a supplemental declaration from Dr. Calvin R. Sumner in support of the Motion, a copy of which is attached hereto as **Exhibit 1** (the "Supplemental Declaration");

**WHEREAS**, the County Defendants have agreed to provide Plaintiffs and the Katie A. Advisory Panel with copies of the documents that Dr. Sumner relied upon or reviewed, to the extent discoverable under Rule 26 of the Federal Rules of Civil Procedure or other law, no later than November 25, 2019;

**WHEREAS**, the County Defendants have also agreed to provide the Katie A. Advisory Panel with copies of the documents the County Defendants have produced to date and will produce in the future in response to Plaintiffs' first and second set of document requests, but the County Defendants reserve the right to revisit this issue at a later date should circumstances change;

**WHEREAS**, the Plaintiffs have agreed that the County Defendants may file the Supplemental Declaration in this Court and that the Court may consider the Supplemental Declaration in its resolution of the Motion, although Plaintiffs reserve the right to object to all or parts of the Supplemental Declaration as inadmissible under the Federal Rules of Evidence; and

**WHEREAS**, the Parties intend for this Joint Stipulation to obviate the need for the County Defendants to file a request or application as indicated by the Court in its Minute Order (ECF Dkt. No. 1001).

**NOW THEREFORE, IT IS HEREBY STIPULATED AND AGREED** as

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

follows:

1.     The County Defendants may file the Supplemental Declaration in this Court; and

2.     The Court may consider the Supplemental Declaration in its resolution of the Motion.

**IT IS SO STIPULATED.**

DATED:  November 7, 2019     MILLER BARONDESS, LLP


By:      /s/ David W. Schecter

               DAVID W. SCHECTER
               Attorneys for the County Defendants

**IT IS SO STIPULATED.**

DATED:  November 7, 2019     WESTERN CENTER ON LAW & POVERTY


By:      /s/ Robert D. Newman

               ROBERT D. NEWMAN
               Attorneys for Plaintiffs

        I hereby attest that pursuant to Local Rule 5-4.3.4, I have received concurrence in the filing of this document from each of the other Signatories.

DATED:  November 7, 2019     MILLER BARONDESS, LLP


By:      /s/ David W. Schecter

               DAVID W. SCHECTER
               Attorneys for the County Defendants

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

# EXHIBIT 1

LOUIS R. MILLER (State Bar No. 54141)
smiller@millerbarondess.com
BRIAN A. PROCEL (State Bar No. 218657)
bprocel@millerbarondess.com
DAVID W. SCHECTER (State Bar No. 296251)
dschecter@millerbarondess.com
MILLER BARONDESS, LLP
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
Tel.:  (310) 552-4400 / Fax:  (310) 552-8400

MARY C. WICKHAM (State Bar No. 145664)
mwickham@counsel.lacounty.gov
VICKI KOZIKOUJEKIAN (State Bar No. 171588)
vokzikoujekian@counsel.lacounty.gov
LAURA QUINONEZ (State Bar No. 253862)
lquinonez@counsel.lacounty.gov
OFFICE OF LOS ANGELES COUNTY COUNSEL
Kenneth Hahn Hall of Administration
500 West Temple Street, Suite 648
Los Angeles, California 90012
Tel.:  (213) 974-1811 / Fax:  (213) 626-7446

Attorneys for the County Defendants

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| KATIE A., et al.,<br><br>       Plaintiffs,<br><br>    v.<br><br>DIANA BONTA, et al.,<br><br>       Defendants. | **CASE NO. 2:02-cv-05662 JAK(FFMx)**<br><br>**DECLARATION OF DR. CALVIN R. SUMNER IN SUPPORT OF THE COUNTY DEFENDANTS' RULE 60(b)(5) MOTION**<br><br>Assigned to the Hon. John A. Kronstadt and Magistrate Judge Frederick F. Mumm |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

## <u>DECLARATION OF DR. CALVIN R. SUMNER</u>

I, Dr. Calvin R. Sumner, hereby declare as follows:

1.      I am a Board-Certified Psychiatrist and Child Psychiatrist and have been retained by counsel for the County of Los Angeles (the "County") to provide expert testimony on the delivery of mental health services to the Katie A. Class with respect to the issues presented in the County's Rule 60(b)(5) Motion.   Unless otherwise expressly stated, I have personal knowledge of the facts set forth herein, and if called upon, I could and would testify to these facts in Court under oath.

### <u>EDUCATION, QUALIFICATIONS AND EXPERIENCE</u>

2.      I earned a Bachelor's degree in Biology in 1971 from Columbia University and a Master's degree in Early Childhood and Special Education in 1973 from Columbia University.

3.      I worked as a psychoeducational specialist on a multidisciplinary team at St. Luke's Hospital, Department of Child Psychiatry from 1971-1977 providing intensive psychotherapeutic services for autistic and developmentally disabled children in a therapeutic day program.

4.      In 1977, I entered medical school at the George Washington University School of Medicine and Health Sciences and I was awarded a Medical Doctorate degree, with distinction, from George Washington University in 1981.

5.      From 1981 to 1984, I worked as a medical intern and psychiatric resident at George Washington University Medical Center in Washington, D.C. From 1984 to 1986, I worked as a Child Psychiatric Fellow at the Children's Hospital National Medical Center in Washington, D.C.  During that time, I also served as Chief Clinical Fellow in Child Psychiatry at Children's Hospital National Medical Center, and worked as a Consulting Psychiatrist in the Metropolitan Psychiatric Group at the Psychiatric Institute of D.C. and as an Associate Psychiatrist in the Washington Clinic for Mood Disorders.

6.      In 1986, I obtained Board Certification in Psychiatry from the

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

American Board of Psychiatry and Neurology.  Board certification by an approved board of the American Board of Medical Specialties (ABMS) requires a high degree of competence in any given specialty.  Among medical doctors (MDs), board-certification is the "gold standard," which demonstrates satisfactorily meeting a set of experience and expertise criteria developed by member associations of the ABMS.  The criteria include aspects such as the number of years in training or fellowship programs, the area of practice, passing an extensive certification exam in the area of practice and any licensing and sub-specialty certifications.

7.    In 1994, I obtained a Board Certification in Child Psychiatry from the American Board of Psychiatry and Neurology.

8.    I have over 35 years of diverse clinical experience and a distinguished career in leadership positions in academic medicine and the healthcare industry. I was employed by the state of West Virginia in the Department of Health from 1986-1997 and West Virginia University from 1997-2001.

9.    I held a number of positions within the West Virginia state mental health system focused on improvement of the continuum of psychiatric care for adults, children and adolescents in the public sector in rural Appalachia.

10.    At the local level, I was Medical Director of Weston Hospital serving adults with serious, persistent and recurrent mental illnesses.

11.    At the state level, I was the Chairman of the Utilization Review Committee for Medicaid Children's Mental Health Services.

12.    At West Virginia University, I provided inpatient and outpatient care for children and adolescents, directed the psychiatry residency training program and I was Medical Director of the Residential Treatment Unit for juvenile sexual offenders who were in the custody of child welfare.  In my administrative capacity I was the founding director of the Division of Public Sector Psychiatry within the Department of Psychiatry and served as the Chief of Psychiatry services.  The work of our public sector group in improving the continuum of public mental health care

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

through cooperative public-academic partnerships was recognized by the American Psychiatric Association with the prestigious State-University Collaboration Award.

13.    The primary focus of my most recent research in the healthcare industry was in the development of innovative treatments for mental illness and improvement in the quality of the diagnosis and management of children and youth with neurodevelopmental disorders.

14.    For the past two years I have served as an independent medical reviewer for a clinical review organization assessing claims for mental health services at the request of clients who are private or public insurers.  My medical reviewer role is to determine conformity of the services provided with applicable treatment guidelines and policies related to the patient's medical diagnosis, to establish the medical necessity for the services, to determine if the requested services not covered by policy are consistent with the current evidence-based literature and to consider appeals on denied claims for unique individual circumstances that may be outside of policy.

15.    I am active in national organizations in medicine and psychiatry, I maintain an active medical license, I earn more than 30 hours of Continuing Medical Education per year through participation in medical learning activities, and I am a Life Fellow of the American Psychiatric Association and Senior Fellow of the Group for the Advancement of Psychiatry.

16.    Attached hereto as **Exhibit A** is a true and correct copy of my current curriculum vitae.

## RETENTION AND ASSIGNMENT

17.    I was retained by counsel for the County to provide expert testimony on the delivery of mental health services to the Plaintiff class (the "Katie A. Class").

18.    My hourly rate for this matter is $400.   To date, I have spent approximately 120 hours reviewing materials, conducting research and speaking with County representatives.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1    19.    In particular, I have reviewed the following materials:

2         a.    The Complaint and First Amended Complaint filed by Plaintiffs

3    in this case;

4         b.    The Katie A. Settlement Agreement and the 2003 Order of the

5    Court approving the Katie A. Settlement Agreement;

6         c.    The February 2004 Order of the Court determining the definition

7    of the Plaintiff class;

8         d.    The 2005 County Plan, the 2006 Findings of Fact and

9    Conclusions of Law, the 2007 Corrective Action Plan and the 2008 Katie A.

10    Strategic Plan;

11         e.    The Settlement Agreement entered into between the Plaintiffs

12    and the State in this case;

13         f.    The Rule 60(b)(5) Motion filed by the County Defendants and all

14    Declarations and attached Exhibits;

15         g.    Panel Reports that have been filed in the case;

16         h.    Studies that have been produced by, or on behalf of, the Katie A.

17    Advisory Panel;

18         i.    Documents that describe the Los Angeles County Shared Core

19    Practice Model ("SCPM"), including the Katie A. Strategic Plan, among other

20    documents;

21         j.    Documents that describe the Quality Services Review Process

22    ("QSR"), including QSR Case Summaries, QSR Roll-Ups and the QSR Protocol,

23    among other documents;

24         k.    Webster, D., et al, California Child Welfare Indicators Project

25    (2019), CCWIP Reports, Retrieved from University of California at Berkeley. URL:

26    <http://cssr.berkeley.edu/ucb_childwelfare>;

27         l.    Short-Doyle/Medi-Cal Organizational Manual for Specialty

28    Mental Health Services;

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1          m.     Memoranda and reports submitted to the Los Angeles County

2    Board of Supervisors in connection with this case;

3          n.     Los Angeles County DCFS and DMH Policies and Guidelines;

4          o.     Aggregate Medi-Cal billing data from Calendar Year 2017 for

5    the Plaintiff class;

6          p.     State All County Letters and other public documents that

7    describe the requirements and implementation of California's Continuum of Care

8    Reform ("CCR");

9          q.     The CMS-416 annual reports on EPSDT service delivery;

10          r.     Academic, scientific and medical literature relevant to the

11    provision of mental health services to the Katie A. Class as well as the issues raised

12    by the Katie A. Advisory Panel and Plaintiffs' counsel; and

13          s.     DHCS LA County "Performance Outcomes System Children in

14    Foster Care County Report" August 9, 2017.

15        20.    In addition to the above materials, I requested aggregate Medi-Cal

16    billing data from DMH for mental health services that were delivered to the Katie A.

17    Class for the most recent period, which was calendar year 2017.  Calendar year 2017

18    was chosen because it is the most recent time segment that would yield a full year's

19    worth of data.  This aggregate Medi-Cal billing data contained (1) diagnostic

20    information describing the range and frequency of specific mental health diagnoses

21    and (2) treatment information describing the type of services, quantity of services

22    and average service units per unique client.  I refer to this data as the "2017 Medi-

23    Cal Aggregate Data."

24        21.    The 2017 Medi-Cal Aggregate Data contains billing information for a

25    cohort of 21,309 Katie A. Class members (the "Cohort") who had an open DCFS

26    case in calendar year 2017 and received mental health services that were reimbursed

27    through Medi-Cal.  The age breakdown for the 21,309 individual clients is as

28    follows:  Ages 0-11 (N=13811, 65%); Ages 12-17 (N=6264 29%); and Ages 18-21

DECLARATION OF DR. SUMNER I/S/O COUNTY DEFENDANTS' RULE 60(b)(5) MOTION

1  (N=1164, 6%).  The Cohort was almost equally divided between females

2  (N=10,537, 49.4%) and males (N=10,739, 50.6%).

3      22.    In addition to the above materials, I spoke with various County

4  officials, including Helen Berberian (DCFS Deputy Director), Anabel Rodriguez

5  (DMH Deputy Director, Child Welfare Division), Dr. Paul Arns (DMH Chief,

6  Clinical Informatics), Mirian Avalos (DMH Chief Information Officer), and John

7  Ortega (DMH Data Management, Business and Intelligence Reporting), as well as

8  Dr. Jay Bartroff, an expert retained by the County for this case.

9      23.    I understand that the County Defendants are in the process of

10  responding to requests for information and documents by Plaintiffs' counsel and the

11  Katie A. Advisory Panel.  I reserve the right to supplement my opinions if new

12  information comes to my attention that is not incorporated in this declaration.

13                                **BACKGROUND**

14      24.    As a Board-Certified Psychiatrist and Child Psychiatrist with over 40

15  years of experience, I recognize that youth in foster care tend to have a higher

16  prevalence of mental health and physical health issues as compared to the general

17  population.  The literature suggests that up to 80% of youth in foster care can exhibit

18  a serious behavioral or mental health problem requiring intervention.[1]

19      25.    A 2016 study authored by Dr. Kristin Turney and Dr. Christopher

20  Wildeman and published by the American Academy of Pediatrics compared the

21  incidence of physical and mental health conditions of children and young adults

22  placed in foster care with those children and young adults who had not been placed

23  in foster care.[2]  Their research revealed that youth in foster care generally have

24  _____

25  [1] Peter J. Pecora, et al., Mental Health Services for Children Placed in Foster Care:

26  An Overview of Current Challenges, *Child Welfare*. 2009); 88(1): 5-26 (the "Pecora Study") at pp. 1-2 (citing eight studies published from 1993 to 2005).

27  [2] Turney K. and Wildeman C., Mental and Physical Health of Children in Foster

28  Care.  *Pediatrics*. 2016; 138(5): e20161118 (the "Turney/Wildeman Study") at pp.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

DECLARATION OF DR. SUMNER I/S/O COUNTY DEFENDANTS' RULE 60(b)(5) MOTION

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1    higher rates of diagnosable mental disorders.  For example, Dr. Turner and Dr.

2    Wildeman found that about 21.8% of foster youth in foster care have attention-

3    deficit hyperactivity disorder ("ADHD") as compared to 7.4% among the general

4    population.[3]  They found similar results with depression and anxiety, as they found

5    that foster youth generally experience diagnosable depression (14.2% vs. 2.0%) or

6    anxiety (14.2% vs. 3.1%) at much higher rates than the general population.[4]

7         26.    Similarly, other studies have found that youth in foster care experience

8    post-traumatic stress disorder ("PTSD") at significantly higher rates than the general

9    population.[5]

10        27.    Based on my experience, which is supported by the literature, there are

11   a number of risk factors that contribute to these mental health needs.  In general,

12   youth in foster care (1) are more likely to have been exposed to illicit substances in

13   utero, (2) tend to have a higher rate of family psychiatric problems, (3) are more

14   likely to have parents and caregivers who abuse illicit substances, (4) experience

15   transitions in primary caregivers that can disrupt attachment relationships, (5) are

16   less likely to have received consistent prevention and primary care services before

17   entering foster care,  and (6) by definition have experienced one or more instances

18   of maltreatment.[6]

19        28.    Scholars and practitioners have recognized that a significant percentage

20   of foster youth in child welfare systems across the nation do not receive or have

21   access to quality mental health services.   While some scholars estimate that one in

22   five children in the United States has a diagnosable mental health condition, the data

23   _____

     3-5.

24   [3] *Id.* at p. 4.

25   [4] *Id.* at p. 4.

26   [5] Pecora Study at pp. 13-14.

27   [6] Dr. Moira A. Szilagyi, et al., Health Care Issues for Children and Adolescents in

28   Foster Care and Kinship Care.  *Pediatrics.* 2015; 136; e1142.

DECLARATION OF DR. SUMNER I/S/O COUNTY DEFENDANTS' RULE 60(b)(5) MOTION

suggests that access for foster youth in general is poor:  at least 85% of those in need of treatment do not get it.[7]

## OPINIONS AND ANALYSIS

### A.    Summary of Opinions

29.    Los Angeles County does not have a policy, custom or practice to deny medically necessary mental health services to the Katie A. Class.  Indeed, the opposite is true.  The County's policies, on their face, are designed to ensure that the members of the Katie A. Class receive the mental health services they need based on the reasoned judgment of mental health professionals.

30.    It is the policy of the County to provide mental health screens to all members of the Katie A. Class, and to provide comprehensive psychiatric diagnostic evaluations to all members of the Katie A. Class who screen positive for potential mental health needs.  It is also the policy of the County to provide mental health treatment to members of the Katie A. Class based on their medical and mental health needs.

31.    The County offers a wide-ranging and diverse set of mental health services and programs that are capable of meeting the needs of the Katie A. Class. Eligibility for these services and programs is based on the individual needs of the members of the Katie A. Class.

32.    The County's data and the Medi-Cal billing records show that the County has substantially implemented its policies to provide the full EPSDT benefit to the Katie A. Class.

33.    I have found there is no evidence of systemic or system-wide discrimination in the provision of mental health services to the Katie A. Class.  The County offers a diverse set of mental services and programs that are provided based

---

[7] Eliot Brenner, The Crisis of Youth Mental Health, *Stanford Social Innovation Review*, 2019, at p. 34.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

on the mental health needs of the individual members of the Katie A. Class. Appropriately, youth who present with significant impairment due to mental health issues generally receive treatment(s) of greater frequency and intensity than those who present with more routine mental health needs.

34.     These findings are discussed in detail below.

**B.     There Is No Policy, Custom or Practice to Deny EPSDT Services to the Katie A. Class**

35.     In general, the EPSDT benefit, which must be provided to Medicaid-eligible persons in jurisdictions that have opted into Medicaid, includes three components:   (1) early and periodic screening and assessment, which includes mental health; (2) diagnostic services; and (3) treatment that is medically necessary to correct or ameliorate the diagnosed condition.

**1.     Screening and Assessment Services**

36.     As part of the EPSDT benefit, EPSDT-eligible youth are entitled to receive early and periodic mental health screening and assessment services.

37.     The aspirational goal set by the Centers for Medicare and Medicaid Services ("CMS")[8] is a participant ratio of at least 80%.  The participant ratio is defined as the percentage of children who received at least one screening during a given time period out of the total number of children who were expected to receive at least one screening during that same time period.

38.     The CMS publishes data on the national and state averages for participant ratios in jurisdictions who have opted into Medicaid.  The most recent CMS participant ratio data is from fiscal year 2017.  Based on this data, the average national participant ratio was 74% in fiscal year 2017.  For the state of California, the average participant ratio is 56%.

---

[8] The Centers for Medicare and Medicaid Services is a federal agency within the U.S. Department of Health and Human Services.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

39.     The County's policy for Medicaid-eligible children in DCFS custody is to exceed the CMS aspirational goal.  The County's policy is to provide a mental health screen to all eligible foster youth in Los Angeles County.[9]

40.     The County's records demonstrate that DCFS and DMH have substantially implemented this policy.  Per the Los Angeles Board of Supervisors Referral Tracking System Calendar Year Summary Data Report for Calendar Year 2018 ("CY 18 RTS Report"), 96.37% of the youth in DCFS custody received a mental health screen in calendar year 2018.  This percentage is significantly greater than the 80% aspirational goal for EPSDT mental health screening set by CMS.

41.     Based on the recent Panel Reports, DCFS and DMH have been able to achieve a screening percentage above 90% on a consistent basis for nearly a decade. The Katie A. Advisory Panel has acknowledged that the departments have made substantial progress in this regard, and that the Panel only monitors to ensure that the County sustains these results.

42.     Indeed, the availability of these mental health services to effectively all of the Katie A. Class stands in stark contrast to the limited access to comprehensive mental health services that most children and youth America experience.[10]

2.     **Diagnostic Services**

43.     As part of the EPSDT benefit, EPSDT-eligible youth are entitled to receive diagnostic services if they present a potential mental health need as a result of the mental health screen or assessment.

44.     The County's policy is to provide psychiatric diagnostic evaluations to all members of the Katie A. Class who present a potential need for mental health

---

[9] The County's policies, practices and procedures that have been implemented in furtherance of that policy are described in the Declarations of Helen Berberian and Anabel Rodriguez.

[10] Eliot Brenner, The Crisis of Youth Mental Health, *Stanford Social Innovation Review*, 2019, at p. 34.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1    services.[11]

2        45.    The County's records show that DCFS and DMH have substantially

3    implemented these policies.  Based on the CY 18 RTS Report, 98.47% of youth who

4    screen positive for mental health needs are referred from DCFS to DMH to receive a

5    comprehensive assessment, and 93.79% of those referrals are timely per County

6    policy.

7        46.    The 2017 Medi-Cal Aggregate Data supports these figures.    Per

8    Director Bobby D. Cagle's April 4, 2018 report to the Los Angeles County Board of

9    Supervisors, 17,104 children or youth screened positive for mental health needs in

10   calendar year 2017.  Based on the 2017 Medi-Cal Aggregate Data, 16,634 members

11   of the Katie A. Class received a comprehensive psychiatric or mental health

12   evaluation during calendar year 2017.  On the assumption that these members of the

13   Katie A. Class screened positive in calendar year 2017, these figures show that

14   97.3% of the Katie A. Class who screened positive received a psychiatric diagnostic

15   evaluation.[12]

16       47.    The 2017 Medi-Cal Aggregate Data also shows that the Katie A. Class

17   receives meaningful diagnostic services.  Of the 21,309 Katie A. Class members

18   who received mental health services in calendar year 2017, 18,173 (85%) met the

19   DSM criteria for at least one specific psychiatric diagnosis.  The 15% of the Cohort

20   without any diagnosis are characterized as "Unspecified," which in DSM means that

21   _____

22   [11] The policies and practices that DCFS and DMH have implemented to effectuate

23   this policy are described in the Declarations of Helen Berberian and Anabel

     Rodriguez.

24   [12] Assumptions such as these must be made because the 2017 Medi-Cal Aggregate

25   Data focuses on a 12-month period.  There may be cases where a child is screened

26   in late calendar year 2016 but receives a psychiatric diagnostic evaluation in early

     2017.  Such cases would inflate the percentage, but this is mitigated by the fact that

27   there may be cases where a child is screened in late calendar year 2017 but receives

28   a psychiatric diagnostic evaluation in 2018.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1    the root of the symptoms or their manifestation has not yet been determined.

2         48.    The distribution of first-billed[13] diagnoses across the Cohort were:

3    Adjustment Disorder (23%), Anxiety Disorder (6%), Attention Deficit Hyperactivity

4    Disorder (10%), Bipolar Disorder (<1%), Conduct Disorder (10%), Impulse

5    Disorder (<1%), Depressive Mood Disorder (18%), Other psychiatric disorder

6    (10%), Post-Traumatic Stress Disorder (10%) and Schizophrenia and Psychotic

7    Disorders (<1%).

8         49.    I compared this data against the prevalence of mental health disorders

9    for foster youth as reported by peer-reviewed studies and with the rate of diagnoses

10   in practice for foster youth in 2017 as reported by the Substance Abuse and Mental

11   Health Services Administration ("SAMHSA") within the U.S. Department of Health

12   and Human Services.

13        50.    The data shows that the first-billed diagnoses for the Cohort in the 2017

14   Medi-Cal Aggregate Data are generally consistent with the distribution of diagnoses

15   found in practice and reported in the literature.  For example, SAMHSA reported

16   that about 7.1% of youth in foster care in 2017 had a diagnosis of anxiety disorder.[14]

17   This data is roughly consistent with the 6% of the Cohort who had a diagnosis of

18   anxiety disorder.  SAMHSA also reported that about 12.6% of youth in foster care

19

20   _____

21   [13] Psychiatric diagnostic data introduces special challenges to providing reasonably

22   interpretable summary-level data.  A given client may, based on a given assessment,
     meet criteria for multiple psychiatric diagnoses.  Additionally, a given individual

23   may be seen across multiple DMH directly operated and contracted service
     providers, each of which may file a slightly different diagnostic record.

24   [14] Substance Abuse and Mental Health Services Administration, Center for

25   Behavioral Health Statistics and Quality. *Mental Health Annual Report: 2017. Use*

26   *of Mental Health Services: National Client-Level Data.* Rockville, MD: Substance
     Abuse and Mental Health Services Administration, 2019 at p. 73.  Available at

27   https://www.samhsa.gov/data/data-we-collect/mental-health-client-level-data.  This

28   report is referred to as "2017 SAMHSA Report."

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

in 2017 had a diagnosis of ADD/ADHD,[15] which is roughly consistent with the Cohort data which shows that about 10% had a diagnosis of ADHD. In addition, about 10% of the Cohort had a diagnosis of Conduct Disorder or Oppositional Defiant Disorder, which is roughly consistent with the SAMHSA data showing that about 8.3% of foster youth in 2017 were diagnosed with conduct disorder.[16]

### a.    Further Analysis of ADHD

51.    The first-billed diagnosis shown in the 2017 Medi-Cal Aggregate Data suggests that rates of ADHD diagnosis, although consistent with nationwide practice as reported by SAMHSA, may be underdiagnosed based on the prevalence data reported in the literature. Some peer-reviewed studies of youth in foster care found that about 21.8% of foster youth suffer from ADHD,[17] which is over twice as high as the rate of diagnosis for ADHD (10%) shown in the Cohort.

52.    To investigate the possibility that symptoms of ADHD could have been recognized in diagnoses other than the first-billed diagnosis, I conducted a more in-depth analysis of ADHD. I requested additional data from DMH on the occurrence of ADHD as any diagnosis for foster youth in the Cohort—not just the first-billed diagnosis.

53.    This additional data showed that, when secondary and other non-primary diagnoses are considered, about 22.3% of Katie A. Class members in calendar year 2017 were diagnosed with ADHD, which more closely approximates

---

[15] *Id.* at p. 73.

[16] The SAMHSA data have separate diagnostic categories for the behavioral disorders of Conduct Disorder and Oppositional Defiant Disorder while the Cohort only uses the diagnosis of Conduct Disorder. The rates of diagnosis of the two SAMHSA behavioral disorders categories were summed to compare with the rate of Conduct Disorder diagnosis in the Cohort data.

[17] Turney/Wildeman Study at p. 5.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

14

1  the population prevalence of ADHD (21.8%) found in the literature.[18]

2  ### b. **Further Analysis of PTSD**

3  54.    The first-billed diagnosis shown in the 2017 Medi-Cal Aggregate Data

4  also suggests that rates of PTSD diagnoses are somewhat less than one would have

5  predicted for this population based on the SAMHSA Report and prevalence data

6  from peer-reviewed studies.  For example, the SAMHSA Report states that about

7  47.5% of youth in foster care in 2017 had "trauma- and stressor-related disorders,"[19]

8  and prevalence data in peer-reviewed studies show that up to 30% of foster youth

9  have PTSD and/or symptoms of trauma.[20]  The Cohort data shows that only about

10  10% had a diagnosis of PTSD.

11  55.    The definition of "trauma- and stressor-related disorders" used by

12  SAMHSA also includes adjustment disorders,[21] whereas the Cohort data categorizes

13  Adjustment Disorder separately.  Thus, to compare the Cohort data to the SAMHSA

14  Report, the rate of diagnosis of Adjustment Disorder (23%) in the Cohort should be

15  added to the rate of diagnosis of PTSD (10%).  However, this combined diagnosis

16  rate (33%) is still somewhat less than the data reported by SAMHSA (47.5%).

17  56.    Trauma is significant issue for youth in foster care, and thus it is

18  important that a mental health and child welfare system recognize the potential for

19  this condition.

20  57.    To determine whether childhood trauma was underdiagnosed, I

21  requested additional data from DMH on the diagnosis of PTSD or any significant

22  post-traumatic reaction beyond the first-billed diagnosis.  This data showed that,

23

24  [18] *Id.* at p. 5.

25  [19] SAMHSA Report at p. 73.

26  [20] Pecora Study at p. 14 (reporting that about 30% of foster youth had symptoms of
27  PTSD over their lifetime, which includes after graduation from foster care).

28  [21] SAMHSA Report at p. 257.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1  although only 10% of the Cohort had a first-billed diagnosis of PTSD, 30% of the

2  clients (N=6,370) had some combination of a first-billed or a secondary diagnosis of

3  significant post-traumatic reaction.  These diagnoses were associated with mental

4  health services that were delivered in calendar year 2017.

5       58.    When these diagnoses are considered, the Cohort received a trauma

6  diagnosis at a rate consistent with prevalence data in the literature.[22]  In addition,

7  when the combined PTSD/significant post-traumatic reaction diagnoses are

8  combined with Adjustment Disorders in the Cohort (23%), the total (53%) is

9  generally consistent with the 47.5% of trauma- and stressor-related disorders

10  reported by SAMHSA for foster youth in 2017.[23]

11       59.    This data shows that Katie A. Class members receive competent and

12  meaningful diagnostic services, and it also shows that the County's mental health

13  care system appreciates and recognizes the potential trauma experienced by the

14  Katie A. Class and delivers services that are trauma-informed.

15       **3.    <u>Treatment Services</u>**

16       60.    As part of the EPSDT benefit, EPSDT-eligible youth are entitled to

17  receive treatment that is medically necessary to correct or ameliorate the mental

18  health conditions identified in the mental health screens or assessments.

19

20  _____

21  [22] Pecora Study at p. 14.  Note, many studies report prevalence data for PTSD

22  among foster youth at rates far lower than 30% of the foster youth population.  *See*

Dr. Guillaume Bronsard, et al., The Prevalence of Mental Disorders Among

23  Children and Adolescents in the Child Welfare System, 2016.  *Medicine* 95(7):

e2622 (reporting that between 2% to 8% of youth in child welfare systems in the

24  U.S. and in Europe have PTSD); Dr. Judy Havlicek, Mental Health and Substance

25  Use Disorders among Foster Youth Transitioning to Adulthood:  Past Research and

Future Directions, 2013.    *Child Youth Serv Rev.* 35(1):  194-203.

26  doi:10.1016/j.childyouth.2012.10.003  (reporting that the lifetime prevalence of

27  PTSD for foster youth ages 17 to 18 is between 14% -15%).

28  [23] SAMHSA Report at p. 73.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

### a.    The Available Mental Health Services

61.    The array of mental health services that are currently offered to the Katie A. Class are described in the Short-Doyle/Medi-Cal Organizational Manual for Specialty Mental Health Services ("OPM").

62.    The OPM incorporates by reference requirements from numerous sources, including the federal Code of Federal Regulations, the California Code of Regulations, State Plan Amendments, the state Manual for Intensive Care Coordination, Intensive Home-Based Services and Therapeutic Foster Care for Medi-Cal Beneficiaries, DMH's own policies, and others.[24]  DMH Policy 401.03 requires all providers to abide by the OPM,[25] including its adoption of Medi-Cal standards as the "minimum standard" for provision of services.[26]

63.    The OPM delineates the mental health services to be provided pursuant to Medicaid, and reflects "the current requirements for Rehabilitative Services, Targeted Case Management and EPSDT Supplemental Specialty Mental Health Services."[27]    It also describes the staffing and documentation requirements applicable to those services.[28]

64.    By policy, services provided pursuant to the OPM "focus on client needs, strengths, choices and involvement in the treatment planning and implementation."[29] It is County policy that "[s]ervices are based on the client's long-term goals/desired result(s) from mental health services concerning his/her own life and his/her diagnosis, functional impairment(s), symptoms, disabilities, life

---

[24] OPM at 5.

[25] LACDMH Policy 401.03 § 3.1.

[26] LACDMH Policy 401.03 § 3.1.1.

[27] LACDMH Policy 401.03 § 2.13.

[28] LACDMH Policy 401.03 § 2.13.

[29] OPM at 6.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

DECLARATION OF DR. SUMNER I/S/O COUNTY DEFENDANTS' RULE 60(b)(5) MOTION

conditions, and rehabilitation readiness," that    "[p]rogram staffing is multi-disciplinary and reflects the cultural, linguistic, ethnic, age, gender, sexual orientation and other social characteristics of the community" and that "[f]amilies, caregivers, human service agency personnel and other significant support persons" in the client's community "are encouraged to participate in the planning and implementation process in meeting the client's needs, choices responsibilities, and desires."[30]  Services are "provided in the setting and manner most appropriate to the treatment and service needs of the client,"[31] and "documentation must show that services took into account the client's culture."[32]

65.    To accomplish these ends, the OPM provides a broad spectrum of therapeutic interventions, including, among others, the following:

- Assessments to determine the client's mental, emotional, and behavioral health, the client's needs and strengths, the existence of maladaptive risk behaviors, the adequacy and availability of resources, and whether there is need for targeted case management services based on the client's individualized needs.[33]

- Professional clinical therapies focusing on "symptom reduction and restoration of functioning as a means to improve coping and adaptation to reduce functional impairments," including "application of cognitive, affective, verbal or nonverbal, strategies based on the principles of development, wellness, adjustment to impairment, recovery and resiliency to assist the client in acquiring greater personal, interpersonal and community functioning or to modify feelings, thought processes, conditions, attitudes or

[30] OPM at 6.

[31] OPM at 8 (incorporating State DMH Letter No. 02-07.).

[32] OPM at 11.

[33] OPM at 28.

DECLARATION OF DR. SUMNER I/S/O COUNTY DEFENDANTS' RULE 60(b)(5) MOTION

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

behaviors which are emotionally, intellectually, or socially ineffective."[34]

- Psychotherapy designed to assist the client "to achieve a better psychosocial adaption, to acquire a greater human realization of psychosocial potential and adaptation, [and] to modify internal and external conditions that affect . . . behavior, emotions and thinking in respect to their intrapersonal and interpersonal processes."[35]

- Rehabilitation services to assist in "restoring, improving, and/or preserving a client's functional, social, communication, or daily living skills to enhance self-sufficiency or self-regulation in multiple life domains relevant to the developmental age and needs of the client."[36]

- Crisis intervention when needed "to stabilize an immediate crisis within a community or clinical treatment setting."[37]

- Intensive Care Coordination—a "targeted case management service that facilitates assessment of, care planning for, and coordination of services."[38]

- Intensive Home-Based Services—"intensive, individualized and strength-based, needs-driven intervention activities that support the engagement and participation of the child or youth and his/her significant support persons to help the child or youth develop skills and achieve the goals and objectives" of their treatment plan.[39]

- Therapeutic Behavioral Services—an "intensive, individualized, one-to-one behavioral mental health service available to children/youth with serious

---

[34] OPM at 32.

[35] OPM at 31.

[36] OPM at 31.

[37] OPM at 30.

[38] OPM at 47.

[39] OPM at 53.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

emotional challenges and their families."[40]

• Therapeutic Foster Care—a "short term, intensive, highly coordinated, trauma-informed, and individualized intervention" for youth with "complex emotional and behavioral needs."[41]

• Transition services designed to assist the client and family "to foster long term stability including the effective use of natural supports and community resources."[42]

• Adjunctive therapies that use "self-expression, such as art, recreation, dance, or music" used alongside core therapies to assist in "attaining or restoring skills which enhance community functioning including problem solving, organization of thoughts and materials, and verbalization of ideas and feelings."[43]

• Collateral services (such as consultation or training) that would aid persons in the client's life in providing support for achievement of the client's goals.[44]

• Monitoring and follow-up to "to ensure the Client Treatment Plan is implemented and adequately addresses the client's needs"[45] and, where intensive care is provided to ensure that "services and activities are progressing appropriately" and "changing and redirecting actions targeted at the client's and family's assessed needs."[46]

---

[40] OPM at 42.

[41] Medi-Cal Manual for Intensive Care Coordination (ICC), Intensive Home Based Services (IHBS), and Therapeutic Foster Care (TFC) Services for Medi-Cal Beneficiaries at 34 (incorporated into OPM at 5).

[42] OPM at 32.

[43] OPM at 28.

[44] OPM at 29.

[45] OPM at 30.

[46] OPM at 30.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

66.    Based on my experience, these and the other services made available pursuant to the policies I have reviewed are comprehensive, providing the full array of services needed to treat every mental health diagnosis and condition recognized in the International Classification of Diseases, Tenth Revision, Clinical Modification (World Health Organization) ("ICD-10-CM") that is included in Medi-Cal.[47]    I have not identified any applicable therapeutic intervention for these ICD-10-CM diagnoses that are excluded from these policies.[48]

67.    Pursuant to LACDMH Policy 401.03, the only requirement for delivery of the above array of mental health services is medical necessity.

68.    A service is deemed medically necessary where three criteria are met: (1) Diagnosis; (2) Impairment, and (3) Intervention.  The "diagnosis" requirement is met where a qualified mental health professional diagnoses a client with any of the hundreds of mental health concerns incorporated into the OPM from ICD-10-CM.

69.    I have reviewed the full set of potential diagnoses appearing in the Appendix to the OPM and found that it is comprehensive.

70.    The "impairment" requirement is met where the applicable diagnosis causes "significant impairment in an important area of life functioning," "a probability of significant deterioration in an important area of life functioning," or

---

[47] A full set of applicable mental health diagnoses appears in the Appendix to the OPM.

[48] In addition, the inclusion of evidence based practices ("EBP") in the service array reflects a dynamic system that provides a solid base of comprehensive services and at the same time is exploring potentially effective evidence-based practices.  The currently reported EBPs are:    Aggression Replacement Training (ART); Alternatives for Families - Cognitive Behavioral Therapy (AF - CBT);    Brief Strategic Therapy, Child Parent Psychotherapy (CPP);    Cognitive Behavioral Intervention for Trauma in Schools (CBITS);  Functional Family Therapy (FFT); Incredible Years (IY);  Managing and Adapting Practice (MAP);  Multisystemic Therapy (MST);    Parent-Child Interaction Therapy (PCIT);    Seeking Safety; Strengthening Families; Trauma Focused - Cognitive Behavioral Therapy (TF-CBT);  Triple P Positive Parenting Program; and UCLA Ties Transition Model.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

"a probability a person under 21 years of age will not progress developmentally as individually appropriate."[49]

71.    The "intervention" requirement is satisfied where the services to be provided are intended and expected to "significantly diminish" the applicable impairment, "prevent deterioration," or allow developmental progression, and the mental health services are needed to accomplish that goal.[50]

72.    An important carve-out to these criteria exists for persons under the age of 21.  Pursuant to California Regulation 1830.210, which the OPM incorporates, County policy is that persons under the age of 21 are entitled to receive mental health services even if the level of impairment or probability of deterioration is not "significant," and even where the therapeutic intervention is not expected to significantly diminish the impairment or prevent deterioration.  Services must be provided whenever an EPSDT screening identifies a diagnosis as above and the services are needed "to correct or ameliorate a defect, mental illness, or condition."[51]  My understanding of the effect of this carve-out is that virtually any person eligible for Medicaid services under the age of 21 who has a diagnosed mental health need will receive mental health services regardless of their level of impairment or the likelihood of success of treatment.

73.    Thus, it is the policy of the County to provide all mental health services that are medically necessary under the EPSDT provision of Medicaid.

**b.    Delivery of Mental Health Services**

74.    The County's records show that the Katie A. Class receives mental health treatment consistent with the County's policies.  In terms of total amount, the County's records show that the Katie A. Class received mental health services that

---

[49] OPM at 13.

[50] OPM at 13.

[51] OPM at 14.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

cost over $192 million in calendar year 2017.  That number increased to over $210 million in calendar year 2018.

75.    The 2017 Medi-Cal Aggregate Data provides a more detailed description of these services.  In calendar year 2017, the Katie A. Class received 1,233,955 billed services (57.9 services/client).  The total number of units of service provided was 96,592,320 (4,533 units of service/client).[52]  A further breakdown of the services delivered to the Cohort are set forth in **Exhibit B**.

76.    To gain a more granular appreciation of patterns, duration and timeliness of service connected to diagnoses, I requested data from DMH on a subset sample of 50 randomly selected cases from the Cohort.

77.    To randomly select 50 cases, DMH assigned each of the 21,309 members of the Cohort a number 1 through 21,309.  DMH created a spreadsheet that contained just this assigned number and the child's DMH ID number.  DMH then requested Dr. Jay Bartroff to use a random number generator to select 50 numbers from 1 through 21,309.  Dr. Bartroff reported those numbers to DMH, who then assembled 12-months' worth of Medi-Cal billing entries for all 50 of the selected cases (the "50 Case Data").  A breakdown of the services delivered in these 50 cases is set forth in **Exhibit C**.

78.    To the extent that this 50 case sample accurately represents the entire Cohort, the data shows that (1) youth in foster care are consistently evaluated for mental health services, (2) the mental health services provided to youth are individualized and appear to prioritize intensive services for youth with urgent needs and (3) the mental health services are generally timely, continuous and of sufficient duration to provide a reasonable likelihood of therapeutic benefit.

79.    A potential limitation of this review is that summary-level data does not

---

[52] Units of Service ("U") are minutes with the following exceptions: U (Crisis Stabilization) are hours; U (Day Rehab and Day Treatment) are 4-6 hour sessions; U (Residential Inpatient) are days.

provide a perspective on internal or external barriers or circumstances that may influence the receipt of such services in particular cases or the specifics of unique psychological and psychosocial needs and strengths of a given child.

80.    This limitation does not impact my findings given the narrow scope of the County's Rule 60 Motion.   The issue, as I understand it, is not whether a particular case was handled perfectly, but whether there is a County policy, custom or practice not to provide EPSDT services for eligible members of the Katie A. Class.  The aggregate data provided by the County is sufficient to determine whether such a policy, custom or practice exists.

## c.    **Individualization**

81.    I carefully reviewed the data for each youth in the 50-case sample from calendar year 2017.  The only mental health service for five of the 50 cases was a psychiatric diagnostic evaluation, and an additional four cases had very few mental health services provided.

82.    Of the other 41 cases that received significant mental health services beyond psychiatric diagnostic evaluations and one or a few treatment services, the mental health service program for each individual appeared to be unique. The individual programs for each client include services that could be beneficial for clients based on their diagnoses and no program of services includes treatment interventions that would be contra-indicated or potential harmful for the clients.

83.    The diagnoses for the clients in the sample generally fell into eight diagnostic categories. The service programs for the individuals in the diagnostic groups discussed below are consistent with the treatments that would be expectable.

84.    **Adjustment Disorder** – A short-term condition that occurs when a person has great difficulty coping with, or adjusting to, a particular source of stress, such as a major life change, loss, or event.   In general individuals with an adjustment disorder require short-term therapy services and seldom need intensive services.   In the sample 12 individuals had an adjustment disorder and, for those

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

cases where services were provided, the class members general received psychotherapy and/or family therapy.

85. **Anxiety** – An umbrella term that includes a group of disorders characterized by significant feelings of anxiety and fear such as panic disorder, social anxiety, generalized anxiety, phobias, etc. The treatments for anxiety disorders are psychotherapy and/or medication. In the sample 4 individuals with anxiety and 3/4 received treatments under the service code of mental health services which includes psychotherapies. In the fourth case, the evaluation was complete on December 18, 2017, and the reporting period ended before treatment began. Thus, it is possible that psychotherapy was provided in that case as well.

86. **Attention Deficit Hyperactivity Disorder** – A developmental disorder that is marked especially by persistent symptoms of inattention (such as distractibility, forgetfulness, or disorganization) or by symptoms of hyperactivity and impulsivity (such as fidgeting, speaking out of turn, or restlessness) or by symptoms of all three and that is not caused by any serious underlying physical or mental disorder. ADHD can present with mild, moderate or severe symptoms that often require multiple therapeutic interventions including medication and educational coordination. In the sample 4 individuals had ADHD and 2/4 received crisis intervention, 4/4 received mental health services including psychotherapies, 3/4 had medication services and 3/4 received Targeted Case Management**.**

87. **Conduct disorders** – A serious behavioral and emotional disorder that can occur in children and teens. A child with this disorder may display a pattern of disruptive and violent behavior and have problems following rules. It is not uncommon for children and teens to have behavior-related problems at some time during their development. Multiple treatment modalities are often necessary to provide treatment for the multiple impairments of these individuals. 4 individuals in the sample had Conduct Disorders. 2/4 received crisis intervention, 1/4 received crisis stabilization, 4/4 received ICC, 4/4 received IHBS, 4/4 received mental health

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

services including psychotherapy, 1/4 received medication management and 2/4 received Targeted Case Management.

88.    **Major Depression** – a mental disorder characterized by a persistently depressed mood and long-term loss of pleasure or interest in life, often with other symptoms such as disturbed sleep, feelings of guilt or inadequacy, and suicidal thoughts. Individuals with major depression may experience varying degrees of impairment from dysthymia to suicidality and require varying levels of service intensity including medication. In the sample there were 8 individuals with Major Depression or Other Affective Disorder.  Of this group, 2/8 received crisis intervention, 2/8 received ICC, 2/8 received IHBS, 1/8 received medication, 3/8 received Targeted Case Management and most received psychotherapy.

89.    **Other Disorder** – A heterogeneous group of reactive emotional disorders that represents an excessive reaction to environmental events. The treatment of this group often requires multiple interventions including medication and environmental stabilization. In the sample 5 individuals had diagnoses in the Other Disorder category and 1/5 received ICC, 1/5 received IHBS, 4/5 received mental health services including psychotherapy or family therapy, 1/5 received medication and 4/5 received Targeted Case Management.

90.    **Post-traumatic stress disorder** – A specific anxiety disorder that develops following frightening, stressful, or distressing life events. Characterized by intense fear, helplessness, and stress, PTSD affects normal life and functioning of the individual.  Treatments include medications and psychotherapy, either alone or in combination. In the sample 6 individuals were diagnosed with PTSD and 4/6 received IHBS, 4/6 received ICC, 6/6 received mental health services and 5/6 received psychotherapy, 2/6 received medication services and 1/6 received Targeted Case Management.

91.    **Unspecified condition** – This diagnostic category applies to presentations of symptoms characteristic of a mental disorder that cause clinically

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

DECLARATION OF DR. SUMNER I/S/O COUNTY DEFENDANTS' RULE 60(b)(5) MOTION

significant distress or impairment in social, occupational, or other important areas of functioning predominate but do not meet the full diagnostic criteria for any mental disorder. The primary treatment is psychotherapy which may provide symptom reduction and an opportunity for extended evaluation. Seven individuals in the sample were characterized as Unspecified Disorder and most received mental health services, 3/7 received psychotherapy and/or family therapy and 2/7 received Targeted Case Management.

92. After completing my review, I found that the treatments provided for the individuals in the 50-case sample related to the diagnoses of those individuals. The data supports that programs of therapeutic services are individualized, are consistent with usual treatments for the diagnoses, and are appropriately responsive to the needs of those diagnoses that are more prone to require multiple or intense services. No individual received mental health treatment that would be contraindicated for their diagnosis or potentially harmful.

**d.** **Intensity and Continuity**

93. I reviewed the number and types of service delivered to each of the individual cases in the 50-case sample who received mental health services. Below is a summary of the data.

94. Based on my review, each of the service programs for each client appeared to be unique without evidence of repetitive patterns of service. The services for each client appear to be designed specific to the client and consistent with the expectations of services for the diagnoses. In usual practice, there may be variation in the number and types of treatment services that will be beneficial for any given individual.

95. In most cases, treatment services were continued for a period of weeks to months after initiation of those services. The number and diversity of service interventions are consistent within the range of the duration and continuity of services to provide reasonable expectation of therapeutic benefit for impairments

associated with mental disorders of childhood.  There is a trend in the data to indicate that those conditions that are more acute (requiring crisis services) and pervasive (trauma-related disorders) receive more intensive services.

### 4.    Timeliness

96.    As part of the EPSDT benefit, EPSDT-eligible youth are entitled to receive services with "reasonable promptness."  The Declarations of Helen Berberian and Anabel Rodriguez, among others, address the timeliness of mental health screens and assessments as well as referrals from DCFS to DMH for evaluation.

97.    I investigated the timeliness of the start of mental health treatment following psychiatric diagnostic evaluation.  To do so, I analyzed the 50 Case Data.

98.    I was able to determine for 27 out of the 50 cases the date by which a Katie A. Class member received a completed psychiatric diagnostic evaluation and the date by which direct mental health services (psychotherapy, group therapy, family therapy, IHBS, or other direct services) began.

99.    For the remainder, it was not possible to calculate the time gap between the completion of an evaluation and the start of service because, for example, the youth was already receiving services when the reporting period began, or the youth received a psychiatric diagnostic evaluation late in the year but services did not begin within the reporting period, or the child or youth received a diagnostic evaluation but no services were provided.

100.    Shown below is a table listing the 27 cases where a psychiatric diagnostic evaluation was completed during the reporting period with billing data to indicate that direct mental health services were provided in the reporting period based on that evaluation:

/ / /

/ / /

/ / /

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

28
Case No. 2:02-cv-05662 JAK(FFMx)

DECLARATION OF DR. SUMNER I/S/O COUNTY DEFENDANTS' RULE 60(b)(5) MOTION

| No. | Case No. | Evaluation Complete | Start of Service | Time Gap |
|---|---|---|---|---|
| 1 | 783 | 7/31/17 | 8/4/17 | 4 days |
| 2 | 1750 | 1/9/18 | 2/21/18 | 43 days |
| 3 | 3487 | 10/20/17 | 10/24/17 | 4 days |
| 4 | 3516 | 4/20/17 | 7/5/17 | 76 days |
| 5 | 3742 | 4/12/17 | 5/9/17 | 27 days |
| 6 | 3917 | 10/2/17 | 10/5/17 | 3 days |
| 7 | 4483 | 4/14/17 | 5/18/17 | 34 days |
| 8 | 4865 | 8/8/18 | 8/22/18 | 14 days |
| 9 | 7071 | 3/31/17 | 4/13/17 | 13 days |
| 10 | 7116 | 7/10/17 | 8/28/17 | 49 days |
| 11 | 7250 | 2/10/17 | 3/15/17 | 33 days |
| 12 | 9780 | 1/19/17 | 2/17/17 | 29 days |
| 13 | 10032 | 10/23/17 | 11/14/17 | 22 days |
| 14 | 10719[53] | 6/27/17 | 7/12/17 | 15 days |
| 15 | 10933 | 4/13/17 | 4/19/17 | 6 days |
| 16 | 11825 | 2/16/17 | 3/9/17 | 21 days |
| 17 | 11924 | 1/5/17 | 1/10/17 | 5 days |
| 18 | 13234 | 3/15/17 | 4/11/17 | 27 days |
| 19 | 13251 | 7/31/17 | 8/16/17 | 16 days |
| 20 | 13569 | 4/12/18 | 5/15/18 | 33 days |
| 21 | 13737 | 1/10/17 | 1/10/17 | 0 days |
| 22 | 14933 | 3/27/17 | 4/5/17 | 9 days |
| 23 | 16601 | 6/23/17 | 6/29/17 | 6 days |
| 24 | 17560 | 5/17/18 | 5/17/18 | 0 days |
| 25 | 17917 | 1/9/17 | 2/8/17 | 30 days |
| 26 | 18749[54] | 1/17/17 | 2/9/17 | 23 days |
| 27 | 20349 | 11/7/17 | 11/14/17 | 7 days |

---

[53] The date of psychiatric diagnostic evaluation performed most proximate to the initiation of services was considered as Evaluation Complete. In one circumstance (Case No. 10719), there multiple evaluations as the client transitioned between different providers, such that it was unclear whether the first provider completed the evaluation or a decision to transfer the case for further evaluation was made.

[54] In this case, the child did start receiving regular services on 2/9/17 as shown on the chart, but there was a rehab service that was provided on 1/19/17. This rehab service was a non-billable Medi-Cal service. It is unclear what happened in that case, and to be conservative, the 2/9/17 start of service was used.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

101.   Based on the above data, DMH or DMH-licensed community service providers began providing direct mental health services on average 20.3 days (with a 95% confidence interval ("CI") of 13.5 to 26.4 days) after concluding the final psychiatric diagnostic evaluation.

102.   In one circumstance (client 10719), the Katie A. Class member had three psychiatric evaluations by different providers before treatment services began. If one considers the date from first psychiatric evaluation to the date of services, the interval would be 84 days.  Factoring that difference into the calculation of mean days between evaluation and service would increase the average interval to 22.9 days (with 95% CI of 14.5 days to 30.3 days).[55]

103.   For those cases where service commenced after a period longer than the average of 20.3 days, I reviewed the Cohort data to identify any cases where immediate treatment was required but not provided.  I found no such cases based on my review.

104.   From my experience directing and working in an outpatient mental health clinic at a large university hospital, the interval between completion of the psychiatric evaluation and the initiation of therapeutic services is reasonable and appropriate.

105.   In many of these cases, DMH or the DMH-licensed community service provider billed for plan development and case management services before direct services were provided, which suggests that the time between evaluation and delivery of services includes time the provider spent developing a treatment plan and coordinating with the child's formal and/or informal supports.   These pre-treatment plan development services are standard practice in the industry.

106.   Once begun, the billing data indicates that the therapeutic services for

---

[55]  Dr. Jay Bartroff performed the confidence interval calculations stated in this declaration.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1  clients continued on a regular basis for a duration of treatment that is generally

2  consistent with accepted psychiatric practices.

3       107.  In sum, the County does not have a policy, practice or custom to deny

4  medically necessary mental health services to the Katie A. Class.  The data shows

5  that the Katie A. Class members receive prompt mental health screens and

6  assessment, meaningful diagnostic services, treatment from a wide-ranging and

7  sufficiently diverse array of services, individualized treatment that is tied to the

8  diagnosed condition and timely direct services following evaluation.

9  **C.    The County Does Not Discriminate in the Provision of Mental Health**

10      **Services to the Plaintiff Class.**

11      108.  As a former mental health provider and administrative leader in public

12 sector mental health, I am acutely familiar with the legacy of practices that

13 segregated individuals with mental illness in highly restrictive environments

14 ("asylums," "warehouses," etc.) without the benefit of meaningful therapeutic

15 services that might restore health.

16      109.  In my review of the current Los Angeles County mental health services

17 for the Plaintiff class (excluding youth assigned to foster care as a condition of

18 probation),  there is no evidence of systemic discriminatory placement of youth with

19 mental illnesses in restrictive environments exceeding their therapeutic needs.

20 Periods of temporary housing in congregate living environments for other than

21 therapeutic purposes during transitions in care are brief and the youth in transition

22 are provided the full spectrum of mental service provided for all other youth in

23 foster care.

24      110.  I noted an exception to the general practice of limited use of restrictive

25 settings for youth in the high utilization of these settings for youth assigned by the

26 Juvenile Court into probation-supervised placement in foster care.  As of July 2019,

27 3.8% of youth in DCFS custody were in congregate care although the vast majority

28 of these youth were assigned that into congregate care as a condition of probation by

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

the court.  Over time, it appears that the proportion of probation-supervised youth in congregate care remain very high; in 2017 these placements accounted for 73.4% of probation-supervised placement in Los Angeles County and 69.7% in other counties statewide.   Nevertheless, congregate care placements for children in probation-supervised foster care are still less restrictive than incarceration or stays in juvenile justice camps.

### 1.   The Array of Mental Health Services Are Available to the Katie A. Class on a Non-Discriminatory Basis.

111.   As detailed previously, it is the policy of the County to provide mental health services to the Katie A. Class based on each member's mental health needs, and that the array of services available are sufficiently diverse and comprehensive to meet those needs.  The County does not have polices that allow for discrimination on the basis of mental health disability.

112.   The 2017 Medi-Cal Aggregate Data and 50 Case Data show that, in general, the Katie A. Class receives substantial and varied mental health services based on their diagnosed condition, and that these services are of sufficient intensity and duration likely to be of therapeutic benefit.

113.   This data shows that children given diagnoses that suggest a significant degree of impairment generally received a greater number and intensity of mental health services as compared to children with diagnoses that suggest a lesser degree of impairment.

114.   In addition, medication services were provided most frequently to members of the Katie A. Class with diagnoses where potential medication benefit is most likely, such as Psychosis/Schizophrenia, Bipolar Disorder and ADHD.

115.   Intensive services, such as IHBS, ICC and TBS, were provided most frequently to clients with diagnoses that could be expected to have the greatest degree of behavioral impairment, such as Psychosis/Schizophrenia, Impulse Control Disorder, Bipolar Disorder and ADHD.   The greatest relative usage of inpatient

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

services was for Major Depression/Affective Disorder, which is to be expected because a symptom of these disorders is suicidality. Disorders that could be anticipated to have a lesser degree of impairment, such as Adjustment Disorders and Unspecified Disorders, were proportionately associated with fewer services and those services were of lesser intensity.

## 2.    <u>EPSDT-Eligible Youth Are Placed in the Most Integrated Setting Based on Their Needs</u>

116.    Youth in foster care in Los Angeles County (excluding youth assigned to foster care as a condition of probation) are not, as a matter of policy, segregated into congregate living situations or institutions unless dictated by the mental health needs of the foster youth.[56]

117.    The data does suggest, however, that there may be circumstances when non-probation youth may be housed temporarily in congregate living for the purpose of providing a safe, monitored and protective environment during a situational crisis while evaluating the mental health needs of the youth and a definitive placement in the least restrictive alternative is secured.  While efforts should be made, and are being made per the Declaration of Helen Berberian, to reduce the incidence of these cases, it has been my experience that reliance on congregate care as a short-term option of last resort is typical of child welfare systems in the nation for such cases.

118.    There is no consensus of opinion in the literature on the role of Short Term Residential Treatment Programs (STRTP) in the continuum of care for youth in foster care.  Cost, system of care philosophy stressing delivery of services within the least restrictive setting possible, and, more recently, increased emphasis on evidence- and community-based interventions have contributed to residential care placement being viewed as an adverse outcome.  Extended stays in residential care

---

[56] These County's congregate care policies are described in the Declaration of Helen Berberian.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

are of particular concern, but counterarguments have been made in the literature that shortening residential care stays can undermine necessary therapeutic processes and may in fact increase the risk of subsequent congregate care placements.[57]

119.  Many experts assert that residential care, if unavoidable, can be justified as a temporary intervention for children who require behavioral and emotional stabilization and cannot be returned to their biological family or maintained in lower level care.[58]

120.  A current summary of policy directives applicable to LA County STRTPs is provided in All County Letter 17-122, January 19, 2018 from the California Department of Social Services, which operationalizes the legislative directive of California Senate Bill (SB) 1013 on the California's Child Welfare Continuum of Care Reform.

121.   The general criteria for admission to an STRTP are that the youth (1) meets criteria for a DSM disorder, (2) has a high degree of potential of the condition leading to acute psychiatric hospitalization in the absence of residential treatment, (3) either demonstrates risk of harm to self or others or an inability to adequately care for physical needs and caretakers/guardians/family members are unable to safely fulfill these needs, and (4) is medically stable.

122.  The STRTP's function is to provide supervision seven days per week/24 hours per day and therapeutic services to assist with the development of skills necessary for daily living, to assist with planning and arranging access to a range of educational, therapeutic and aftercare services, and to assist with the development of the adaptive and functional behavior that will allow youth to live outside of a residential setting.

---

[57] Dr. Sigrid S. James, et al., Residential Care for Youth in the Child Welfare System: Stop-Gap Option or Not?  *Resid Treat Child Youth*. 2012, 29(1): 10.1080/0886571X.2012.643678 at p. 2.

[58] *Id.*

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

123. Annual data summaries from the University of California, Berkeley California Child Welfare Indicators Project reflect that in Los Angeles County the occupancy of the Plaintiff class in STRTPs has decreased over the past ten years for children in child welfare supervised placements but there is continued high use of congregate care for probation supervised children.

124. A 2018 review of services for the Katie A. Class conducted by the Katie A. Advisory Panel concluded that DCFS has made significant progress in reducing the number of children in group care but one would expect a certain number of youths will always need intensive monitored treatment. The report also noted that all of the 24 children surveyed in the group care sample were either receiving therapy or have therapy in their treatment plan but do not wish to participate.

125. It is important for children to be cared for in the least restrictive, most family-like setting possible. At times, congregate care is necessary to ensure a child's safety and stabilization, but it should be used judiciously, efficiently, and effectively.

126. In sum, there is no evidence of systemic discrimination in the provision of mental health services to the Katie A. Class. The data shows that the Katie A. Class members receive treatment that is individualized –there is no systemic refusal to provide treatment based on any diagnosed condition.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 7th day of November 2019 at New York, New York.

Calvin R. Sumner, MD

Calvin R. Sumner, MD

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1

## INDEX OF EXHIBITS TO THE DECLARATION OF DR. CALVIN R. SUMNER

2

3

| Ex. No. | Description | Pg. No. |
|---------|-------------|---------|
| A. | Curriculum vitae of Calvin Russell Sumner, MD, MA, LFAPA | 37-44 |
| B. | Breakdown of 2017 Medi-Cal Aggregate Data | 45-51 |
| C. | Narratives for Katie A. 2017 Court – 50 Case Data | 52-75 |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

# EXHIBIT A

# CURRICULUM VITAE

**NAME:  Calvin Russell Sumner, MD, MA, LFAPA**          Mobile:  (561) 445-3353

Email :  docsumner@gmail.com

**CURRENT PROFESSIONAL POSITIONS:**

| | |
|---|---|
| 4/17-present | Contract Medical Consultant |
| | Medical Affairs and Behavioral Health Strategy |
| 2/17-present | Senior reviewer, Child and Adolescent Psychiatry, Advanced Medical Reviews |
| 2/18-present | Clinical Affiliate Associate Professor, Florida Atlantic University, Charles E. Schmidt College of Medicine |
| 4/01-present | Clinical Associate Professor, West Virginia University School of Medicine, Department of Behavioral Medicine and Psychiatry |
| 4/17-present | Treasurer, Group for the Advancement of Psychiatry |
| 9/01-9/02 | Past President, West Virginia Psychiatric Association |
| 9/00-6/07 | Past Examiner, American Board of Psychiatry and Neurology |

**RELEVANT PAST EMPLOYMENT AND PROFESSIONAL EXPERIENCE:**

8/13-4/17          NCS Pearson, Inc., Clinical Assessment
                        Chief Scientist, New Business and Innovation
                        Medical Director, ADHD Clinical Research

9/07-8/13          BioBehavioral Diagnostics Company
                        Chief Medical Officer, Senior Vice President for Medical Affairs

4/01-9/07          Eli Lilly and Company
                        1/05 - 9/07          Medical Adviser – Lilly Research Laboratories, US Medical Division - Neuroscience, product psychiatry leader for US olanzapine
                        4/01-1/05          Senior Clinical Research Physician, Lilly Research Laboratories, US Medical Division – Neuroscience, product child psychiatry leader for US atomoxetine

12/92-4/01          West Virginia University School of Medicine, Morgantown, WV
                        Department of Behavioral Medicine and Psychiatry
                        10/97-4/01          Associate Professor of Psychiatry
                        Director, Psychiatry Residency Training Programs
                        Chief of Psychiatry Section
                        Principle Investigator, Clinical Research Center
                        Medical Director, Adolescent Residential Treatment Centers

| | |
|---|---|
| 12/92-10/97 | Director, Division of Public Sector Psychiatry, |
| 3/94-10/95 | Medical Director, Young Adult Unit, Sharpe Hospital |
| 10/95-10/97 | Medical Director, Neuropsychiatry Unit, Sharpe Hospital |
| 10/96-10/97 | Clinical Director/Chief Medical Officer, Sharpe Hospital |

| | |
|---|---|
| 7/86-12/92 | WV Department of Health and Human Resources, Charleston, WV |
| | Clinical Director/Chief Medical Officer, Weston Hospital |
| | Chairman, WV Medicaid Children's Behavioral Health Utilization Review Committee |
| | Director, WV State Forensic Psychiatry Services |
| | Clinical Assistant Professor of Psychiatry, WVU School of Medicine |
| 9/95-4/01 | Physician Reviewer, Child Psychiatry Medicaid Claims, West Virginia Medical Institute |
| 8/86-4/01 | Child and Adolescent Psychiatry - Private Practice, (part time), Buckhannon, WV |
| 10/86-10/97 | Clinical Associate Professor of Psychiatry, WV School of Osteopathic Medicine, Assistant Director of Medical Education, Lewisburg, WV |
| 7/95-10/97 | Clinical Associate Professor of Psychiatry, Marshall University School of Medicine, Huntington, WV |
| 7/85-7/86 | Chief Clinical Fellow - Child Psychiatry, Children's Hospital National Medical Center, Washington, D.C. |
| 7/84-7/86 | Consulting Psychiatrist, Metropolitan Psychiatric Group, Psychiatric Institute of D.C., Washington, D.C. |
| 9/84-7/86 | Associate Psychiatrist, Washington Clinic for Mood Disorders, Washington, D.C. |
| 7/84-7/85 | Clinical Fellow in Child Psychiatry, Children's Hospital National Medical Center, Washington, D.C. |
| 7/81-7/84 | Resident in Psychiatry, George Washington University Medical Center, Washington, D.C. |
| 9/71-7/77 | Psychoeducational Specialist/Program Director Therapeutic School for Autistic and Developmentally-Delayed Children, St. Luke's Hospital, Department of Child Psychiatry, New York, NY |

**EDUCATION AND PROFESSIONAL TRAINING:**

| | |
|---|---|
| 7/84-7/86 | Child Psychiatry Fellowship, Children's Hospital National Medical Ctr.  Washington, D.C. |
| 7/81-7/84 | Medical Internship and Psychiatry Residency, George Washington University Medical Center, Washington, D.C. |
| 8/77-6/81 | M.D. degree "with distinction", George Washington University School of Medicine, Washington, D.C. |
| 9/75-5/77 | Pre-Medical Studies, School of Post-Graduate General Studies, Columbia University, New York, NY |
| 9/71-6/73 | Master's degree, Elementary and Special Education, Teachers College, Columbia University, New York, NY |
| 9/67-9/71 | Bachelor's degree, Biology, Columbia College, Columbia University, New York, NY |

**CERTIFICATE AND LICENSURE:**

| | |
|---|---|
| 11/86 | Board Certified in Psychiatry - American Board of Psychiatry and Neurology - #28613 |
| 9/94 | Board Certified Child Psychiatry - American Board of Psychiatry and Neurology - #3836 |
| 5/86 | Medical License - West Virginia #14683 (Active) |
| 8/18 | Medical License – Tennessee #57920 (Active-Administrative Medicine) |
| 7/00 | Medical License - Pennsylvania #MD-071298-L (Retired) |
| 2/83 | Medical License – District of Columbia #13789 (Expired) |
| 1982 | Diplomate, National Board of Medical Examiners - #255201 |
| 1973 | New York State Teaching Licenses - Permanent Early Childhood and Special Education |

**PROFESSIONAL ORGANIZATIONS:**

American Psychiatric Association - Life Fellow
American College of Psychiatrists
Group for Advancement of Psychiatry – Senior Fellow
Alpha Omega Alpha Medical Honor Society
West Virginia Psychiatric Association
American Professional Society for ADHD and Related Disorders

**RECENT CLINICAL RESEARCH:**

Original research

Investigating Validity for the Quotient® System iPad Test (Ages 6 –12 years of age), IRB-approved study of 80 youth to establish concurrent and divergent validity of Quotient assessment

Normative Database Development for the Quotient® System iPad Test (Ages 6 – 80 years of age), IRB-approved study of 1500 typically developing individuals to establish performance norms for innovative computer platform for the Quotient assessment technology.

Effectiveness of the Quotient® ADHD Assessment in a System of Care, 2-year Health Outcomes study in collaboration with Kaiser Permanente of Northern California, 500 subjects with ADHD, 6-12 y.o. comparing outcomes of usual care to usual care plus Quotient

Pilot Study: Detecting Feigned ADHD in Adults Using Computerized Assessment Technology. 20 typical adults feigning ADHD and 20 unmedicated honest ADHD adults assessed with Quotient® and results interpreted by blinded raters tasked with distinguishing the groups

Clinical Correlation of Quotient® ADHD System with Diagnosis in a Referred Patient Population in a Psychiatric Clinical Practice, 100 subjects consecutively referred into an outpatient Child Psychiatry practice for evaluation for learning, emotional or behavioral problems

Pilot Study of the Quotient™ ADHD System for the Monitoring of Response to Either a Given Dose or Type of Medication in Children and Adolescents with Attention-Deficit/Hyperactivity Disorder (ADHD), (Phase I 3 sites, 30 subjects; Phase II 2 sites, 30 subjects)

**Exhibit A, Page 40**

Double-Blind Placebo Controlled Trial of Divalproex and Adjunctive Olanzapine in the Treatment of Bipolar I Disorder, Mixed Episode (20 sites, 240 subjects)

Randomized, Double-Blind Comparison of Placebo and Atomoxetine Hydrochloride given once a day in Adults with Attention-Deficit/Hyperactivity Disorder with an Examination of Impact of Treatment on Family Functioning (22 sites, 250 subjects)

Open-Label Treatment with Atomoxetine Hydrochloride in Children and Adolescents with Attention-Deficit/Hyperactivity Disorder and Comorbid Dyslexia (6 sites, 60 subjects)

Maintenance of Benefit after 8-Week and 52-Week Treatment with Atomoxetine Hydrochloride in Adolescents with Attention-Deficit/Hyperactivity Disorder (20 sites, 240 subjects)

Randomized, Double-Blind, Placebo-Controlled Study of Atomoxetine Hydrochloride in Children and Adolescents with Attention-Deficit/Hyperactivity Disorder and Comorbid Anxiety (10 sites, 150 subjects)

Placebo-Controlled Study of the Effects of Atomoxetine Hydrochloride on Bladder Control in Children with Nocturnal Enuresis (8 sites, 70 subjects)

Once Daily Atomoxetine Treatment for Children with Attention-Deficit/Hyperactivity Disorder including an Assessment of Evening and Morning Behavior:  A Double-Blind, Placebo-Controlled Trial (16 sites, 220 subjects)

Collaborative research

Applying Bilateral Stimulation in Tactile form (BLAST) to improve attention and decrease movement in children with Attention-Deficit/Hyperactivity Disorder (ADHD) (50 subjects)

Open label medical device study, Efficacy of NeuroPlus attention training for the treatment of ADHD (60 subjects)

Single Dose, Open-Label Pharmokinetic Study and Single-Blind, Placebo-Controlled Dose Escalation Study of NFC-1 in Adolescents with Attention-Deficit Hyperactivity Disorder (Quotient outcome measure for efficacy) Phase I

Efficacy and Safety of Olanzapine in the Treatment of Patients with Bipolar I Disorder, Depressed: A Randomized, Double-Blind Comparison with Placebo 44 sites, 640 subjects

Phase IV Observational Study of Strattera™ Treatment in Children and Adolescents Diagnosed with Attention-Deficit Hyperactivity Disorder (55 community sites, 657 subjects)

Double-Blind Placebo-Controlled Study of Atomoxetine Hydrochloride in the Treatment of Adults with ADHD and Comorbid Social Anxiety Disorder (18 sites, 240 subjects)

Randomized, Double-Blind, Placebo-Controlled Study of Atomoxetine Hydrochloride in Adolescents with Attention-Deficit/Hyperactivity Disorder and Comorbid Depressive Disorder (20 sites, 240 subjects)

Double-Blind, Placebo-Controlled Trial of Atomoxetine Hydrochloride to Evaluate Efficacy in the School Setting in Children Ages 8 to 12 Years with Attention-Deficit / Hyperactivity Disorder (14 sites, 180 subjects)

**PUBLICATIONS:**

Radhakrishnan R, Garakani A, Gross L, Goin M, Pine J, Slaby A, **Sumner C**, Baron D, Neuropsychiatric aspects of concussion, *Lancet Psychiatry*, Lancet Psychiatry. 2016 Dec;3(12):1166-1175

Badre N, Baron D, Gross L, Goin M, Pine J, Slaby A, **Sumner C,** Psychopharmacologic Management in Integrated Care: Challenges for Residency Education. *Academic Psychiatry*, August 2015, 39(4): 466-469.

**Sumner CR,** Ritchie CA, Hoadley KH, Pilot Study: Detecting Feigned ADHD with Computerized Technology, Scientific Poster at annual meeting of the American Professional Society of ADHD and Related Disorders (APSARD), September 2013, Washington, DC

Lacy BW, Baron DA, Goin MK, Gross LS, **Sumner CR**, Doing Nothing is Doing Something: Primary Care Antidepressant Treatment in the Era of FDA Boxed Warnings. *Journal of the American Osteopathic Association*, February 2013, 113(2): 117-119.

**Sumner CR,** New Tool for Objective Assessments of ADHD: The Quotient™ ADHD System, *The ADHD Report*, edit Russell A. Barkley, October 2010, 18(5): 6-10

**Sumner CR**, Sutton VK, Newcorn JH, Does Placebo Response Differ Between Objective and Subjective ADHD Measures? *Postgraduate Medicine*: September 2010, 122(5): 51-62

**Sumner CR**, Gathercole S, Greenbaum M, Rubin R, Williams D, Hollandbeck M, Wietecha L. Atomoxetine for the treatment of attention-deficit/hyperactivity disorder (ADHD) in children with dyslexia. *Child & Adolescent Psychiatry and Mental Health:* 15 December 2009, 3:40.

Newcorn JH, Sutton VK, Weiss MD, **Sumner CR**. Clinical Responses to Atomoxetine in Attention-Deficit/Hyperactivity Disorder: The Integrated Data Exploratory Analysis (IDEA) Study. *Journal of the American Academy of Child Psychiatry*, April, 2008.

**Sumner CR**. ADHD: Making the diagnosis. *Executive Healthcare*, 2008, 2(2), 90

Bhanji N, Baron D, Lacy B, Gross L, Goin M, **Sumner C,** Fischer B, Slaby A, Direct-to-Consumer Marketing: *An Attitude Survey of Psychiatric Physicians.* Primary Psychiatry. 2008;15(11):67-71.

Bakken RJ, Paczkowski M, Kramer HP, Axelson AA, Williams DW, Malcolm SK, **Sumner CR** Effects of atomoxetine on attention-deficit/hyperactivity disorder in clinical pediatric treatment settings: a naturalistic study. *Curr Med Res Opin* 2008; 24:449-460,

Geller D, Donnelly C, Lopez F, Rubin R, Newcorn J, Sutton V, Bakken R, Kelsey D, **Sumner C**. Atomoxetine treatment for pediatric patients with attention-deficit/hyperactivity disorder (ADHD) with comorbid anxiety disorder. *Journal of the American Academy of Child and Adolescent Psychiatry,* September 2007

Bangs M, Emslie G, Spencer T, **Sumner C**. Efficacy and Safety of Atomoxetine in Adolescents With Attention-Deficit/Hyperactivity Disorder (ADHD) and Major Depression. *Journal of Child and Adolescent Psychopharmacology –Vol 17, Number 4, Aug 2007.*

Teicher MH, Polcari A, **Sumner CR**.  New Research Poster Abstract: Methylphenidate Effects on Objective Measures of Activity and Attention Accurately Identify Doses Associated with Optimal Clinical Response. American Psychiatric Association, Washington, DC; May, 2008.

**Sumner, C**, Kelsey, K, Sutton, V, Schuh, K. 2004 Placebo-Controlled Study of the Effects of Atomoxetine Hydrochoride on Bladder Control in Children with Nocturnal Enuresis.  *Journal of Child and Adolescent Psychopharmacology – 2006, 16(6): 699-711.*

Brown T, Sutton V, Levine L, **Sumner C**. Atomoxetine Improves Executive Function Impairment Associated with ADHD. *The International Journal of Neuropsychopharmacology,* 2006;9 (Suppl1): Po1.128.

Johnston JA, Ye W, Van Brunt DL, Pohl G, **Sumner CR**. Decreased Use of Clonidine Following Treatment with Atomoxetine in Children with ADHD. *Journal of Clinical Psychopharmacology 26(4): 389-394,* Aug 2006.

**Sumner, C**, Review of "Juvenile Onset Schizophrenia: Assessment, Neurobiology and Treatment" edited by R Findling and C Shultz. *Psychiatric Services,* Aug 2006, Vol 57:1220-1221

Bangs M, Emslie G, Spencer T,Ramsey J, Detke M, Allen A, **Sumner C**.  A Study of Atomoxetine in Adolescents with ADHD and Comorbid Depression. *Journal of Child and Adolescent Psychopharmacology –Vol 15, Number 6, 2005:848-865.*

Perwein A, Faries D, Kratochvil C, Kelsey D, Allen A, **Sumner C**.    Improvement in Health Related Quality of Life in Children with ADHD: An Analysis of Placebo Controlled Trials of Atomoxetine.  *Journ of Dev and Behavl Pediatrics.* 2004, Aug;25(4):264-71

Kelsey, D, **Sumner, C**, Casat, C, Coury, D, Quintana, H, et al.  2003.  Once-Daily Atomoxetine Treatment for Children with ADHD including Assessment of Evening and Morning Behavior: A Double-Blinded, Placebo-Controlled Trial.  *Pediatrics* 2004 Jul;114(1): e1-8

**Sumner, C**, Review of "Pharmacogenetics of Psychotropic Drugs" edited by B Lerer for APA journal *Psychiatric Services*, Jan 2004, Vol 55, No. 1.

Kelsey D, **Sumner C**, Sutton V, Gonzales J, Schuh K, Malcolm S, Allen A, Michelson D. Use of Palm Pilot Technology to Collect Parent Assessments of Evening and Morning Behaviors of Children with ADHD.  *Journal of Child and Adolescent Psychopharmacology – Vol 13, Number 4, 2003*

Saylor K, Buermeyer C, Michelson D, **Sumner C**, Sutton V, Thomason C. Development of the Life Participation Scale for ADHD: An Adaptive Change Assessment Instrument. *Journal of Child and Adolescent Psychopharmacology – Vol 13, Number 4 2003: 411-424.*

Allen A, Kelsey D, **Sumner C**, Sutton V, Gonzales J, Malcolm S, Schuh K, Michelson D. Once Daily Atomoxetine in Childhood ADHD: Continuous Symptom Relief. *European Neuropsychopharmacology, Vol 13 Sup 4, October 2003: 454-455.*

Perwein, A, Faries, D, Kratochvil, C, **Sumner, C**, Kelsey, D, and A. Allen.  Functional Outcomes and ADHD: the effect of atomoxetine treatment.  Scientific poster American Academy of Child and Adolescent Psychiatry (AACAP) Annual Meeting, 2003.

Adler, L, Spencer, T, Sutton, V, Jones, ED, and **Sumner, C**.  Abstract: Dose and Time Response or Atomoxetine Use in Adult ADHD.  American Academy of Child & Adolescent Psychiatry; Miami, Fl; October 14-19, 2003.

Sutton, V, **Sumner, C,** Allen, A, Feng, W, Schuh, K, and D. Michelson.  2003.  Abstract: Validity, Reliability, and Responsiveness of the DPREMB-R Scale for ADHD.  AACAP, Miami, Fl; October 14-19, 2003.

**Sumner CR**, Swensen A, Claxton A, Birnbaum HG, Greenberg M, "Increased Risk of Accidents and Injuries for Patients with Attention Deficit/Hyperactivity Disorder", Poster at Institute on Psychiatric Services, Chicago, IL (2002)

**Sumner CR,** (2001) Telepsychiatry:  Challenges in Rural Aging, *The Journal of Rural Health, 17(4):370-373.*

**Sumner CR** (2000), Review of "Pharmacotherapy for Mood, Anxiety, and Cognitive Disorders" by Uriel Halbreich, M.D. and Stuart Montgomery, M.D. (psychiatric critique and review) *Psychiatric Services, 51(12):1577.*

**Sumner CR,** (2000), Treating the refusing patient with a psychiatric disorder, *National Network of Hospital Ethics Committees, 9(2):15-17.*

Withersty DJ, **Sumner CR**, Stevenson JM (I 998), "The First Five Years: A Review of the Collaboration Between DHHR and the WVU School of Medicine", *Journal of the West Virginia State Medical Association, 95(2):62-63.*

**Sumner CR** (I998), Review of "The Psychiatrist as Expert Witness" by T Guttheil, (psychiatric critique and review) *Psychiatric Services, 49(8):1096-97.*

**Sumner CR** (I998), Review of "The Psychiatrist in Court" by T Guttheil, M.D., (psychiatric critique and review) *Psychiatric Services, 49(8):1096-97.*

**Sumner CR** (I998), Fetal Alcohol Syndrome: The Hangover That Lasts Forever, *Journal of the West Virginia State Medical Association Medical Journal, Summer 1998.*

**Sumner CR** (I997), Review of "Gifted Children: Myths and Realities" by Ellen Winner, (psychiatric critique and review) *Psychiatric Services, 48(12):1605.*

**Sumner CR** (I 996), State-University Collaboration in West Virginia, Interdisciplinary Collaboration Awards Section *Psychiatric Services 47(10):1116-1117.*

**Sumner CR**, Clark JS (I1994), WVU Active in Recreating Weston Hospital, *West Virginia Psychological Association 17(l):1,9.*

**Sumner CR** (I 992), Mentally Ill Deserve Adequate Treatment, invited editorial, "Opinion" *Charleston Gazette, January 9, 1992.*

**Sumner CR** (I 990), One Year Review of Clozapine Use in West Virginia, *National Alliance for the Mentally Ill, 3(4): 5-6.*

Hendren RL, Adkins DK, **Sumner CR** (I987), Model for Group Treatment of Eating Disorders, *International Journal of Group Psychotherapy, 37(4):589-602.*

Speaking Out for Psychiatry: A Handbook for Involvement with the Mass Media, Public Education Committee, GAP, American Psychiatric Press (I987).

# EXHIBIT B

## Summary of Data

| SvcCategory | SvcCnt | TotUofS | ClientCnt | UofSperClient |
|---|---|---|---|---|
| Crisis Intervention (CI) | 6357 | 1428958 | 1908 | 749 |
| Crisis Stabilization (CS) | 1977 | 19901 | 873 | 23 |
| Day Rehab | 3587 | 3587 | 58 | 62 |
| Day Treatment Intensive (DTI) | 15983 | 15983 | 151 | 106 |
| ICC | 130489 | 13415466 | 4524 | 2965 |
| IHBS | 135456 | 12672854.51 | 4416 | 2870 |
| Inpatient/PHF (Inpt) | 5044 | 5044 | 328 | 15 |
| Medication Support (MSS) | 159218 | 2336230 | 4463 | 523 |
| Mental Health Services (MHS) | 698185 | 58910771.91 | 21178 | 2782 |
| Not Assigned | 5035 | 128251 | 691 | 186 |
| Residential (Res) | 327 | 327 | 4 | 82 |
| Targeted Case Management (TCM) | 39592 | 2079437 | 8209 | 253 |
| Therapeutic Behavioral Services (TBS) | 32705 | 5575509 | 817 | 6824 |

Units of Service (UofS) are minutes with the following exceptions:

*UofS are **Hours***
*UofS are **Sessions** (4 to 6 hours)*
*UofS are **Days***

**Exhibit B, Page 46**

## Definitions of Terms

**Crisis Intervention** services last less than 24 hours and are for, or on behalf of, a beneficiary for a condition that requires more timely response than a regularly scheduled visit. Service activities include, but are not limited to, assessment, collateral and therapy. Crisis Intervention services may either be face-to-face or by telephone with the beneficiary or the beneficiary's significant support person and may be provided anywhere in the community.

**Crisis stabilization** services last less than 24 hours and are for, or on behalf of, a beneficiary for a condition that requires a more timely response than a regularly scheduled visit. Service activities include but are not limited to one or more of the following: assessment, collateral, and therapy. Collateral addresses the mental health needs of the beneficiary to ensure coordination with significant others and treatment providers.

**Day Rehabilitative (Half-Day & Full-Day)** services are a structured program of rehabilitation and therapy with services to improve, maintain or restore personal independence and functioning, consistent with requirements for learning and development and which provides services to a distinct group of beneficiaries who receive services for a minimum of three hours per day (half-day) or more than four hours per day (full-day). Service activities may include, but are not limited to assessment, plan development, therapy, rehabilitation and collateral. Collateral addresses the mental health needs of the beneficiary to ensure coordination with significant others and treatment providers.

**Day Treatment Intensive (Half-Day & Full-Day)** is a structured, multi-disciplinary program of therapy that may be used as an alternative to hospitalization, or to avoid placement in a more restrictive setting, or to maintain the client in a community setting and which provides services to a distinct group of beneficiaries who receive services for a minimum of three hours per day (half-day) or more than four hours per day (full-day). Service activities may include, but are not limited to, assessment, plan development, therapy, rehabilitation and collateral. Collateral addresses the mental health needs of the beneficiary to ensure coordination with significant others and treatment providers.

**Intensive Care Coordination (ICC)** is a targeted case management service that facilitates assessment of, care planning for and coordination of services, including urgent services. ICC services are provided within the Child and Family Team ("CFT") and in accordance with the Core Practice Model ("CPM"). ICC must be used to facilitate implementation of the cross-system/multi-agency collaborative services approach described in the CPM. ICC service components include assessing; service planning and implementation; monitoring and adapting; and transition. The CFT is comprised of the child/youth and family and all ancillary individuals who work together to develop and implement the client plan and are responsible for supporting the child/youth and family in attaining their goals.

**Intensive Home Based Services (IHBS)** are individualized, strength-based interventions designed to ameliorate mental health conditions that interfere with a child/youth's functioning and are aimed at helping the child/youth build skills necessary for successful functioning in the home and community and improving the child/youth's family ability to help the child/youth successfully function in the home and community. IHBS services are provided within the CFT and in accordance with

the CPM. The CFT participates in the development of the child's and family's overall service plan which may include IHBS. Service activities may include, but are not limited to assessment, plan development, therapy, rehabilitation and collateral.

**Inpatient Hospital** services include both acute psychiatric inpatient hospital services and administrative day services. Acute psychiatric inpatient hospital services are provided to beneficiaries for whom the 24-hour/day medically monitored level of care provided in a hospital is medically necessary to diagnose or treat a covered mental illness. Administrative day services are inpatient hospital services provided to beneficiaries who were admitted to the hospital for an acute psychiatric inpatient hospital service and the beneficiary's stay at the hospital must be continued beyond the beneficiary's need for acute psychiatric inpatient hospital services due to lack of residential placement options at non-acute residential treatment facilities that meet the needs of the beneficiary. Psychiatric inpatient hospital services are provided by Short Doyle/Medi-Cal (SD/MC) hospitals and Fee-For-Service/Medi-Cal (FFS/ MC) hospitals.

**Medication Support Services** include prescribing, administering, dispensing and monitoring of psychiatric medications or biologicals that are necessary to alleviate the symptoms of mental illness. Service activities may include but are not limited to: evaluation of the need for medication; evaluation of clinical effectiveness and side effects; obtaining informed consent; instruction in the use, risks and benefits of, and alternatives for, medication; collateral and plan development related to the delivery of service and/or assessment for the client; prescribing, administering, dispensing and monitoring of psychiatric medications or biologicals; and medication education.

**Mental Health Services** (now referred to as Therapy and Other Service Activities) include individual or group therapies and interventions are designed to provide a reduction of mental disability and restoration, improvement or maintenance of functioning consistent with the goals of learning, development, independent living, and enhanced self-sufficiency. These services are separate from those provided as components of residential services, treatment services, crisis intervention, crisis stabilization, day rehabilitation, or day treatment intensive. Service activities may include but are not limited to assessment, plan development, therapy, rehabilitation and collateral. Collateral may include, but is not limited to, consultation and training of the significant support person(s) to assist in better utilization of mental health services.

**Targeted Case Management (TCM)** is a service that assists a beneficiary in accessing needed medical, educational, social, prevocational, vocational, rehabilitative, or other community services. The service activities may include, but are not limited to, communication, coordination and referral; monitoring service delivery to ensure beneficiary access to services and the service delivery system; monitoring of the beneficiary's progress, placement services, and plan development. TCM services may be face-to-face or by telephone with the client or significant support persons and may be provided anywhere in the community. Additionally, services may be provided by any person determined by the MHP to be qualified to provide the service, consistent with the scope of practice and state law.

**Therapeutic Behavioral Services (TBS)** are intensive, individualized, short-term outpatient treatment interventions for beneficiaries up to age 21. Individuals receiving

these services have serious emotional disturbances (SED), are experiencing a stressful transition or life crisis and need additional short-term, specific support services to accomplish outcomes specified in the written treatment plan.

# EXHIBIT C

## Narratives for Katie A. 2017 Court – 50 Case Data

### By Dr. Calvin R. Sumner

Of the 21,309 Katie A. class members who had an open DCFS case in calendar year 2017 (the "2017 Cohort"), DMH randomly selected 50 cases for my review. For each case, DMH provided the child's age range, mental health diagnosis and Medical billing data showing the (1) types of services provided, (2) dates the services were provided and (3) units of services provided (i.e., the number of minutes or hours of each particular service). Below are summaries of each of the 50 cases describing the mental health services that were provided in each case.

**1.    Case No. 783**[1]

This class member was in the 12 to 17 age group during calendar year ("CY") 2017. The youth was diagnosed with "reaction to severe stress, unspecified" which fell under the Diagnosis Group of Other Disorder. From January 1 to September 28, 2017, the youth received 69 separate services totaling 6,707 units of service (6,707 minutes or 111.8 hours). The youth received a wide range of services, including psychotherapy, group therapy, Intensive Care Coordination ("ICC"), Intensive Home Based Services ("IHBS") and other services.

When the reporting period began, the youth was in a treatment program with Maryvale, a DMH-licensed community services provider. The Maryvale treatment program predominately included psychotherapy sessions that were provided on a weekly basis. The psychotherapy sessions lasted at least one hour and twenty minutes per session, with some sessions lasting one hour and thirty minutes or more. The youth also received group therapy that lasted about twenty minutes per session. The Maryvale treatment program stopped on April 12, 2017.

On July 3, 2017, the youth received a psychiatric diagnostic evaluation from Los Angeles Child Guidance Clinic ("LACGC"), a DMH-licensed community services provider. The psychiatric diagnostic evaluation continued on July 7, 2017. On July 13, 2017, LACGC provided eight hours and fifteen minutes of ICC. LACGC

---

[1] To protect the identity of the Katie A. class members, these summaries do not include the class member's name, birth date, DMH Client ID or other identifying information. To identify a particular case, each member of the 2017 Cohort received a number 1 through 21,309. The case numbers referred to herein refer to that numbering system.

continued to provide ICC and psychiatric diagnostic evaluations until the evaluation concluded on July 31, 2017.  In total, the diagnostic evaluation took 10 hours and 43 minutes over four separate days to complete.  The youth received psychotherapy and/or IHBS, along with ICC, on a regular basis until September 28, 2017.

**2.    Case No. 929**

This class member was in the 0 to 11 age group during CY 2017.  The child was diagnosed with "attention-deficit hyperactivity disorder, unspecified type" which fell under the Diagnosis Group of ADHD.  From January 1 to December 12, 2017, the child received 79 separate services totaling 4,437 units of service (4,437 minutes or about 74 hours).  The child predominately received family therapy and psychotherapy for the entire year from Pacific Clinics, a DMH-licensed community services provider.

**3.    Case No. 1750**

This class member was in the 0 to 11 age group during CY 2017.  The child was diagnosed with "adjustment disorder, unspecified" which fell under the Diagnosis Group of Adjustment Disorder.  The child received 27 separate services totaling 3,728 units of service (3,728 minutes or 62.1 hours).

The child received a psychiatric diagnostic evaluation that began on December 14, 2017 and concluded on January 9, 2018.  LACGC provided the psychiatric diagnostic evaluation, which lasted over 11 hours.  After a case conference and two team plan development sessions, family therapy sessions began on February 21, 2018.  The child received family therapy sessions on roughly a biweekly basis until November 7, 2018 when the reporting period ended.  The family therapy sessions typically lasted over two hours per session.

**4.    Case No. 2508**

This class member was in the 0 to 11 age group during CY 2017.  The child was diagnosed with "childhood emotional disorder, unspecified" which fell under the Diagnosis Group of Other Disorder.  The child received one service during the reporting period, which was seven minutes of targeted case management from the Children's Hospital of Los Angeles on January 4, 2017.  No additional services were provided.

5. __Case No. 2839__

This class member was in the 0 to 11 age group during CY 2017. The child was diagnosed with "illness, unspecified" which fell under the Diagnosis Group Unspecified. The child received two psychiatric diagnostic evaluations from DMH on September 6 and 21, 2017, totaling eight hours and 45 minutes. No additional services were provided.

6. __Case No. 3028__

This class member was in the 0 to 11 age group during CY 2017. The child was diagnosed with "adjustment disorder with anxiety" which fell under the Diagnosis Group Adjustment Disorder. The child received a psychiatric diagnostic evaluation on June 29, 2017 from DMH that lasted five hours and 21 minutes. The child received another psychiatric diagnostic evaluation on July 24, 2017 from the Children's Bureau of Southern California ("Children's Bureau"), a DMH-licensed community services provider, that lasted four hours and 55 minutes. On September 7, 2017, the Children's Bureau billed for a phone call lasting 20 minutes.

7. __Case No. 3487__

This class member was in the 12 to 17 age group during CY 2017. The child was diagnosed with "attention-deficit hyperactivity disorder, predominantly inattentive type" which fell under the Diagnosis Group ADHD. The youth received 135 services totaling 11,484 units of service (11,482 minutes or 191.4 hours, plus two hours for crisis stabilization). The youth received individual rehab, psychotherapy, crisis intervention, medication support, targeted case management, team plan development and other services over the course of the entire 12 month reporting period.

The youth started receiving individual rehab services on June 7, 2017 from Children's Hospital of Los Angeles ("Children's Hospital"). The youth received rehab, psychotherapy, family therapy and case planning services from Children's Hospital over the course of the 12 month reporting period. During the course of treatment, it appears that there were certain behavioral episodes that required interventions. On September 7, 2017, the Exodus Foundation for Recovery provided two hours of crisis stabilization services. The day before, the youth received over two

hours of psychotherapy from Children's Hospital. Then, on September 16, 2017, DMH provided over 10 hours of crisis intervention services. The youth continued to receive rehab, medication support, psychotherapy and team plan development services from Children's Hospital.

On October 13 and 20, 2017, the youth received over four hours of psychiatric diagnostic evaluations from Tessie Cleveland Community Services Corporation ("Tessie Cleveland"), a DMH-licensed community services provider. The youth continued to receive services from Children's Hospital during this period. On October 24, 2017, the youth received individual rehab services from Tessie Cleveland. The youth received additional rehab services from Tessie Cleveland on November 9 and 16, 2017, but it appears that a determination was made to continue with Children's Hospital, as the youth stopped receiving services from Tessie Cleveland and continued with Children's Hospital until May 2018.

## 8.    Case No. 3516

This class member was in the 12 to 17 age group during CY 2017. The youth was diagnosed with "other reactions to severe stress" which fell under the Diagnosis Group Other Disorder. The youth received 12 services totaling 1,516 units of service (1,516 minutes or 25.3 hours). The youth primarily received psychotherapy services that lasted at least one hour and 50 minutes per session.

The youth initially received psychiatric diagnostic evaluations from Children's Hospital on February 23 and 24, 2017. No additional services were provided by Children's Hospital.

On March 27 and April 20, 2017, the youth received over four and a half hours of additional psychiatric diagnostic evaluations from LACGC. LACGC billed for over five hours of team plan development on June 8 and 26, 2017. Psychotherapy began on July 5, 2017, and additional sessions were held on July 7 and July 11, 2017. About four months later, another psychotherapy session was held on November 13, 2017 for two hours and 28 minutes. The final psychotherapy session was held on November 29, 2017 for two hours and 25 minutes.

## 9.    Case No. 3742

This class member was in the 0 to 11 age group during CY 2017. The child was

diagnosed with "post-traumatic stress disorder, unspecified" which fell under the Diagnosis Group Post-Traumatic Stress Disorder ("PTSD"). The child received 51 services over the course of 10 months totaling 4,964 units of service (4,964 minutes or 82.7 hours). The child predominately received psychotherapy and family therapy services.

The child was receiving treatment from ChildNet Youth and Family Services ("ChildNet"), a DMH-licensed community services provider, when the reporting period began. The child received multiple services per week in January and February, including psychotherapy, family therapy, individual rehab, team plan development and collateral services. The ChildNet treatment program concluded on March 1, 2017 with over three hours of psychotherapy in addition to one hour and 40 minutes of individual rehab and an additional 49 minutes of family therapy.

On April 12, 2017, the child received a five hour psychiatric diagnostic evaluation from Children's Bureau. Psychotherapy sessions began on May 9, 2017 and were provided on roughly a weekly basis until November 7, 2017. The psychotherapy sessions lasted over an hour per session.

## 10.    Case No. 3917

This class member was in the 0 to 11 age group during CY 2017. The child was diagnosed with "oppositional defiant disorder" which fell under the Diagnosis Group Conduct Disorder. The child received 62 services totaling 7,739 units of service (7,739 minutes or about 129 hours). The child generally received individual rehab, psychotherapy, ICC, IHBS and other services.

On March 7, 2017, the child started receiving family therapy from Five Acres – The Boys' and Girls' Aid Society of Los Angeles County ("Five Acres"), a DMH-licensed community services provider. The child continued to receive individual rehab, psychotherapy and other services from Five Acres until May 19, 2017.

On October 2, 2017, the child received a psychiatric diagnostic evaluation from D'Veal Family and Youth Services, a DMH-licensed community services provider. The child began receiving IHBS and ICC on October 5, 2017. The child continued to receive ICC, IHBS and psychotherapy from October through December, 2017, when the reporting period concluded. The child received 22 sessions of IHBS over a three

month period totaling 2,178 minutes or 36.3 hours.

**11.    <u>Case No. 4483</u>**

This class member was in the 0 to 11 age group during CY 2017.  The child was diagnosed with "post-traumatic stress disorder, unspecified" which fell under the Diagnosis Group PTSD.  The child received 75 services totaling 5,376 units of service (5,376 minutes or 89.6 hours) over a 12 month period.  The child predominantly received IHBS, ICC and psychotherapy, among other services.

The child was receiving IHBS and ICC from AspiraNet, a DMH-licensed community service provider, as well as psychotherapy and family therapy from DMH when the reporting period began.  This pattern of treatment continued until March 2, 2017.

From March 21 through April 14, 2017, the child received psychiatric diagnostic evaluations totaling almost six hours from Counseling and Research Associates ("Masada Homes"), a DMH-licensed community service provider.  The child began receiving psychotherapy on May 18, 2017.  The child received a mixture of psychotherapy, IHBS, ICC, individual rehab and other services on roughly a weekly basis until December 20, 2017, when the reporting period concluded.

**12.    <u>Case No. 4865</u>**

This class member was in the 0 to 11 age group during CY 2017.  The child was diagnosed with "illness, unspecified" which fell under the Diagnosis Group Unspecified.  The child received 29 services totaling 2,540 units of service (2,540 minutes or 42.3 hours).  The predominant service provided was family therapy.

The child received psychiatric diagnostic evaluations totaling four hours and 43 minutes from Penny Lane Centers ("Penny Lane"), a DMH-licensed community service provider, on December 8, 2017 and January 8, 2018.  The records show that Penny Lane held a case conference and conducted team plan development on January 25, 2018, but no services were provided.

On August 8, 2018, the child received another psychiatric diagnostic evaluation from Penny Lane totaling two hours and 50 minutes.  The child began receiving family therapy on August 22, 2018.  There were a few follow-up sessions of family

therapy, among other services, for about six weeks thereafter.  Then, on October 10, 2018, the child began receiving family therapy on roughly a weekly basis until November 13, 2018, when the reporting period concluded.  The family therapy sessions were usually an hour or longer, although the first two family therapy sessions were less than one hour.

13.    **Case No. 5171**

This class member was in the 0 to 11 age group during CY 2017.  The child was diagnosed with "dysthymic disorder" which fell under the Diagnosis Group Other Affective Disorder.  The child received 104 services over a five month period totaling 7,148 units of service (7,148 minutes or 119.1 hours).  The primary services provided were ICC and IHBS.

The child was receiving ICC, IHBS and psychotherapy from Penny Lane when the reporting period began.  These services were provided on a regular basis until May 22, 2017.  The child received 51 separate ICC services totaling 2,616 minutes, or 51.3 minutes per ICC service.  The child also received 45 separate IHBS services totaling 3,968 minutes, or 88.2 minutes per session.

14.    **Case No. 6392**

This class member was in the 12 to 17 age group during CY 2017.  The youth was diagnosed with "major depressive disorder, recurrent severe with psychotic features" which fell under the Diagnosis Group Major Depression.  The youth received 11 services over a three month period totaling 2,020 units of service (2,020 minutes or 33.7 hours).  The primary services provided were ICC, IHBS and psychotherapy.

The youth was receiving IHBS and psychotherapy from Hillsides, a DMH-licensed community service provider, when the reporting period began.  Three sessions of IHBS, each totaling over 240 minutes per session, were provided in January 2017.  The child received psychotherapy during January 2017 as well.  In February, the child received 207 minutes of ICC on February 1 and two psychotherapy sessions on February 13 and 28, 2017.  The last service provided was over six hours of crisis intervention by DMH on March 21, 2017.  No services provided thereafter in the reporting period.

15.  **Case No. 7071**

This class member was in the 12 to 17 age group during CY 2017.  The youth was diagnosed with "anxiety disorder, unspecified" which fell under the Diagnosis Group Anxiety Disorder.  The youth received 14 services over a three month period totaling 1,563 units of services (1,563 minutes or 26.1 hours).  The primary service provided was psychotherapy.

The youth was receiving psychotherapy from Bienvenidos Children's Center ("Bienvenidos"), a DMH-licensed community service provider, when the reporting period began.  The youth received psychotherapy on roughly a weekly basis during the month of January 2017.  The sessions lasted over one hour and 40 minutes per session.

On March 31, 2017, the youth received a psychiatric diagnostic evaluation from Bienvenidos which lasted three hours and four minutes.  The youth began receiving psychotherapy from Hillsides, an affiliate of Bienvenidos, on April 13, 2017.  The youth received psychotherapy on roughly a weekly basis until May 30, 2017.  The sessions lasted at least an hour, with most lasting more than one hour and a half.

16.  **Case No. 7116**

This class member was in the 0 to 11 age group during CY 2017.  The child was diagnosed with "adjustment disorder with mixed anxiety and depressed mood" which fell under the Diagnosis Group of Adjustment Disorder.  The child received 32 services over a seven month period totaling 2,666 units of service (2,666 minutes or 44.4 hours).  The primary service provided was psychotherapy.

On May 24, 2017, the child received an initial psychiatric diagnostic evaluation from Star View Behavioral Health ("Star View"), a DMH-licensed community service provider.  Star View completed its psychiatric diagnostic evaluation on June 12, 2017.  Star View billed for team plan development and targeted case management services, but it did not provide treatment to the child.

While Star View was providing team plan development and targeted case management, the child received an initial psychiatric diagnostic evaluation from Ettie Lee Homes ("Ettie Lee"), a DMH-licensed community service provider.  Ettie Lee completed its psychiatric diagnostic evaluation on July 10, 2017.  Ettie Lee began

provided psychotherapy on August 28, 2017. The psychotherapy sessions continued on roughly a weekly basis until January 2, 2018, with the sessions typically lasting an hour and a half per session.

17.    **Case No. 7250**

This class member was in the 12 to 17 age group during CY 2017. The youth was diagnosed with "major depressive disorder, single episode, unspecified" which fell under the Diagnosis Group Major Depression. The youth received a psychiatric diagnostic evaluation from DMH on February 10, 2017 which lasted two hours and 55 minutes. DMH provided individual rehab on March 15, 2017 for 49 minutes. No other services were provided.

18.    **Case No. 7652**

This class member was in the 0 to 11 age group during CY 2017. The child was diagnosed with "post-traumatic stress disorder, unspecified" which fell under the Diagnosis Group PTSD. The child received 154 services from Star View totaling 13,901 units of service (13,901 minutes or 231.7 hours) over the course of a 12 month period. The primary services provided were ICC and IHBS, in addition to psychotherapy, individual rehab, team plan development and other services.

The child received 45 IHBS services totaling 4,688 minutes, or 104.2 minutes per IHBS session, on a regular basis for the entire 12 month reporting period. The child also received 70 ICC services totaling 5,370 minutes, or 76.7 per ICC service, on a regular basis until the end of October 2017. Thereafter, the child continued to receive IHBS but also received targeted case management.

19.    **Case No. 7654**

This class member was in the age group 12 to 17 during CY 2017. The child was diagnosed with "adjustment disorder with anxiety" which fell under the Diagnosis Group Adjustment Disorder. The youth received 28 services totaling 1,866 units of service (1,866 minutes or 31.1 hours).

The youth received an initial psychiatric diagnostic evaluation from El Centro De Amistad ("El Centro") on August 14, 2017 which lasted over eight hours. The psychiatric diagnostic evaluation concluded on September 21, 2017. El Centro then

billed for case conference and team plan development on September 28, 2017 with no additional services provided.  El Centro continued to bill for team plan development, targeted case management and collateral services on a sporadic basis until March 26, 2018.  The billing data does not reflect that any direct mental health service, such as psychotherapy, was provided.

20.  **Case No. 9780**

This class member was in the age group of 0 to 11 during CY 2017.  The child was diagnosed with "adjustment disorder, unspecified" which fell under the Diagnosis Group Adjustment Disorder.  The child received 40 services over a 10 month period totaling 2,941 units of service (2,941 minutes or about 49 hours).  The primary service provided was family therapy.

The child was receiving targeted case management from DMH when the reporting period began.  The child received an initial psychiatric diagnostic evaluation from LACGC on January 12, 2017 which lasted two hours and 49 minutes.  LACGC concluded its psychiatric diagnostic evaluation on January 19, 2017.  DMH continued to provide targeted case management during January and into February 2017.  LACGC began providing family therapy on February 17, 2017.  Family therapy sessions were conducted on roughly a weekly basis until November 1, 2017.

21.  **Case No. 9789**

This class member was in the age group of 0 to 11 during CY 2017.  The child was diagnosed with "adjustment disorder with depressed mood" which fell under the Diagnosis Group Adjustment Disorder.   The child received an initial psychiatric diagnostic evaluation from VIP Community Mental Health Center on October 30, 2017.  The evaluation lasted for one hour and 38 minutes.  No additional services were provided.

22.  **Case No. 10032**

This class member was in the age group of 0 to 11 during CY 2017.  The child was diagnosed with "adjustment disorder with mixed disturbance of emotions and conduct" which fell under the Diagnosis Group Adjustment Disorder.  The child received 45 services over a 10 month period totaling 3,527 units of service (3,527 minutes or 58.8 hours).  The primary service provided was psychotherapy.

The child received a psychiatric diagnostic evaluation from Pathways Community Services ("Pathways"), a DMH-licensed community service provider, on October 23, 2017, which lasted three hours and 25 minutes. Pathways began psychotherapy on November 14, 2017, which continued on roughly a weekly basis for the next nine months.

## 23.  Case No. 10719

This class member was in the age group of 0 to 11 during CY 2017. The child was diagnosed with "adjustment disorder with mixed disturbance of emotions and conduct" which fell under the Diagnosis Group Adjustment Disorder. The child received 51 services totaling 4,222 units of service (4,222 minutes or 70.4 hours).

The child received a psychiatric diagnostic evaluation from Bienvenidos on January 3, 2017 lasting three hours and twenty minutes. Bienvenidos billed for team plan development and targeted case management thereafter, but no direct services were provided.

On January 17, 2017, the child received a psychiatric diagnostic evaluation from McKinley, a DMH-licensed community service provider, which lasted two hours and 48 minutes. McKinley billed for collateral phone calls thereafter, but no direct services were provided.

On April 12, 2017, the child received a psychiatric diagnostic evaluation from DMH. DMH concluded its evaluation on April 19, 2017. The two DMH evaluations combined lasted five hours and 12 minutes. DMH billed for plan development and team plan development from April to June 2017, but DMH did not provide direct services.

On June 27, 2017, the child received a psychiatric diagnostic evaluation from Children's Institute, which lasted 52 minutes. Following team plan development, Children's Institute began provided psychotherapy on July 12, 2017. Children's Institute continued to provide psychotherapy on roughly a weekly basis until December 27, 2017, when the reporting period concluded. The psychotherapy sessions were typically longer than an hour and a half per session.

## 24.  Case No. 10933

This class member was in the 12 to 17 age group during CY 2017. The youth was diagnosed with "post-traumatic stress disorder, unspecified" which fell under the Diagnosis Group PTSD. The youth received 68 services over a nine month period totaling 4,423 units of service (4,423 minutes or 73.7 hours). The primary services provided were family therapy, psychotherapy and individual rehab.

The youth received psychiatric diagnostic evaluations on March 31 and April 13, 2017 from Counseling and Research Associates, which lasted five hours and 54 minutes. The youth began receiving psychotherapy on April 19, 2017. The youth continued to receive treatment on roughly a weekly basis for about nine months until December 26, 2017, when the reporting period concluded.

### 25.  Case No. 11812

This class member was in the 0 to 11 age group during CY 2017. The child was diagnosed with "major depressive disorder, recurrent, moderate" which fell under the Diagnosis Group Major Depression. The child received 52 services over a 12 month period totaling 4,005 units of service (4,005 minutes or 66.8 hours). The primary services provided was psychotherapy, among other services.

The child was receiving treatment from Pacific Clinics, a DMH-licensed community service provider, when the reporting period began. The treatment provided was psychotherapy sessions on roughly a weekly basis with psychotherapy sessions typically lasted over one hour per session. This treatment pattern continued for roughly nine months.

On September 20, 2017, the child received a psychiatric diagnostic evaluation from Pacific Clinics which lasted three hours and 49 minutes. The treatment program does not appear to have changed, as the child continued to receive psychotherapy on roughly a weekly basis through the remainder of the reporting period.

### 26.  Case No. 11825

This class member was in the 0 to 11 age group during CY 2017. The child was diagnosed with "separation anxiety disorder of childhood" which fell under the Diagnosis Group Other Disorder. The child received 68 services over a 12 month period totaling 4,026 units of service (4,026 minutes or 67.1 hours). The primary services provided were family therapy and psychotherapy.

The child received psychiatric diagnostic evaluations from VIP Community Mental Health Center ("VIP Community") from January 26 to February 16, 2017, totaling nine hours and 48 minutes.  VIP Community began providing family therapy on March 9, 2017.  The child continued to receive treatment through December 27, 2017, when the reporting period concluded.  The treatment generally included either family therapy or psychotherapy on a weekly basis.

**27.    Case No. 11924**

This class member was in the 12 to 17 age group during CY 2017.  The youth was diagnosed with "major depressive disorder, single episode, unspecified" which fell under the Diagnosis Group Major Depression.  The youth received 35 services over an eight month period totaling 3,069 units of service (3,069 minutes or 51.2 hours).  The primary services provided were psychotherapy and family therapy.

The youth received a psychiatric diagnostic evaluation from Counseling4Kids, a DMH-licensed community service provider, on January 5, 2017 which lasted two hours and 45 minutes.  The youth began receiving psychotherapy on January 10, 2017.  The treatment continued on roughly a weekly basis until August 23, 2017, with most psychotherapy and family therapy sessions lasting over one hour per session.

**28.    Case No. 12670**

This class member was in the 12 to 17 age group during CY 2017.  The youth was diagnosed with "major depressive disorder, recurrent, moderate" which fell under the Diagnosis Group Major Depression.  The youth received 118 services over roughly an 11 month period totaling 9,193 units of service (9,193 minutes or 153.2 hours).  The primary services provided were psychotherapy, family therapy and crisis intervention, among other services.

**29.    Case No. 12851**

This class member was in the 12 to 17 age group during CY 2017.  The youth was diagnosed with "post-traumatic stress disorder, acute" which fell under the Diagnosis Group PTSD.  The youth received 64 services over roughly a seven month period totaling 8,889 units of service (8,889 minutes or 148.2 hours).  The primary services provided were ICC, IHBS, psychotherapy, group therapy, family therapy and other services.

The youth was receiving treatment from ChildNet when the reporting period began. The treatment included ICC, IHBS and psychotherapy. ICC and IHBS were provided on a regular basis from January to July 2017. The youth received 21 separate ICC services totaling 2,868 minutes, or two hours and 16 minutes per service. The youth also received 26 IHBS sessions totaling 3,134 minutes, or two hours and five minutes per IHBS session. Psychotherapy was provided from January through April 2017, and then group and family therapy were provided from May through July 2017.

## 30.    Case No. 13234

This class member was in the 0 to 11 age group during CY 2017. The child was diagnosed with "adjustment disorder with depressed mood" which fell under the Diagnosis Group Adjustment disorder. The child received 6 services totaling 561 units of service (561 minutes or 9.4 hours). The primary service provided was family therapy.

The child received a psychiatric evaluation from Pacific Clinics on March 15, 2017 which lasted two hours and 54 minutes. The child received a family therapy session on April 11, 2017 and another session on June 6, 2017. No other services were provided from Pacific Clinics.

On November 6 and 8, 2017, the child received psychiatric evaluations from ENKI Health and Research Systems ("ENKI"), a DMH-licensed community service provider, which lasted two hours and 58 minutes. ENKI billed for a team plan development session on December 20, 2017, and no other services were provided before the reporting period concluded.

## 31.    Case No. 13251

This class member was in the 12 to 17 age group during CY 2017. The youth was diagnosed with "conduct disorder, unspecified" which fell under the Diagnosis Group Conduct Disorder. The youth received 43 services over a four month period totaling 3,244 units of service (3,244 minutes or 54.1 hours). The primary services provided were ICC, IHBS, psychotherapy, targeted case management and team plan development, among other services.

The youth received psychiatric diagnostic evaluation from Uplift Family

Services ("Uplift"), a DMH-licensed community service provider, on July 12, 2017 which lasted two hours and 46 minutes. Uplift billed for ICC that same day. Uplift concluded its psychiatric diagnostic evaluation on July 31, 2017 which lasted six hours and 12 minutes. Uplift continued to provide ICC both prior to and after concluding its evaluation. IHBS services began on August 16, 2017. The youth received treatment from August to November 2017, which included ICC, IHBS and psychotherapy.

## 32.    Case No. 13569

This class member was in the 12 to 17 age group during CY 2017. The youth was diagnosed with "adjustment disorder, unspecified" which fell under the Diagnosis Group Adjustment Disorder. The youth received 38 services totaling 3,612 units of service (3,612 minutes or 60.2 hours). The primary services provided were psychotherapy, individual rehab and targeted case management, among other services.

The youth received a psychiatric diagnostic evaluation from DMH on December 11, 2017 which lasted six hours and one minute. DMH began providing individual rehab services on December 12, 2017. DMH billed for targeted case management in January and February 2018, with the last billing event on March 2, 2018.

On April 9 and 12, 2018, the youth received psychiatric diagnostic evaluations from Personal Involvement Center ("PIC"), a DMH-licensed community service provider, for six hours and seven minutes. PIC began providing psychotherapy on May 15, 2018. The youth then received a combination of psychotherapy and family therapy on roughly a weekly basis until November 21, 2018, when the reporting period concluded.

## 33.    Case No. 13737

This class member was in the 12 to 17 age group during CY 2017. The youth was diagnosed with "anxiety disorder, unspecified" which fell under the Diagnosis Group Anxiety Disorder. The youth received 44 services over a five month period totaling 2,440 units of service (2,440 minutes or 40.7 hours). The primary services provided were psychotherapy and family therapy.

The youth received a psychiatric diagnostic evaluation from ChildNet on

January 10, 2017 which lasted two hours and 19 minutes. ChildNet provided family therapy that same day. The youth then received psychotherapy on roughly a weekly basis until June 6, 2017. The psychotherapy sessions lasted longer than one hour per session.

34.    **Case No. 14070**

This class member was in the 12 to 17 age group during CY 2017. The youth was diagnosed with "major depressive disorder, single episode, unspecified" with fell under the Diagnosis Group Major Depression. The youth received 27 services totaling 2,434 units of service (2,434 minutes or 40.6 hours).

The youth received a psychiatric diagnostic evaluation from VIP Community on September 22, 2017 for one hour and 24 minutes. VIP Community did not provide any additional services.

The youth received psychiatric diagnostic evaluations from Amanecer Community Counseling ("Amanecer"), a DMH-licensed community service provider, on September 27 and October 5, 2017. These evaluations took 14 hours in total. Amanecer billed for targeted case management and team plan development in October and November, 2017. No additional services were provided.

The youth received psychiatric diagnostic evaluations from Hathaway Sycamores Child and Family Services ("Hathaway Sycamores") from March 2 to April 26, 2018. These evaluations took eight hours and 13 minutes. No services were provided before the reporting period concluded.

35.    **Case No. 14800**

This class member was in the 12 to 17 age group during CY 2017. The youth was diagnosed with "oppositional defiant, disorder" which fell under the Diagnosis Group Conduct Disorder. The youth received 115 services over a 12 month period totaling 9,129 units of service (9,129 minutes or 152.2 hours). The primary services provided were ICC and IHBS, among other services.

The youth was receiving treatment from LACGC when the reporting period began. LACGC provided ICC, IHBS, psychotherapy and family therapy from January to mid-March 2017. The youth was then seen by individual psychiatrists and DMH

from mid-March to mid-April 2017.  On April 23, 2017, the youth resumed receiving treatment, including ICC, IHBS and psychotherapy, among other services for the remainder of the reporting period.

## 36.    Case No. 14933

This class member was in the 12 to 17 age group during CY 2017.  The youth was diagnosed with "oppositional defiant disorder" which fell under the Diagnosis Group Conduct Disorder.  The youth received 78 services over a six month period totaling 6,783 units of service (6,783 minutes or 113.1 hours).  The primary services provided were ICC, IHBS and psychotherapy, among other services.

The youth was receiving services from Star View when the reporting period began.  Star View primary provided ICC and IHBS until March 9, 2017.  On March 23 and 27, 2017, the youth received psychiatric diagnostic evaluations from Bayfront Youth and Family Services ("Bayfront"), a DMH-licensed community service provider, totaling four hours.  Bayfront began providing psychotherapy on April 5, 2017, and provided ICC, IHBS and psychotherapy on a regular basis until June 21, 2017.

## 37.    Case No. 15240

This class member was in the 0 to 11 age group during CY 2017.  The child was diagnosed with "illness, unspecified" which fell under the Diagnosis Group Unspecified.  The child received 8 services totaling 1,205 units of service (1,205 minutes or 20.1 hours).

The child received psychiatric diagnostic evaluations on December 11 and 29, 2017 for eight hours and 30 minutes from Counseling4Kids.  Counseling4Kids billed for collateral and plan development, but no other services were provided.

## 38.    Case No. 15565

This class member was in the 0 to 11 age group during CY 2017.  The child was diagnosed with "illness, unspecified" which fell under the Diagnosis Group Unspecified.  The child received 3 services totaling 382 units of service (382 minutes or 6.4 hours).

The child received psychiatric diagnostic evaluations from PIC on May 10, June

28 and July 12, 2017 for six hours and 22 minutes.  No other services were provided.

**39.    Case No. 15966**

This class member was in the 0 to 11 age group during CY 2017.  The child was diagnosed with "encounter for observation for other suspected diseases and conditions ruled out" which fell under the Diagnosis Group Unspecified.  The child received a psychiatric diagnostic evaluation on January 17, 2017 from VIP Community for two hours and 20 minutes.  No other services were provided.

**40.    Case No. 16178**

This class member was in the 0 to 11 age group during CY 2017.  The child was diagnosed with "attention-deficit hyperactivity disorder, unspecified type" which fell under the Diagnosis Group ADHD.  The child received 16 services over six months totaling 744 units of service (744 minutes or 12.4 hours).  The primary service provided was psychotherapy.

The child was receiving services from Children's Hospital when the reporting period began.  Children's Hospital generally provided psychotherapy roughly once every two weeks.  The services concluded on June 19, 2017.

**41.    Case No. 16601**

This class member was in the 0 to 11 age group during CY 2017.  The child was diagnosed with "illness, unspecified" which fell under the Diagnosis Group Unspecified.  The child received 70 services totaling 5,774 units of service (5,774 minutes or 96.2 hours).  The primary services provided were targeted case management, family therapy and team plan development.

The child received psychiatric diagnostic evaluations on April 11 and 20, 2017 from Star View totaling nine hours and 51 minutes.  Star View billed for targeted case management and team plan development, but no direct services provided.

The child received a psychiatric diagnostic evaluation from Counseling4Kids on June 23, 2017 for two hours and 56 minutes.  The child began receiving family therapy on June 29, 2017, which continued for the duration of the reporting period.

**42.    Case No. 16603**

This class member was in the 12 to 17 age group during CY 2017. The youth was diagnosed with "adjustment disorder with disturbance of conduct" which fell under the Diagnosis Group Adjustment Disorder. The youth received 24 services totaling 2,835 units of service (2,835 minutes or 47.3 hours).

The youth received extensive psychiatric diagnostic evaluations from The Child Inc., a DMH-licensed community service provider, from November to December 2017. The evaluations, in total, 24 hours and 16 minutes. The youth received services such as targeted case management and other services, but no direct services like therapy provided.

### 43.    Case No. 16720

This class member was in the 0 to 11 age group during CY 2017. The child was diagnosed with "anxiety disorder, unspecified" which fell under the Diagnosis Group Anxiety Disorder. The child received psychiatric diagnostic evaluations in December 2017 totaling 10 hours and five minutes. No other services provided before the reporting period concluded.

### 44.    Case No. 17560

This class member was in the 0 to 11 age group during CY 2017. The child was diagnosed with "childhood emotional disorder, unspecified" which fell under the Diagnosis Group Other Disorder. The child received 20 services totaling 2,305 units of service (2,305 minutes or 38.4 hours).

The child received an initial psychiatric diagnostic evaluation from Counseling and Research Associates on June 19 and July 10, 2017, which totaled 11 hours and 39 minutes. Counseling and Research Associates billed for team plan development and targeted case management, but no direct services, such as therapy, were provided.

The child then received psychiatric diagnostic evaluations from Children's Institute on September 18, 22 and 25, 2017, which totaled eight hours. Children's Institute billed for collateral, but no direct services were provided.

The child received another psychiatric diagnostic evaluation from Institute for the Redesign of Learning on May 17, 2018, which totaled seven hours and six minutes. The child received family therapy that same day. The reporting period

concluded a few days thereafter, and thus it is unclear whether the child continued to receive family therapy.

## 45.    Case No. 17917

This class member was in the 0 to 11 age group during CY 2017. The child was diagnosed with "attention-deficit hyperactivity disorder, combined type" which fell under the Diagnosis Group ADHD. The child received 135 services over a 12 month period totaling 14,429 units of service (14,429 minutes or 240.5 hours). The primary services provided were psychotherapy, ICC and Therapeutic Behavioral Services ("TBS"), among other services.

The child received a psychiatric diagnostic evaluation from Star View on January 9, 2017, which lasted six hours and 26 minutes. Star View billed for team plan development that same day.[2] Star View began providing psychotherapy on roughly a weekly basis from February 8, 2017 through December 27, 2017 when the reporting period concluded. The psychotherapy sessions generally lasted longer than one hour per session.

While the child continued to receive psychotherapy, in April 2017, Star View began providing regular medication support and rehab services. In August 2017, Star View provided multiple TBS sessions over a two-week period. Star View continued to provide TBS through December 2017, when the reporting period concluded. The child also started receiving small amounts of ICC (about 15 minutes per session) in December 2017.

## 46.    Case No. 18698

This class member was in the 0 to 11 age group during CY 2017. The child was diagnosed with "major depressive disorder, single episode, mild" which fell under the Diagnosis Group Major Depression. The child received 25 services over roughly a two month period totaling 1,854 units of service (1,854 minutes or 30.9 hours). The primary services provided were rehab, psychotherapy and team plan development.

The child was receiving treatment from Uplift when the reporting period began. The treatment generally included one psychotherapy session and individual rehab each

---

[2] The child received family therapy from Hathaway Sycamores on January 19, 2017

week from January 3 to March 3, 2017.  The last service provided was one hour and 42 minutes of family therapy on March 7, 2017.

47.    **Case No. 18749**

      This class member was in the 12 to 17 age group during CY 2017.  The youth was diagnosed with "illness, unspecified" which fell under the Diagnosis Group Unspecified.  The youth received 41 services over roughly a nine month period totaling 4,804 units of service (4,804 minutes or 80.1).  The primary service provided was psychotherapy.

      The youth received psychiatric diagnostic evaluations from Hathaway Sycamores on January 12 and 17, 2017 which totaled five hours and 50 minutes.  The youth began receiving psychotherapy on February 9, 2017, which continued on roughly a weekly basis until September 26, 2017.

48.    **Case No. 18989**

      This class member was in the 0 to 11 age group during CY 2017.  The child was diagnosed with "anxiety disorder, unspecified" which fell under the Diagnosis Group Anxiety Disorder.  The child received 127 services over a 12 month period totaling 8,290 units of service (8,290 minutes or 138.2 hours).  The primary services provided were psychotherapy and family therapy, among other services such as team plan development and rehab.

      The child was receiving treatment from Didi Hirsch Psychiatric Services ("Didi Hirsch"), a DMH-licensed community services provider, when the reporting period began.  The child generally received psychotherapy on a weekly basis for the entire reporting period.  These psychotherapy sessions generally lasted over an hour per session.  The child also received family therapy on a weekly or bi-weekly basis from January to August 2017.  The family therapy sessions also generally lasted over an hour per session.

49.    **Case No. 19242**

      This class member was in the 0 to 11 age group during CY 2017.  The child was diagnosed with "post-traumatic stress disorder, chronic" which fell under the Diagnosis Group PTSD.  The child received 16 services totaling 1,546 units of service

(1,546 minutes or 25.8 hours).  The primary services provided were ICC and IHBS, among other services.

The child was receiving treatment from Vista Del Mar Child and Family Services ("Vista Del Mar"), a DMH-licensed community services provider, when the reporting period began.  The child received two hours and 38 minutes of IHBS on January 6, 2017.  The child received another session of IHBS for 43 minutes on January 18, 2017.  The child received ICC throughout January 2017, including over five hours of ICC on January 24, 2017 and one hour and 47 minutes of ICC on January 27, 2017.  Vista Del Mar did not provide any other services during the reporting period.

From October 27 to December 21, 2017, the child received psychiatric diagnostic evaluations from Providence Saint John's Health Center ("Providence"), a DMH-licensed community services provider.  These evaluations totaled ten hours and 52 minutes.  Providence billed for collateral on December 21, 2017 and for record review on December 22, 2017.  No other services were provided before the reporting period concluded.

## 50.  <u>Case No. 20349</u>

This class member was in the 12 to 17 age group during CY 2017.  The youth was diagnosed with "adjustment disorder with mixed disturbance of emotions and conduct" which fell under the Diagnosis Group Adjustment Disorder.  The youth received 25 services totaling 2,737 units of service (2,737 minutes or 45.6 hours).  The primary services provided were family therapy, psychotherapy and team plan development, among other services.

The youth was receiving treatment from D'Veal Family and Youth Services when the reporting period began.  This treatment included rehab, family therapy and psychotherapy during January 2017.

On May 25, 2017, the youth received a psychiatric diagnostic evaluation from ENKI which lasted two hours and 33 minutes.  ENKI billed for team plan development on June 19, 2017 for two hours and 11 minutes, but no other services were provided.

From October 10 to November 7, 2017, the youth received psychiatric

diagnostic evaluations from Five Acres totaling seven hours and 40 minutes. The youth received family therapy and psychotherapy on November 14, 2017. The youth received psychotherapy on roughly a weekly or bi-weekly basis for the duration of the reporting period.