LOUIS R. MILLER (State Bar No. 54141)
smiller@millerbarondess.com
BRIAN A. PROCEL (State Bar No. 218657)
bprocel@millerbarondess.com
DAVID W. SCHECTER (State Bar No. 296251)
dschecter@millerbarondess.com
MILLER BARONDESS, LLP
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
Tel.: (310) 552-4400 / Fax: (310) 552-8400

MARY C. WICKHAM (State Bar No. 145664)
mwickham@counsel.lacounty.gov
LAURA QUINONEZ (State Bar No. 253862)
lquinonez@counsel.lacounty.gov
OFFICE OF LOS ANGELES COUNTY COUNSEL
Kenneth Hahn Hall of Administration
500 West Temple Street, Suite 648
Los Angeles, California 90012
Tel.: (213) 974-1811 / Fax: (213) 626-7446

Attorneys for the County Defendants

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| KATIE A., et al., <br><br> Plaintiffs, <br> v. <br><br> DIANA BONTA, et al., <br><br> Defendants. | **CASE NO. 2:02-cv-05662 JAK(FFMx)** <br><br> **JOINT STIPULATION RE: CLASS ACTION SETTLEMENT** <br><br> Assigned to the Hon. John A. Kronstadt |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

## JOINT STIPULATION

The Plaintiffs and Defendants County of Los Angeles, Department of Children and Family Services ("DCFS"), and the Director of the Department of Children and Family Services (collectively, the "County Defendants"), by and through their respective counsel of record, hereby stipulate as follows:

**WHEREAS**, Plaintiffs filed a First Amended Complaint on December 20, 2002 on behalf of themselves and a putative class of certain children and young adults who are in, or are at imminent risk of placement in, foster care in Los Angeles County against the County Defendants for alleged violations of the Medicaid Act, the Americans with Disabilities Act, the Rehabilitation Act and the Fourteenth Amendment to the U.S. Constitution, in addition to alleged state law violations;

**WHEREAS**, the Parties entered into a settlement shortly thereafter with the County Defendants denying all wrongdoing, denying liability and claiming meritorious defenses;

**WHEREAS**, on July 16, 2003, the Court approved the settlement as fair, reasonable and adequate for members of the class (ECF Dkt. No. 128 (together with the accompanying settlement agreement, the "2003 Consent Decree"));

**WHEREAS**, the Parties agreed in the 2003 Consent Decree to appoint an advisory panel (the "Katie A. Advisory Panel" or the "Panel");

**WHEREAS**, on August 10, 2009, the Court approved the Katie A. Strategic Plan (ECF Dkt. No. 689 (the "Strategic Plan"), which was created by the County Defendants and supported by Plaintiffs and the Panel, as a comprehensive set of reforms to the County Defendants' delivery of mental health services to the class pursuant to the obligations of the 2003 Consent Decree;

**WHEREAS**, on December 1, 2011, the Court entered an Order to Stipulation Regarding Exit Conditions (ECF Dkt. No. 776 (the "Exit Conditions")), setting forth conditions for the County to exit this Action pursuant to the 2003 Consent Decree;

**WHEREAS**, since 2003, the County has, with the guidance and supervision

1    of Plaintiffs, the Katie A. Advisory Panel, and the Court, implemented extensive

2    reforms in the delivery of child welfare services and mental health services to the

3    Class, including the adoption of the Shared Core Practice Model, using a Child and

4    Family Team to plan services for children with an open DCFS case, reducing the

5    caseloads of social workers, creating multidisciplinary Medical Hubs in all DCFS

6    Service Planning Areas to provide comprehensive medical exams to children shortly

7    after being placed in care, adopting and administering the County's Mental Health

8    Screening Tool, creating Coordinated Services Action Teams collocated in all

9    DCFS regional offices to assist social workers in linking children to appropriate

10   services and programs, and other measures identified by the County in its Rule

11   60(b)(5) motion referenced below;

12        **WHEREAS**, this Action has remained pending against the County and the

13   County has remained subject to supervision by Plaintiffs, the Katie A. Advisory

14   Panel, and the Court, after the County's implementation of the above-mentioned

15   reforms;

16        **WHEREAS**, on August 26, 2019, the County filed a Motion to Vacate the

17   2003 Consent Decree Pursuant to Rule 60(b)(5) of the Federal Rules of Civil

18   Procedure;

19        **WHEREAS**, the Parties respectively believe that they will prevail on the

20   Rule 60(b)(5) Motion, but also recognize the risks and costs of litigation and

21   therefore believe that it is in the Parties' and class members' best interests to focus

22   on further enhancing the delivery of mental health services rather than litigating the

23   Rule 60(b)(5) Motion;

24        **WHEREAS**, since May 6, 2020, the Parties have participated in extended

25   arm's-length settlement negotiations, including two mediation sessions before the

26   Honorable Jay C. Gandhi (Ret.) and more than a dozen settlement conferences

27   between counsel;

28        **WHEREAS**, the Parties have reached agreement to settle and have fully

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

executed a long-form settlement agreement, which is attached hereto as <u>Exhibit A</u>;

**WHEREAS**, the Parties believe that this settlement agreement ("Agreement") offers significant benefits to the class and is fair, reasonable, adequate and in the best interests of all Parties;

**WHEREAS**, per the terms of Paragraph 48 of the Agreement, the Parties agreed to file a Stipulation and Proposed Order with the following terms (all capitalized terms below shall have the same meaning as defined in the attached settlement agreement):

a. The County's Rule 60 Motion shall be taken off calendar and any studies, reports, data or documents that have been requested during discovery for the Rule 60 Motion shall no longer be required.

b. The County's obligations under the Prior Agreements shall be stayed pending a decision by the Court approving the Agreement. "Prior Agreements" means the Prior Settlement Agreement and every subsequent agreement, stipulation or order arising thereunder or in connection therewith, including the Strategic Plan and the Exit Conditions. As an example, the County will not be required to conduct Qualitative Service Reviews going forward and will not be required to complete the current QSR cycle.

c. Since the County's obligations under the Prior Agreements will be stayed, the Panel will no longer perform its current responsibilities (including those identified in paragraphs 10-19 of the Prior Settlement Agreement) and will instead be invited to (i) file a response in accordance with a mutually agreeable briefing schedule to be determined after this Agreement is executed, using the data and information currently in its possession and that will be make available to Plaintiffs and the Panel pursuant to the terms of the Agreement, and (ii) assist the County, at the County's request, with its obligations under

the Agreement. The Parties will seek a court order concerning a briefing schedule if the Panel will not agree. If the Panel requests any data and information in addition to that in (i) above, the County will meet and confer in good faith with the Panel on whether the additional data and information are necessary for the Panel to prepare its response and not unduly burdensome for the County to produce. In the event that there is a dispute between the Panel and the County under this provision, either the Panel or the County may seek a resolution on an expedited basis by the appointed Magistrate Judge pursuant to the Federal Rules of Civil Procedure and Local Rule 37.

d.    The Parties have begun implementing the terms of the Agreement, and the County will implement deliverables stated in the Work Plans in the time frames set forth therein.

e.    Plaintiffs shall be allowed to file a motion to enforce the Agreement after following the Dispute Resolution Process outlined in Paragraph 67.

**WHEREAS**, the Parties agreed that the above terms will remain in effect until the Court rules upon the Parties' motion for preliminary approval of the settlement agreement;

**WHEREAS**, pursuant to Paragraph 48 of the Agreement, the Parties have asked the Panel to join in signing this Stipulation and Proposed Order;

**WHEREAS**, the Panel is not willing to join in the filing of this Stipulation and Proposed Order; and

**WHEREAS**, the Parties jointly submit a Proposed Order with the above terms and request that the Court approve the Proposed Order and enter an Order to that effect.

## JOINT STIPULATION

Based on the foregoing recitals and the terms of the attached settlement

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1   agreement, the Parties stipulate and agree that the Parties shall cease litigating the

2   Rule 60 Motion and comply with the terms of the attached settlement agreement.

3       **IT IS SO AGREED.**

4

5   DATED: September 23, 2020          MILLER BARONDESS, LLP

6

7

8                                     By: _____/s/ David W. Schecter_____

9                                         DAVID W. SCHECTER
                                          Attorneys for County Defendants

10

11  DATED: September 23, 2020          WESTERN CENTER ON LAW & POVERTY

12

13

14                                    By: _____/s/ Robert D. Newman_____

15                                        ROBERT D. NEWMAN
                                          Attorneys for Plaintiffs

16

17

18

19      I hereby attest that pursuant to Local Rule 5-4.3.4, I have received

20  concurrence in the filing of this document from each of the other Signatories.

21

22  DATED: September 23, 2020          MILLER BARONDESS, LLP

23

24                                    By: _____/s/ David W. Schecter_____

25                                        DAVID W. SCHECTER
26                                        Attorneys for County Defendants

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

# EXHIBIT A

# SETTLEMENT AGREEMENT

WHEREAS, Plaintiffs brought this lawsuit entitled *Katie A. et al. v. Diana Bontá et al.* (this "Action" or the "Katie A. Litigation"), by a complaint filed on July 18, 2002 in the district court for the Central District of California (the "Court"), case no. 02-05662 (the "Complaint"), seeking certification of a class and declaratory and injunctive relief against Diana Bontá, then-Director of the California Department of Health Services; Rita Saenz, then-Director of the California Department of Social Services (collectively, the "State Defendants") and against Los Angeles County; the Los Angeles Department of Children and Family Services ("DCFS"); Anita Bock, then-Director of DCFS (collectively, the "County") and against Does 1 through 100, inclusive;

WHEREAS, Plaintiffs filed a First Amended Complaint ("FAC") on December 20, 2002 and the FAC is the operative pleading in this action;

WHEREAS, the County denied all wrongdoing alleged in the Action and denied any liability whatsoever to Plaintiffs, and whereas the County asserted that it had meritorious defenses which it had asserted in this Action;

WHEREAS, the County and Plaintiffs (together, the "Parties") entered into a settlement because the Parties agreed that "continued reform of the child welfare system and the best interests of the Class will be substantially advanced by the settlement of the *Katie A.* litigation based on the novel and innovative resolution reflected in … [the settlement], rather than by a trial on the merits" and because the County sought "to avoid the expense and diversion of [its] personnel caused by protracted litigation, and to terminate the claims asserted against the County";

WHEREAS, on July 16, 2003, the court approved the settlement agreement between the Parties ("Consent Decree") and certified a class (the "Class");

WHEREAS, on February 23, 2004, the Court modified the Class to include children and young adults who:  (a) are in the custody of DCFS in foster care or are at imminent risk of foster care placement by DCFS; (b) are eligible for services under the Early and Periodic Screening, Diagnostic and Treatment ("EPSDT") program of the Medicaid Act as defined in 42 USC

Section 1396 et seq.; (c) have a mental illness or condition that is documented, or had an assessment been completed, could have been documented; and (d) need individualized mental health services, including but not limited to professionally acceptable assessments, behavioral support and case management services, family support, crisis support, therapeutic foster care, and other medically necessary services in the home or in a home-like setting, to treat or ameliorate their illness or condition;

WHEREAS, the Parties and Advisory Panel together formulated and, on August 10, 2009, the Court entered an In-Chambers Order (Dkt. 689) approving, the Katie A. Strategic Plan ("Strategic Plan") for implementation of reforms to the delivery of mental health services to the Class pursuant to the Consent Decree;

WHEREAS, on December 1, 2011, the Court entered an Order to Stipulation Regarding Exit Conditions (Dkt. 776) ("Exit Conditions"), setting forth conditions for the County to exit this Action pursuant to the Consent Decree;

WHEREAS, since 2003, the County has, with the guidance and supervision of Plaintiffs, the Katie A. Advisory Panel, and the Court, implemented extensive reforms in the delivery of child welfare services and mental health services to the Class, including the adoption of the Shared Core Practice Model, using a Child and Family Team to plan services for children with an open DCFS case, reducing the caseloads of social workers, creating multidisciplinary Medical Hubs in all DCFS Service Planning areas to provide comprehensive medical exams to children shortly after being placed in care, adopting and administering the County's Mental Health Screening Tool, creating Coordinated Services Action Teams collocated in all DCFS regional offices to assist social workers in linking children to appropriate services and programs, and other measures identified by the County in its Rule 60(b)(5) motion referenced below;

WHEREAS, this Action has remained pending against the County and the County has remained subject to supervision by Plaintiffs, the Katie A. Advisory Panel, and the Court, after the County's implementation of the above-mentioned reforms;

WHEREAS, Bobby Cagle, solely in his official capacity as the current Director of DCFS, is the successor-in-interest to the previous Directors of DCFS named in the Complaint and FAC;

WHEREAS, on August 26, 2019, the County filed a Motion to Vacate the 2003 Consent Decree Pursuant Federal Rule of 60(b)(5) (the "Motion"), on the grounds that, under *Horne v. Flores*, 557 U.S. 433 (2009), the Consent Decree must be vacated and the County must be released from the Action because there exist no ongoing violations of federal law authorizing continued judicial supervision of the County;

WHEREAS, the County believes its Motion is meritorious and likely to prevail and Plaintiffs intend to oppose the Motion;

WHEREAS, Plaintiffs believe that their opposition to the Motion is meritorious and likely to prevail, but Plaintiffs also believe, among other things, that the Motion will not be heard and decided until April 12, 2021 at the earliest, a favorable outcome on the Motion for Plaintiffs is not certain in the district court or on appeal, the County has ceased to hold quarterly meetings with the Katie A. Advisory Panel and Plaintiffs' counsel since February 2019 and is no longer soliciting the Advisory Panel's advice on how to comply with the Consent Decree, and the County has devoted considerable time and effort to litigating the Motion rather than adopting measures, like those in the instant settlement;

WHEREAS, if the Court grants the relief requested in the Motion, the Consent Decree will be vacated, Court jurisdiction will end, and the County will have no further obligations to the Class arising from the Consent Decree, Strategic Plan and Exit Conditions and will all cease to have effect;

WHEREAS, the Parties recognize the risks and costs of litigating the Motion and believe it is in the Parties' and the Class' best interests to focus the Parties' efforts on further enhancing the County's delivery of mental health services and child welfare services to the Class based on the resolution reflected in this agreement (this "Agreement"), rather than on litigating the Motion;

WHEREAS, since May 6, 2020 the Parties have participated in extended arm's-length negotiations, including two mediation sessions before the Honorable Jay C. Gandhi (Ret.) and more than a dozen settlement conferences between counsel;

WHEREAS, counsel for Plaintiffs vigorously negotiated on behalf of the Class and secured additional enhancements to the delivery of mental health services and child welfare services for the Class;

WHEREAS, the undersigned Parties believe this Agreement offers significant benefits to the Class and is fair, reasonable, adequate and in the best interests of all Parties;

NOW THEREFORE, in consideration of the covenants and undertakings set forth herein and intending to be legally bound thereby, it is stipulated and agreed by the Plaintiffs and the County, represented by the undersigned counsel, that the Consent Decree shall be vacated, and all of Plaintiffs' claims for relief against the County which were asserted in the Complaint filed on July 18, 2002, or the FAC filed on December 20, 2002, including any claims against employees and/or officers of the County of Los Angeles, shall be resolved on the following terms as set forth in this Agreement:

## I.    DEFINITIONS

1.    "Action" or "Katie A. Litigation" mean *Katie A., et al. v. Diana Bontá, et al.*, No. 02-05662 JAK (FFM) (C.D. Cal.).

2.    "Advisory Panel" or "Panel" means the Katie A. Advisory Panel, currently comprised of Paul Vincent (Chair), Edward Walker, and Dr. Marty Beyer.

3.    "Agreement" means this Agreement.

4.    "Behavioral Health Information Notice No. 20-012" refers to the document available at https://www.dhcs.ca.gov/Documents/Behavioral-Health-Information-Notice-20-012-2020-NA-Certification-4-3-20.pdf.

5.    "CFT" means Child and Family Team, as defined in Welfare and Institutions Code § 16501(a)(4), and the Medi-Cal Manual for Intensive Care Coordination (ICC), Intensive Home Based Services (IHBS), and Therapeutic Foster Care Services (TFC), available at

https://www.dhcs.ca.gov/services/MH/Pages/Manuals_And_Guides.aspx, and amendments thereto.[1]

6.      "CFTM" means Child and Family Team Meeting, as defined in Welfare and Institutions Code § 16501(a)(5) and the Medi-Cal Manual for Intensive Care Coordination (ICC), Intensive Home Based Services (IHBS), and Therapeutic Foster Care (TFC) Services for Medi-Cal Beneficiaries, available at https://www.dhcs.ca.gov/services/MH/Pages/Manuals_And_Guides.aspx, and amendments thereto.

7.      "Class" means the class certified by the district court in this Action, namely children and young adults who (a) are in the custody of DCFS in foster care or are at imminent risk of foster care placement by DCFS; (b) are eligible for services under the Early and Periodic Screening, Diagnostic and Treatment ("EPSDT") program of the Medicaid Act as defined in 42 USC Section 1396 et seq.; (c) have a mental illness or condition that is documented, or had an assessment been completed, could have been documented; and (d) need individualized mental health services, including but not limited to professionally acceptable assessments, behavioral support and case management services, family support, crisis support, therapeutic foster care, and other medically necessary services in the home or in a home-like setting, to treat or ameliorate their illness or condition.  This Agreement is not intended to narrow or expand the definition of the Class for this Action for purposes of giving notice of the Agreement or identifying individuals benefiting from the terms of the Agreement.

8.      "Class Members" means those persons included within the Class.

9.      "Consent Decree" means the Stipulated Order re Final Approval of Class Settlement, Dkt. 128 (entered July 16, 2003) and Settlement Agreement incorporated thereto.

---

[1] None of the definitions in the Agreement are intended to interfere with the County's discretion in providing child welfare services and mental health services so long as the County complies with all applicable federal and state laws, regulations and other guidance.

10.     "County" means, collectively, the County of Los Angeles, DCFS, and the Director of DCFS except in Paragraphs 57-64, 72-74, 76, 79, and 86 of this Agreement, wherein "County" also includes DMH.

11.     "DCFS" means the Los Angeles County Department of Children and Family Services.

12.     "DHCS" means the California Department of Health Care Services.

13.     "DMH" means the Los Angeles County Department of Mental Health.

14.     "Effective Date" means the date defined in Paragraph 47.

15.     "Exit Conditions" means exit conditions entered by Order to Stipulation Regarding Exit Conditions, Dkt. 776 (entered Dec. 1, 2011).

16.     "Expiration Date" means the date defined in Paragraph 54(a).

17.     "FFA" means Foster Family Agency, as defined in the DCFS Child Welfare Policy Manual Glossary, available at http://policy.dcfs.lacounty.gov.

18.     "Final Settlement Hearing" means the final hearing(s) scheduled by the district court in the Action to determine whether to finally approve this Agreement.

19.     "FSP" refers to Full Service Partnerships, as defined in 9 Cal. Code Reg. § 3200.130.

20.     "I/DD" means intellectual and/or developmental disabilities.

21.     "ICC" means Intensive Care Coordination, as defined in the Medi-Cal Manual for Intensive Care Coordination (ICC), Intensive Home Based Services (IHBS), and Therapeutic Foster Care (TFC) Services for Medi-Cal Beneficiaries, available at https://www.dhcs.ca.gov/services/MH/Pages/Manuals_And_Guides.aspx, and amendments thereto.

22.     "IFCCS" means Intensive Field Capable Clinical Services (IFCCS) and is an intensive mental health program that provides field based trauma sensitive services to children and youth with an open child welfare case.  IFCCS is designed to foster relationships built upon strengths of the children, youth and their families with the goal to minimize psychiatric hospitalizations and promote placement stability.

23.     "IHBS" means Intensive Home Based Services, as defined in the Medi-Cal Manual for Intensive Care Coordination (ICC), Intensive Home Based Services (IHBS), and Therapeutic Foster Care (TFC) Services for Medi-Cal Beneficiaries, available at https://www.dhcs.ca.gov/services/MH/Pages/Manuals_And_Guides.aspx,     and     amendments thereto.

24.     "Implement a Practice" means to complete the actions identified in this Agreement and the attached Work Plans, unless the County is unable to do so due to unforeseen circumstances outside of the County's control.

25.     "ISFC" means Intensive Services Foster Care, as defined in California Welfare and Institutions Code § 18360.

26.     "MAT" means Multidisciplinary Assessment Team, as defined in DCFS Child Welfare Policy Manual No. 0600-500.05.

27.     "MHSUDS Information Notice No. 18-043" refers to the document available at https://www.dhcs.ca.gov/services/MH/Documents/Information%20Notices/IN_18-043_Beneficiary_Handbook/MHSUDS_Information_Notice_18-043_Beneficiary_Handbook_Information_Notice.pdf

28.     "MHSUDS Information Notice No. 19-026" refers to the document available at https://www.dhcs.ca.gov/services/MH/Documents/FMORB/MHSUDS_IN_19-026_Authorization_of_SMHS.pdf.

29.     "Motion" or "Rule 60 Motion" means Defendants' Motion to Vacate Consent Decree Pursuant to Federal Rule of Civil Procedure 60(b)(5), Dkt. 975 (filed Aug. 26, 2019).

30.    "Parties" means, collectively, Plaintiffs (including in their capacity as representatives of the Class) and the County.

31.    "PMRT" means Psychiatric Mobile Response Teams consisting of DMH-licensed clinical staff assigned to a specific service area in the County of Los Angeles that provide crisis intervention and that have legal authority per Welfare and Institutions Code §§ 5150 and 5585 if necessary to initiate applications for evaluation of involuntary detention of individuals determined to be at risk of harming themselves or others or who are unable to provide food, clothing, or shelter as a result of mental disorder.

32.    "Preliminary Approval Order" means an order of the district court granting preliminary approval of this Agreement and authorizing notice to the Class.

33.    "Plaintiffs' Counsel" means Western Center on Law & Poverty, Disability Rights California, National Health Law Program, Bazelon Center for Mental Health Law, Public Counsel, National Center for Youth Law, and Akin Gump Strauss Hauer & Feld LLP.

34.    "Prior Agreements" means the Prior Settlement Agreement and every subsequent agreement, stipulation or order arising thereunder or in connection therewith, including the Strategic Plan and the Exit Conditions.

35.    "Prior Settlement Agreement" means the settlement agreement approved by the Court and incorporated into the Consent Decree.

36.    "Qualitative Service Review" and "QSR" shall have the same meaning as in the Motion.

37.    "Regional Center Liaison" shall have the same meaning as in DCFS Child Welfare Policy Manual No. 0070-516.10.

38.    "RFA" means the Resource Family Approval program, as defined in California Welfare and Institutions Code § 16519.5.

39.    "SMHS" means Specialty Mental Health Services, as defined in 9 Cal. Code. Reg. § 1810.247.

40.     "Strategic Plan" means the Katie A. Strategic Plan approved by the district court in the Action by In-Chambers Order on August 10, 2009, as reflected in the minutes thereof, Dkt. No. 689 (Aug. 10, 2009).

41.     "STRTP" means Short-Term Residential Therapeutic Program, as defined in California Health and Safety Code § 1502(a)(18).

42.     "TFC" means Therapeutic Foster Care, as defined in the Medi-Cal Manual for Intensive Care Coordination (ICC), Intensive Home Based Services (IHBS), and Therapeutic Foster Care (TFC) Services for Medi-Cal Beneficiaries, available at https://www.dhcs.ca.gov/services/MH/Pages/Manuals_And_Guides.aspx, and amendments thereto.

43.     "TSCF" means Temporary Shelter Care Facility, as defined in California Health and Safety Code § 1530.8.

44.     "Work Plans" refers to Appendix A hereto.

II.     **JURISDICTION AND AUTHORITY OF THE COURT**

45.     The United States District Court has jurisdiction over the claims against all Defendants pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.  Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b).

46.     After notice of and an opportunity to comment on this Agreement has been provided to the Plaintiff Class and others thereby affected, the Court shall determine whether to approve this Agreement as being a fair, reasonable and adequate settlement of the *Katie A.* Litigation.

### III.        **THE AGREEMENT**

47.        **Effective Date**.  The Agreement becomes effective and enforceable upon the date of execution by all signatories.  The terms of the Agreement may not be modified by the Parties without the Parties' written consent.

48.        **Filing of Stipulation and Proposed Order within Two Calendar Days of the Effective Date**.  Within two calendar days of the Effective Date, the Parties shall file a Stipulation and Proposed Order with the Court. The Parties will ask the Advisory Panel to join in signing this Stipulation and Proposed Order but this filing will not be conditioned upon the Panel's assent.  Subject to Court approval, this Stipulation and Proposed Order will remain in effect until the Court rules upon the Parties' motion for preliminary approval of the Agreement referenced in the subsequent paragraph and will contain the following terms:

      a.  The County's Rule 60 Motion shall be taken off calendar and any studies, reports, data, or documents that have been requested during discovery for the Rule 60 Motion shall no longer be required.

      b.  The County's obligations under the Prior Agreements shall be stayed pending a decision by the Court approving the Agreement. As an example, the County will not be required to conduct Qualitative Service Reviews going forward and will not be required to complete the current QSR cycle.

      c.  Since the County's obligations under the Prior Agreements will be stayed, the Panel will no longer perform its current responsibilities (including those identified in paragraphs 10-19 of the Prior Settlement Agreement) and will instead be invited to (i) file a response in accordance with a mutually agreeable briefing schedule to be determined after this Agreement is executed, using the data and information currently in its possession and that will be made available to Plaintiffs and the Panel pursuant to the terms of the Agreement, and (ii) assist the County, at the County's request, with its obligations under the Agreement.  The Parties will seek a court order concerning a briefing schedule if the Panel will not agree. If the Panel requests any data and information in addition to that in (i) above, the

County will meet and confer in good faith with the Panel on whether the additional data and information are necessary for the Panel to prepare its response and not unduly burdensome for the County to produce.  In the event that there is a dispute between the Panel and the County under this provision, either the Panel or the County may seek a resolution on an expedited basis by the appointed Magistrate Judge pursuant to the Federal Rules of Civil Procedure and Local Rule 37.

d. The Parties have begun implementing the terms of the Agreement, and the County will implement deliverables stated in the Work Plans in the time frames set forth therein.

e. Plaintiffs shall be allowed to file a motion to enforce the Agreement after following the Dispute Resolution Process outlined in Paragraph 67.

49. **Approval of the Agreement**.  The Parties will prepare joint motions for preliminary and final approval of the Agreement.

50. As part of the motion for preliminary approval of the Agreement, the Parties will ask that the Court (i) extend all the terms of the above Stipulation and Proposed Order until the Expiration Date; and (ii) schedule the fairness hearing for the earliest available date convenient for the Court after giving class members notice of the Agreement and an opportunity to object in accordance with Rule 23 of the Federal Rules of Civil Procedure, the Due Process Clause of the United States Constitution and the case law regarding class action settlements after judgment. By executing the Agreement, the County agrees that it will fulfill all the terms of the settlement and the Parties agree that the settlement is fair, reasonable and adequate to the Class and will support Court approval.

51. The Parties to this Agreement acknowledge that notice of, and an opportunity to comment on, this Agreement must be provided to the Class and others thereby affected. Immediately following the execution of the Agreement, the Parties shall jointly develop the contents of the written notice to be given to the Class, and will negotiate the terms of how notice shall be given to the Class.

52.     The Parties shall take all necessary steps to obtain judicial approval of this Agreement.  As part of the approval process, the Parties agree to cooperate and use their best efforts in describing and explaining the benefits of this Agreement to the Class and in the creation of all papers submitted to the Court to secure such approval.  In the event that the Court does not approve this Agreement or the order approving this Agreement is reversed on appeal, the Parties shall make good faith efforts to modify the Agreement so as to gain judicial approval.

53.     Upon expiration of the deadline for filing objections under this Agreement as set forth in the Preliminary Approval Order and Notice, and on the date set forth in the Preliminary Approval Order, a Final Settlement Hearing shall be conducted to determine final approval of the Agreement.

54.     **The Expiration Date**.

    a.  The Court will retain jurisdiction over this Action until June 30, 2021 or the date the Court grants final approval to the Agreement, whichever is later, at which time the Court's jurisdiction will expire.

    b.  The Parties agree that this expiration of jurisdiction shall not be extended, for any reason, beyond the Expiration Date. The terms of the Agreement are not exit conditions and no provision of the Agreement, agreement to make corrective measures or any Court order entered in connection therewith (including pursuant to the Dispute Resolution Process set forth in paragraph 67) will be enforceable beyond the Expiration Date.

    c.  Upon the Expiration Date, the Parties will take all necessary steps to dismiss the case within five business days, including filing a joint stipulation or a motion to dismiss; the Court's jurisdiction over the Action will expire; and the entire Katie A. litigation will be terminated.

    d.  The Parties will not seek to enforce any such provision or otherwise extend the term of the Agreement or Court order beyond the Expiration Date.

55.     **The Agreement Supersedes All Prior Agreements**.  Upon final approval, the Agreement supersedes the Prior Agreements.  The Prior Agreements shall become null and void, and the obligations and rights arising thereunder shall terminate immediately upon the Expiration Date.

## IV.     SPECIFIC AGREEMENTS AND BENEFITS TO THE CLASS

56.     The main objectives of this Agreement are to (a) increase the number of Class members who receive ICC and IHBS, when medically necessary, in a timely manner and in appropriate amount and duration, (b) prevent the unnecessary psychiatric hospitalization, placement in an STRTP or group home and multiple placements of Class members, (c) provide TFC to Class members for whom this mental health service is medically necessary, (d) allow the County to exit this litigation by the Expiration Date, and (e)  allow the Parties to avoid the risk and expense of litigating the County's Motion.

57.     In aid of the above objectives, the County agrees as follows:

58.     **Agreement #1:  Training/Coaching on Pre-Replacement CFTMs to Prevent Placement Disruptions**.

    a.  The County will implement a practice that, in the event that a class member's social worker identifies or is informed of a risk of placement disruption due to a class member's mental health condition or behavior, (a) the social worker will timely and appropriately address the risk in collaboration with formal and informal supports, including by attempting to convene a CFTM, and (b) DMH or a DMH provider will timely determine the class member's need for SMHS, including ICC and/or IHBS, and provide such SMHS, including ICC and/or IHBS, as promptly as necessary to meet the class member's mental health needs in order to promote placement stability.

    b.  The County will implement a practice that when a class member has experienced one placement disruption due to a class member's mental health condition or behavior, (a) the social worker will timely attempt to convene a CFTM and (b) DMH or a DMH provider will timely determine the class member's need for

SMHS, including ICC and/or IHBS, and provide such SMHS, including ICC and/or IHBS, as promptly as necessary to meet the class member's mental health needs in order to promote placement stability.

c. The County will implement a practice that a class member's social worker participates in CFTMs convened by the class member's mental health provider.

d. Provide training on the above practices and DCFS's practice of holding CFTMs as frequently as needed.

59. **Agreement #2:  SMHS for Children and Youth**.

a. For class members (a) who have been hospitalized for a psychiatric condition, (b) for whom PMRT or other crisis intervention has been requested, or (c) who are referred to or discharged from an STRTP, the County shall implement a practice of automatically making a referral to DMH or a DMH provider for a timely determination of the need for SMHS (including ICC and/or IHBS if the child is not already receiving ICC and/or IHBS).  DMH or a DMH provider will provide such SMHS, including ICC and/or IHBS, as promptly as necessary to meet the class member's mental health needs in order to avoid unnecessary hospitalization, placement in an STRTP, and/or need for PMRT or other crisis intervention services.  DMH will also implement a practice that, in the event a class member is hospitalized for a psychiatric condition, DMH or a DMH provider participates in the hospitalization discharge planning process to ensure appropriate SMHS (including ICC and/or IHBS) are provided, as appropriate, after hospitalization.

b. The County will implement a practice that if DMH mobile crisis teams determine that a child does not require hospitalization, they must provide appropriate mental health services to intervene in and stabilize the crisis, as necessary, until the child's regular mental health provider is able to intervene and provide appropriate services.

c. The County will implement a practice that, in the event that a DMH provider or DMH staff identifies a risk of placement disruption due to a class member's

mental health condition or behavior, (a) the DMH provider or the class member's DCFS social worker will timely and appropriately address the risk in collaboration with formal and informal supports, including by attempting to convene a CFT, and (b) DMH or a DMH provider will timely determine the class member's need for SMHS, including ICC and/or IHBS, and provide such SMHS, including ICC and/or IHBS, as promptly as necessary to meet the class member's mental health needs in order to promote placement stability.

60.  **Agreement #3:  I/DD**.

a.  The County will provide training from experts in I/DD (such as the University of Southern California University Center for Excellence in Developmental Disabilities) to MAT and other DMH or DCFS staff who conduct screening to identify I/DD conditions (including Fetal Alcohol Syndrome), through reports from the family, schools and other sources.

b.  For children identified as having a co-occurring mental health and I/DD conditions, implement a practice of:

i.  ensuring that class members' social workers promptly apply for regional center services,

ii.  providing additional training and support to caregivers, regarding appropriate services to these children, and

iii.  working with the appropriate regional center to transition children with known I/DD from STRTPs to lower levels of care.

c.  For class members who are regional center clients, the class member's social worker or Regional Center Liaison shall:

i.  invite the regional center service coordinator to attend each CFT; and

ii.  attend the child's annual regional center planning meetings (IPPs).

61.    **Agreement #4:  ICC and IHBS**.

a.    DMH will implement a practice consistent with State Department of Health Care Services (DHCS) MHSUDS Information Notice No: 19-026 (IN 19-026) that prior authorization is not required for class members to receive ICC and class members may receive ICC without being enrolled in a specific intensive or other program (e.g. wraparound FSP, or IFCCS). When a DMH provider determines that a class member needs ICC, a DMH provider or DMH staff may thereafter begin to provide ICC to the class member with the requisite consent. When consent for ICC is required from the class member, parent and/or caretaker, appropriate engagement strategies will be applied to obtain consent and services for the class member.

b.    DMH will implement a practice that, after obtaining prior authorization for IHBS as required by IN 19-026, a class member may receive IHBS without being enrolled in a specific intensive or other program (e.g. wraparound, FSP, or IFCCS). When a DMH provider determines that a class member needs IHBS and DMH has pre-authorized IHBS, a DMH provider or DMH staff may thereafter begin to provide IHBS to the class member with the requisite consent.  When consent for IHBS is required from the class member, parent and/or caretaker, appropriate engagement strategies will be applied to obtain consent and services for the class member.

c.    DMH will implement a practice whereby a class member or a person acting on the class member's behalf (e.g., parent, foster parent, other caretaker, therapist, and other service provider) may make a request directly to DMH or a DMH contracted provider for ICC, IHBS, and/or other mental health services for the class member. The class member or person acting on the class member's behalf will not be required to first contact DCFS to request mental health services. When DMH or a DMH contracted provider receives such a request, DMH or a contracted provider will provide the class member an assessment and any medically necessary specialty mental health services with the requisite consent.

d.  When a court order is required to provide consent to mental health services, DCFS will seek a court order authorizing mental health assessment and services as promptly as necessary to meet the child's needs.

e.  The County will issue a Provider Bulletin or other written guidance and provide training, clarifying that mental health providers must provide or arrange for the provision of covered behavioral health services—including ICC and/or IHBS—in a timely manner appropriate for the nature of the beneficiary's condition consistent with good professional practice.  Such Provider Bulletin or other written guidance shall enclose a copy of Behavioral Health Information Notice No. 20-012 and call attention to the timeframes set forth therein on page 7.

f.  When a request or referral is made for ICC and/or IHBS for a class member, including a request or referral by DCFS for a determination of a class member's need for SMHS, including ICC and/or IHBS, DMH or a DMH provider will timely determine whether the class member needs SMHS, including ICC and/or IHBS.  When a class member is determined to need SMHS, including ICC and/or IHBS, a DMH provider will timely provide these services with the requisite consent, consistent with applicable state law, regulations, and guidance.  When a class member's need for ICC and/or IHBS is identified during the MAT process, a referral for ICC and/or IHBS will not be delayed until the presentation of findings.  When DCFS refers a class member to a co-located DMH clinician for a determination of a class member's need for SMHS, an appointment with a DMH provider will be offered consistent with Behavioral Health Information Notice No. 20-012.

g.  DMH will issue a Provider Bulletin or other written guidance to its contract providers providing information regarding resources made available by the County to assist with the administration of providers' contracts.

h.  DMH will convene a meeting of DMH providers where the providers are invited to discuss with DMH questions regarding the administration of their contracts, including providing and billing of ICC, IHBS and/or other SMHS.

62.    **Agreement #5:  SMHS Materials and Training for County RFA Caregivers**.

a.    When DCFS opens a child's case and at the time of each new placement, or within a reasonable time after these events, caregivers shall be provided consumer-friendly informational materials, including as part of information on the child's medical HUB, explaining:

    i.    SMHS and supports, including ICC and IHBS, available to the caregiver and child and how to obtain these services, including the relevant timeframes;

    ii.    the benefits of ICC and IHBS, including in the management of behavior, that support placement stability;

    iii.    how to access ICC, IHBS and other SMHS before a placement disruption occurs;

    iv.    how to request ICC and IHBS and other supports, if the caregiver is having difficulty managing a child's behavior or believes the child needs more intensive services;

    v.    contact information and procedures for requesting access to ICC, IHBS and other mental health services; and

    vi.    contact information for DCFS staff who can assist with the above.

b.    DCFS will supplement training provided to caregivers in the Resource Family Approval (RFA) process and through continuing education RFA classes to include information regarding the benefits of and how to access ICC, IHBS and other SMHS.

c.    A copy of an MHSUDS Information Notice 18-043-compliant handbook shall be posted online and made available to any class member who calls the county mental health plan ACCESS Center about SMHS or contacts a contracted mental health provider to request services.

d. The format, content, and medium of the foregoing informational and training materials shall be in the discretion of the County.  The County will provide a draft of informational and training materials to Plaintiffs' counsel and allow them ten business days to comment.

63.    **Agreement #6:  Therapeutic Foster Care**.

a. Under the State's Medi-Cal Plan, the TFC service model allows for the delivery of short-term, intensive, highly-coordinated, and individualized SMHS, to children and youth up to age 21 who have complex emotional and mental health needs and who are placed with trained, intensely supervised and supported TFC parents (see MHSUDS INFORMATION NOTICE NO.: 17-021, https://www.dhcs.ca.gov/services/MH/Documents/PPQA%20Pages /MHSUDS_Information_Notice_17-021_TFC_Claiming. pdf; DSS ACIN i-52-16E). The TFC service model is intended for youth who require intensive and frequent mental health support and is a home-based alternative to high-level care in institutional settings such as group homes and STRTPs. The TFC parent is both a Medi-Cal provider and a caregiver who works directly with the child/class member.  The approved reimbursement methodology allows MHPs to claim reimbursement from local and/or federal funding sources for a combination of certain SMHS service activities under one TFC per diem rate. To provide TFC, a caregiver must be associated with an FFA that also has a contract with DMH. For purposes of this Agreement, a "TFC parent with a prior relationship" is an individual who has an existing relationship with a particular child and is willing to become a TFC parent and who will work with an FFA that is also a DMH provider for that child.  A child receiving TFC should also be receiving ICC and, if medically necessary, IHBS.

b. The County will take the following measures to facilitate its efforts to make TFC available when medically necessary for class members, including those at risk of placement in, placed in, or being discharged from an STRTP, group home, crisis stabilization unit, temporary shelter care facility or psychiatric inpatient care:

    i.   contract with FFAs that are qualified and willing to provide TFC services to class members when medically necessary;

    ii.  request input from the State and the California Institute for Behavioral Health Solutions ("CIBHS") to determine whether there are additional steps DMH can take to expand the delivery of TFC, including potential cost savings by providing TFC to class members in order to avoid unnecessary placement in STRTPs, group homes, psychiatric hospitalizations and temporary shelter care facilities. The County will thereafter implement what the County considers to be the reasonable recommendations by the State and the CIBHS; and

    iii.  provide additional information to FFAs and their certified resource parents on  the ISFC board and care rate and the availability of additional funding for providing TFC services.

c.  The County will take the following steps to expand the availability and provision of TFC through TFC parents with a prior relationship:

    i.   Connect individuals who have expressed interest in being TFC parents for a particular class member to an appropriate FFA for training and certification;

    ii.  Allow the provision of ICC and IHBS to children living with a prospective TFC parent while the individual is being trained and certified to become a TFC parent;

    iii.  Implement a practice that DCFS, DMH and/or FFA providers invite any prospective TFC parent to CFTMs.

d.  The County will provide additional training to DCFS case workers and co-located DMH staff on:

    i.   The benefits of, and need for, TFC for class members and the benefits of recruiting and certifying TFC parents with a prior relationship; and

ii. The options of (i) placing a class member with prospective TFC parents while they are being trained and certified to become a TFC parent and (ii) providing ICC and IHBS to the class member in the prospective TFC parents' home while the prospective TFC parents are being trained and certified.

64. **Agreement #7: Data Reporting**.

a. The terms below are intended to provide Plaintiffs with sufficient assurances that the County is implementing the terms of this Agreement, but also seek to limit the burdens imposed on the departments during this settlement period.

b. *Implementation of new practices, instructions and training*. The County will finalize its Work Plans for implementation of the settlement to include estimated dates for the commencement and completion of each task. The Parties, through counsel, will confer by telephone or video conference on a monthly basis and more frequently as needed regarding the County's progress. The Parties agree to invite the Advisory Panel to participate in these calls as its schedule permits. In addition, the County will provide a monthly report to Plaintiffs and the Advisory Panel during the Agreement period that documents and describes the steps the County, through its departments, took to implement the terms of the Agreement. These reports will include, at a minimum, the following information, which shall also be reflected in updates to the Work Plans regarding the specific tasks performed regarding each settlement provision and the date(s) this was completed or performed:

i. A description of the work DCFS performed in implementing the Agreement terms;

ii. A description of the work DMH performed in implementing the Agreement terms;

iii. A description of the work performed to create directives, guidelines, training materials, updates, brochures, information notices and other such materials, with copies of the completed materials[2];

iv. For Agreement terms that require the County to provide training, the reports will include the following for the prior reporting period:  (1) when the first training session was conducted; (2) how many training sessions were conducted during the Reporting Period (defined as the period in between the most recent report and the current report); (3) which training sessions were conducted during the Reporting Period; (4) how many people attended the training sessions during the Reporting Period; (5) who the instructors were for the training sessions during the Reporting Period; and (6) the upcoming schedule for additional training sessions.

v. For trainings and other Agreement terms that require the County to distribute materials to providers and/or caregivers, the monthly reports will include:  (1) which materials were distributed during the Reporting Period and a copy of the materials; (2) who the County sent the materials to during the Reporting Period; and (3) the upcoming schedule for future distributions and information sessions with providers and/or caregivers;

vi. The County will provide Plaintiffs with a reasonable opportunity to review and comment on training materials provided to County staff, providers and caregivers to implement the Agreement.

c. *Data Reporting - General*. The County will prepare a report for Plaintiffs and the Advisory Panel on a monthly basis regarding the following:

---

[2] For settlement terms that permit Plaintiffs or other persons to review and comment on materials before they are finalized and disseminated, the County will provide those materials when they are ready for outside review.  The County anticipates that these materials could be provided to the required recipients in between reports when they are ready.

    i.   The total number of ISFC providers, available ISFC beds and placements in ISFC homes in Los Angeles County for the Reporting Period; and

    ii.   The total number of TFC providers, available TFC parents and placements with TFC parents in Los Angeles County.

d.  *Data Reporting regarding Agreement Nos. 1, 2 and 3*.  The County will provide Plaintiffs and the Advisory Panel the following data on a monthly basis during the settlement period, except for subdivision (vi) which will be provided every other month during the settlement period:

    i.   the number of children in DCFS custody in an out of home placement that had an initial CFT and/or follow-up CFT.

    ii.   The number of placement disruptions during the reporting period along with a breakdown of the reasons for placement disruption.

    iii.   The number of psychiatric hospitalizations during the reporting period.

    iv.   The number of children residing in an STRTP during the prior month.

    v.   The number of children in a TSCF at the end of each month.

    vi.   The number of class members who received SMHS during the reporting period, broken down by SMHS service categories, which will include data showing pending and/or approved costs and place of service.[3]

e.  In its reports to Plaintiffs and the Advisory Panel, the County may provide tentative data that will be subject to revisions upon the County's receipt and analysis of the full data sets for a given period.  The County may provide tentative data for information purposes only, and if such data is incomplete, the County shall designate why it believes such data is incomplete, how it is incomplete, and

---

[3] If the data produced pursuant to this subdivision differs from that reported to or by DHCS, the County will identify and provide an explanation of these differences.

shall indicate when such final and complete data will be available. If the County reports tentative data on a given topic, the County will include the final figures in a subsequent report, unless the final data is not available prior to the Expiration Date.  The County will not be required to submit any reports after the Expiration Date.

## V.    EFFECT OF DISAPPROVAL

65.    Subject to Paragraph 52, in the event (i) the Court does not grant preliminary approval of the Agreement, (ii) the Court does not grant final approval of the Agreement, (iii) the Parties fail to timely file the joint stipulation or motion to dismiss contemplated by Paragraph 54(c), (iv) the Court denies the joint stipulation or motion to dismiss contemplated by Paragraph 54(c), in whole or in part, such that court's jurisdiction does not end and/or this Action is not terminated as against the County, or (v) the Agreement does not become final for any other reason, this Agreement shall be null and void and any order or judgment entered by the Court in furtherance of this settlement shall be vacated nunc pro tunc, in which case the Parties shall proceed in all respects as if this Agreement had not been executed, and the terms or fact of this Agreement (as well as the negotiations leading up to the execution of this Agreement) shall be inadmissible in any proceeding for any purpose.

66.    The Parties agree to use their best efforts to carry out the terms of the Agreement. At no time shall any of the Parties or their counsel seek to solicit or otherwise advocate for Class members to submit objections to the Agreement or to appeal from the order giving final approval to the Agreement.

## VI.    DISPUTE RESOLUTION PROCESS

67.    If a dispute arises concerning the County's performance of any Agreement term, Plaintiffs shall first provide the County with written notice specifying with particularity the basis for the dispute within ten (10) days of discovering the facts giving rise to the dispute.  No later than ten (10) days thereafter the Parties shall discuss thoroughly, preferably in person, the substance of the dispute and any possible resolution.  If the Parties are unable to resolve this dispute, then, no later than seven (7) days thereafter, the Parties shall file a joint stipulation and

request the Court's resolution of this dispute on an expedited basis. Like the other provisions in the Agreement, the Dispute Resolution Process outlined herein shall expire and become no longer enforceable upon the Expiration Date. Plaintiffs will not file any motion to enforce the Agreement after May 31, 2021, and the Parties will ask that any motion to enforce be heard and decided on an expedited basis before June 30, 2021. In the event that either the County agrees with Plaintiffs about its nonperformance of Agreement term(s) as presented during the Dispute Resolution Process or the Court rules for Plaintiffs on a motion to enforce particular Agreement terms(s), the County shall thereafter implement the appropriate corrective measures on an expedited basis so that the County will comply with the Agreement term(s) at issue as soon as possible and prior to June 30, 2021. The foregoing Dispute Resolution Process shall be Plaintiffs' sole remedy for any dispute relating to or arising out of the Agreement.

## VII.    **ATTORNEYS' FEES AND COSTS**

68.     The County agrees to pay a total of $1.4 million as an all-inclusive attorneys' fees sum, and $12,095 in costs, which sum shall be paid by the County into an escrow account at Plaintiffs' counsel's selection and direction for the benefit of Plaintiffs' counsel within 30 days of the Expiration Date.

69.     The Parties agree that this amount is meant to cover all of Plaintiffs' claims for attorneys' fees and costs, including any future attorneys' fees and costs through and including the Expiration Date, and any and all claims by any of Plaintiffs' current or former counsel and their successors or assigns.

70.     Notwithstanding the foregoing paragraph, Plaintiffs' counsel will be entitled to reasonable fees over and above the foregoing agreed-upon amount in the event Plaintiffs prevail on a motion to enforce the Agreement.

71.     The County shall have no other responsibility for payment of Plaintiffs' attorneys' fees or litigation expenses, and the County shall have no responsibility for the allocation among Plaintiffs' counsel of funds from the aforementioned escrow account.

## VIII.        NO ADMISSION OF LIABILITY

72.        The County expressly denies each and all of the claims and contentions against it by Plaintiffs in this action.  This Agreement, anything contained herein, and any negotiations or proceedings hereunder shall not be construed as or deemed to be an admission, presumption, evidence of, concession by the County of the truth of any fact alleged or the validity of any claim which has or could have been asserted in this action, or of the deficiency of any defense which has or could have been asserted in this action or of any wrongdoing or liability whatsoever.

73.        This Agreement, the fact of its existence, any term thereof, and any information or data provided to Plaintiffs, Plaintiffs' counsel or the Panel in connection therewith shall not be used as evidence in, or to support, any civil, criminal, or administrative action or proceeding against the County except in any proceedings in the instant Action.

74.        Nothing herein shall be deemed, or be treated as evidence of the existence or lack of any custom, policy, or practice of the County.  Neither this Agreement nor any portion or provision thereof is intended to require or effect any change to existing policy or practice except as expressly provided herein.

75. Plaintiffs' Release of claims in Section IX. below shall not be construed or deemed to be an admission, evidence of, concession by Plaintiffs that the County was in compliance with the EPSDT requirements of the Medicaid Act, 42 USC § 1396 et seq., and its implementing regulations, 42 C.F.R. § 430 et seq., the Americans with Disabilities Act, 42 U.S.C. § 12132, and its implementing regulations, 28 C.F.R. § 35.130, the Rehabilitation Act, 29 U.S.C. § 701 et seq., and the parallel California statutes and regulations, Gov. Code § 11135 et seq., 22 C.C.R. § 98000 et seq., prior to or on the Expiration Date.

## IX.        RELEASE

76.        In consideration of the covenants and promises contained herein, Plaintiffs and their successors, assigns, agents and representatives hereby release, absolve and discharge the County of Los Angeles, DCFS, DMH, the Directors of DCFS and DMH  from all rights, claims, demands, obligations, causes of action and suits of all kinds and descriptions that seek declaratory and/or injunctive relief on a class-wide basis based on acts or omissions that occurred

prior to the Effective Date and that arise from the identical factual predicate as the claims at issue in the *Katie A.* litigation (the "Released Claims"). The Released Claims do not include individual or class claims for damages.

## X.    OTHER PROVISIONS

### A.    Supervening Changes in Law

77.    The obligations of the County set forth in this Agreement are subject to supervening changes in federal or state law, directives, guidance, or policy or any agreements entered into by the County with federal or state governments. If there is such a supervening change, the County will endeavor to provide Plaintiffs' counsel with at least 30-days advance notice in writing of the intended modification and the basis for such modification unless circumstances prevent advance notice thereof.

### B.    Entire Agreement

78.    This Agreement contains all the terms and conditions agreed upon by the Parties hereto, and no oral agreement entered into at any time nor any written agreement entered into prior to the execution of this Agreement regarding the subject matter of this proceeding shall be deemed to exist, or to bind the parties hereto, or to vary the terms and conditions contained herein. The Parties covenant and warrant that they have not relied upon any promise, representation or undertaking not set forth in writing herein to enter into this Agreement.

### C.    Beneficiaries

79.    This Agreement and any notice required in connection herewith shall inure to the benefit of, and be binding solely upon, the Parties, the Class, and DMH, and their legal representatives and successors. This Agreement is not intended to and shall not be construed to give any third party any interest or rights (including, without limitation, any third party beneficiary rights) with respect to or in connection with this Agreement or any portion or provision thereof.

### D.    Drafting

80.    The Parties to this Agreement have participated equally in its drafting and, consequently, any ambiguity shall not be construed for or against either party.

### E.    Void Clauses

81.    If any provision of this Agreement is held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby, and such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability.

### F.    Headings

82.    The section and other headings contained in this Agreement are for reference purposes only and shall not control or affect the construction of this Agreement or the interpretation thereof in any respect.  Section, subsection, paragraph and Appendix references are to this Agreement unless otherwise specified.

### G.    Representations of Counsel

83.    Each of the undersigned attorneys represents and warrants that they have the authority on behalf of their respective clients, to execute, deliver, and perform this Agreement and that this Agreement has been duly and validly executed and delivered and constitutes a legal, valid and binding obligation.

### H.    Covenants Not to Sue

84.    Plaintiffs agree that they will not bring new lawsuits or join in existing lawsuits against the County arising out of or relating to the subject matter of the Complaint, FAC and/or this Agreement until after the Expiration Date.

**I.**        **Amendments**

85.        This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by both the County and the Plaintiffs' counsel and approved by the Court.

**J.**        **Notice**

86.        Notice, when due to Plaintiffs, the County and the Advisory Panel, shall be given by delivering it, in person or by United States certified first class mail, or by email, as follows:

<u>Plaintiffs' Counsel</u>:

Robert Newman
rnewman@wclp.org
Antionette Dozier
adozier@wclp.org
Western Center on Law & Poverty
3701 Wilshire Boulevard, Suite 208
Los Angeles, CA 90010

Melinda Bird
melinda.bird@disabilityrightsca.org
Robert Borrelle
robert.borrelle@disabilityrightsca.org
Disability Rights California
350 South Bixel Street, Suite 290
Los Angeles, CA 90017

Kimberly Lewis
lewis@healthlaw.org
National Health Law Program
37301 Wilshire Boulevard, Suite 750
Los Angeles, CA 90019

Ira Burnim
irab@bazelon.org
Bazelon Center for Mental Health Law
1090 Vermont Avenue, NW, Suite 220
Washington, DC 20005

Mark Rosenbaum
mrosenbaum@publiccounsel.org

Public Counsel
610 South Ardmore Avenue
Los Angeles, CA 90005

Leecia Welch
lwelch@youthlaw.org
National Center for Youth Law
1212 Broadway, Suite 600
Oakland, CA 94612

Neal Marder
nmarder@akingump.com
Akin Gump Strauss Hauer & Feld LLP
1999 Avenue of the Stars, Suite 660
Los Angeles, CA 90067

Counsel for the County:

Judy Whitehurst
jwhitehurst@counsel.lacounty.gov
Senior Assistant County Counsel
Office of the Los Angeles County Counsel
Kenneth Hahn Hall of Administration
500 West Temple Street, Room 605
Los Angeles, CA 90012

Skip Miller
smiller@millerbarondess.com
Brian Procel
bprocel@millerbarondess.com
Miller Barondess, LLP
1999 Avenue of the Stars, Suite 1000
Los Angeles, CA 90067

Counsel for the Advisory Panel:

William D. Temko
william.temko@mto.com
Munger, Tolles & Olson LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071

### J.  Counterparts

87.       This Agreement may be executed in counterparts, each of which will be deemed to be an original and all of which taken together shall constitute a single instrument.  This Agreement may be executed by signature via facsimile transmission or electronic mail which shall be deemed the same as an original signature.

### K.       Governing Law

88.       This Agreement shall be governed and construed in accordance with the substantive laws of the State of California, without giving effect to any of its conflict of law provisions.

### L.       Costs

89.       Except as specifically provided for in this Agreement, each Party shall bear its own costs and attorneys' fees, including taxable court costs.

Dated:  September 17, 2020

 

 

*Robert D. Newman*

_____
Robert Newman
Antionette Dozier
Western Center on Law & Poverty
3701 Wilshire Boulevard, Suite 208
Los Angeles, CA 90010
*Attorneys for Plaintiffs*

Dated:  September ___, 2020

 

 

_____
Melinda Bird
Robert Borrelle
Disability Rights California
350 South Bixel Street, Suite 290
Los Angeles, CA 90017
*Attorneys for Plaintiffs*

87.      This Agreement may be executed in counterparts, each of which will be deemed to be an original and all of which taken together shall constitute a single instrument.  This Agreement may be executed by signature via facsimile transmission or electronic mail which shall be deemed the same as an original signature.

### K.      Governing Law

88.      This Agreement shall be governed and construed in accordance with the substantive laws of the State of California, without giving effect to any of its conflict of law provisions.

### L.      Costs

89.      Except as specifically provided for in this Agreement, each Party shall bear its own costs and attorneys' fees, including taxable court costs.

Dated:  September ___, 2020

_____
Robert Newman
Antionette Dozier
Western Center on Law & Poverty
3701 Wilshire Boulevard, Suite 208
Los Angeles, CA 90010
*Attorneys for Plaintiffs*

Dated:  September 17, 2020

_____
Melinda Bird
Robert Borrelle
Disability Rights California
350 South Bixel Street, Suite 290
Los Angeles, CA 90017
*Attorneys for Plaintiffs*

Dated:  September ___, 2020

_____

Dated: September  17 , 2020

_Kimberly Lewis_
Kimberly Lewis
National Health Law Program
37301 Wilshire Boulevard, Suite 750
Los Angeles, CA 90019
*Attorneys for Plaintiffs*

Dated: September ___, 2020

_____
Ira Burnim
Bazelon Center for Mental Health Law
1090 Vermont Avenue, NW, Suite 220
Washington, DC 20005
*Attorneys for Plaintiffs*

Dated: September ___, 2020

_____
Mark Rosenbaum
Public Counsel
610 South Ardmore Avenue
Los Angeles, CA 90005
*Attorneys for Plaintiffs*

Dated: September ___, 2020

_____
Leecia Welch
National Center for Youth Law
1212 Broadway, Suite 600
Oakland, CA 94612
*Attorneys for Plaintiffs*

**EXHIBIT A - Page 40 of 55**

Dated:  September ___, 2020

                                               _____
Kimberly Lewis
National Health Law Program
37301 Wilshire Boulevard, Suite 750
Los Angeles, CA 90019
*Attorneys for Plaintiffs*

Dated:  September 17, 2020

_____
Ira Burnim
Bazelon Center for Mental Health Law
1090 Vermont Avenue, NW, Suite 220
Washington, DC 20005
*Attorneys for Plaintiffs*

Dated:  September 18 , 2020

_____
Mark Rosenbaum
Public Counsel
610 South Ardmore Avenue
Los Angeles, CA 90005
*Attorneys for Plaintiffs*

Dated:  September ___, 2020

_____
Leecia Welch
National Center for Youth Law
1212 Broadway, Suite 600
Oakland, CA 94612
*Attorneys for Plaintiffs*

Dated: September ___, 2020

 

_____
Kimberly Lewis
National Health Law Program
37301 Wilshire Boulevard, Suite 750
Los Angeles, CA 90019
*Attorneys for Plaintiffs*


Dated: September ___, 2020

 

_____
Ira Burnim
Bazelon Center for Mental Health Law
1090 Vermont Avenue, NW, Suite 220
Washington, DC 20005
*Attorneys for Plaintiffs*


Dated: September ___, 2020

 

_____
Mark Rosenbaum
Public Counsel
610 South Ardmore Avenue
Los Angeles, CA 90005
*Attorneys for Plaintiffs*


Dated: September 17, 2020

 

_____
Leecia Welch
National Center for Youth Law
1212 Broadway, Suite 600
Oakland, CA 94612
*Attorneys for Plaintiffs*

**EXHIBIT A - Page 42 of 55**

Dated:  September 17 , 2020

                       _____

Neal Marder
Akin Gump Strauss Hauer & Feld LLP
1999 Avenue of the Stars, Suite 660
Los Angeles, CA 90067
*Attorneys for Plaintiffs*


Dated:  September \_\_\_, 2020

                       _____

Judy Whitehurst
Senior Assistant County Counsel
Office of the Los Angeles County Counsel
Kenneth Hahn Hall of Administration
500 West Temple Street, Room 605
Los Angeles, CA 90012
*Attorneys for The County*

Dated:  September ___, 2020

                                      _____

                                        Neal Marder
                                        Akin Gump Strauss Hauer & Feld LLP
                                        1999 Avenue of the Stars, Suite 660
                                        Los Angeles, CA 90067
                                        *Attorneys for Plaintiffs*

Dated:  September  17 , 2020

                                      _____

                                        Judy Whitehurst
                                        Senior Assistant County Counsel
                                        Office of the Los Angeles County Counsel
                                        Kenneth Hahn Hall of Administration
                                        500 West Temple Street, Room 605
                                        Los Angeles, CA 90012
                                        *Attorneys for The County*

Appendix A

## COUNTY WORK PLANS

| Agreement #1:  Training/Coaching on Pre-replacement CFTMs to Prevent Placement Disruptions Work Plan/Deliverables | Start | End |
|---|---|---|
| 1.  The DMH Coaching Team (DMH Coaching Supervisor and selected DMH Coaches) will develop a curriculum. | August 3, 2020 | August 31, 2020 |
| 2.  The training curriculum and PowerPoint will be completed and sent in for review and approval to the DMH Program Manager/Coaching Supervisor to make revisions, as deemed necessary. | September 1, 2020 | September 25, 2020 |
| 3.  The actual training/coaching series will be conducted, as follows: <br> a.  The County will conduct a virtual Train-the Trainer session for an audience of DMH Supervisors and selected Coaches; and DCFS Countywide Coaches. <br> 1.     DCFS Countywide coaches will be trained to virtually deliver the new curriculum to all DCFS Regional Coaches. <br> 2.     DMH Supervising Coaches and selected Coaches will be trained to virtually deliver the new curriculum to the remainder of Countywide Coaches. <br> b.  DCFS' trained countywide coaches will conduct a virtual Skills Lab (Coach-the-Coach session) for DCFS Regional Coaches on conducting specialized pre-replacement CFT meetings and developing placement preservation plans. DMH Supervisors and selected Coaches will conduct virtual Coaching Labs to train DMH Coaches to facilitate the new curriculum. <br> c.  DCFS' trained countywide coaches will conduct a virtual Skills Lab for all DCFS Continuous Quality Improvement staff, so that they utilize the skills to support quality improvement throughout all DCFS Offices. <br> d.  DCFS' trained countywide coaches will conduct virtual Skills Labs for the Core Practice Model Implementation Teams in each DCFS office, which include but are not limited to Assistant Regional Administrators and community stakeholders. | September 28, 2020 | October 30, 2020 |

| | | |
|---|---|---|
| 4.    Multiple online trainings will be available to DMH staff, DCFS staff and DMH contracted providers. | November 9, 2020 | ONGOING |
| 5.    When a social worker suspects or learns of the potential for a placement disruption due to behavioral needs:<br>a.    The social worker will timely inform the trained Regional Coach.<br>b.    The trained Regional Coach will timely attempt to convene a pre replacement CFT meeting, intended to develop a placement preservation strategy.<br>c.    DMH or a DMH provider will timely determine the class member's need for SMHS, including ICC and/or IHBS, and provide such SMHS, including ICC and/or IHBS, as promptly as necessary to meet the class member's mental health needs in order to promote placement stability | January 1, 2021 | ONGOING |
| 6.    When DMH staff or DMH provider identifies the potential for a placement disruption, they will:<br>a.    Contact the CSW<br>b.    Consult with supervisor<br>c.    Attempt to convene a CFT meeting to develop a placement preservation strategy.<br>d.    Consult with the DMH Coach, as needed<br>e.    Timely determine the class member's need for SMHS, including ICC and/or IHBS, and provide such SMHS, including ICC and/or IHBS, as promptly as necessary to meet the class member's mental health needs in order to promote placement stability | January 1, 2021 | ONGOING |

| Agreement #2:  SMHS for Children and Youth<br>Work Plan/Deliverables | START | END |
|---|---|---|
| 1.  DMH will develop a process for receiving notifications of a class member's hospitalization for a psychiatric condition in DHS directly-operated and County-contracted hospitals | AUG 1, 2020 | OCT 31, 2020 |
| 2.  DMH and DCFS will convene a workgroup to create a workflow for cross-informing the occurrence of hospitalizations for a psychiatric condition. | AUG 15, 2020 | OCT 31, 2020 |
| 3.  DMH will develop liaison relationships with DHS directly-operated and County-contracted hospitals to assist hospital personnel with identifying treatment needs and to support the linkage process for class members with hospitalization for a psychiatric condition. | AUG 1, 2020 | ONGOING |
| 4.  DMH will participate in the DCFS discharge planning teleconference calls for follow-up & linkage. | AUG 15, 2020 | ONGOING |
| 5.  DMH will provide training and technical assistance to DMH staff and contracted providers regarding the importance of clinician participation in DCFS hospital discharge planning teleconferences to ensure medically necessary and timely access to ICC, IHBS and other SMHS. | SEPT 1, 2020 | ONGOING |
| 6.  DMH will provide technical assistance to STRTP providers regarding the timely completion of the assessments and  treatment plans, which may include ICC and or IHBS. | AUG 1, 2020 | ONGOING |
| 7.  DMH will offer trainings and technical support to STRTP providers regarding aftercare planning. | AUG 1, 2020 | ONGOING |
| 8.  DMH and DCFS will commit to ongoing meetings for children and youth in need of the PMRT interventions. | JULY 21, 2020 | ONGOING |
| 9.  DMH will review and revise a communication bulletin on steps for notification of non-hospitalized children/youth. | AUG 6, 2020 | OCT 31, 2020 |
| 10. The DMH Deputy will meet with Program Managers to reinforce the importance of staff notifying DCFS and or mental health providers about non-hospitalized children/youth; and follow up with clinically- | AUG 6, 2020 | ONGOING |

| | | |
|---|---|---|
| appropriate interventions for children/youth until linkage to mental health services are confirmed. | | |
| 11. PMRT staff will contact the DCFS High-Risk Division and/or the mental health provider at the end of a crisis response call about the non-hospitalized child/youth and the need for follow up. | AUG 6, 2020 | ONGOING |
| 12. PMRT will stabilize the crisis and, as necessary; and follow-up with the family, the DCFS social worker and/or and the mental health provider. | AUG 6, 2020 | ONGOING |
| 13.  DMH will deliver an online placement disruption training for DMH staff and contracted providers. | NOV 1, 2020 | ONGOING |
| 14. DMH will review and revise written materials to ensure that DMH providers notify DCFS when a child/youth's placement may be at risk of disruption, in an attempt to convene a CFT meeting as a placement preservation effort. | SEPT 1, 2020 | OCT 31, 2020 |

| Agreement #3:  I/DD<br>Work Plan/Deliverables | | |
|---|---|---|
| | **START** | **END** |
| 1    DMH is working with UCLA Prevention Center of Excellence (UCLA PCOE); and through forthcoming meetings, DMH will work with UCLA PCOE to customize existing training curriculums to effectively address the mental health audience. | AUG 1, 2020 | OCT 31, 2020 |
| 2.    DMH and DCFS will work with UCLA or USC Center of Excellence on Developmental Disabilities (USC UCEDD) to develop a training for child welfare staff and resource parents providing care to children and youth identified with co-occurring MH and ID/DD.  The County will work with UCLA and USC to customize existing training curriculums rather than create entirely new ones.   DCFS is already in contact with the USC Center of Excellence on Developmental Disabilities (USC UCEDD); and throughout forthcoming meetings, DCFS will work with USC UCEDD to customize existing training curriculums to effectively address a child welfare audience. | AUG 1, 2020 | DEC 30 2020 |
| 3.    DMH and DCFS will collaborate with regional centers to develop an interagency MOU, pursuant to AB2083, which defines mutual commitment to cross-training and support of the ID/DD population.  As a result of the passage of Assembly Bill 2083, DCFS and DMH are actively working with Los Angeles County Regional Centers on developing inter-agency MOU roles and responsibilities to ensure that all public programs serving child welfare-involved children, youth and families in common, including Regional Centers, provide services in an integrated, comprehensive manner. | AUG 1, 2020 | ONGOING |
| 4.    DCFS will ensure that class members are referred for regional center services upon entry into the child welfare system by:. | | |
| ·    DCFS' Regional Center section staff will continue training newly-hired CSWs (through the Training Academy), on how to utilize DCFS' Disability Screening Tool, which is accessible on DCFS' Regional Center Section website; and the importance of screening all youth for developmental disabilities. | AUGUST 1, 2020 | ONGOING |
| ·    DCFS' Regional Center section staff will continue regularly frequenting each DCFS regional office to re-enforce how to utilize DCFS' Disability Screening Tool, accessible on DCFS' Regional Center Section | AUGUST 1, 2020 | ONGOING |

| | | |
|---|---|---|
| website; and the importance of screening all youth for developmental disabilities. | | |
| ·    To support AB2083 mandates, DCFS will work with Regional Centers on the potential for establishing an inter-agency comprehensive data-sharing commitment, administered through DCFS' electronic Referral Portal, enabling DCFS to centrally track those referred DCFS children/youth whom Regional Centers accept/deny for I/DD services.<br><br>Referrals to Regional Center are currently issued as follows:<br><br>Ø  When a CSW's completion of DCFS' Disability Screening Tool indicates the need for a Regional Center referral, the CSW completes and issues the referral to the correct Regional Center, by fax/email.<br><br>Ø  For newly-detained, MAT-eligible youth:   In the event that a MAT Assessor indicates a child's/youth's need for a Developmental Screen and/or a recommendation to be referred to the Regional Center, the DCFS MAT Coordinator (CSAT) enters the Regional Center referral on the Referral Portal and issues the referral, with all attachments, to the correct Regional Center.<br><br>Ø  For newly non-detained, non-MAT-eligible youth: In the event that a co-located DMH clinician indicates a child's/youth's need for a Developmental Screen and/or a recommendation to be referred to the Regional Center, the DCFS SLS (CSAT) enters the Regional Center referral on the Referral Portal; and issues the referral, with all attachments, to the correct Regional Center. | AUGUST 1, 2020 | ONGOING |
| 5.    Within the context of its existing protocols/procedures to transition STRTP-placed children/youth to lower levels of care.  When possible, DCFS will engage Regional Center staff in STRTP transition planning of children/youth with I/DD to lower levels of care. | AUGUST 1, 2020 | ONGOING |
| 6.    DCFS will develop protocols and practices to ensure that social workers of children/youth who are Regional Center clients invite the Regional Center service coordinator to attend the child's/youth's CFT meeting; and also attend the child's annual Regional Center planning meetings (IPPs).   The child's/youth's family has the right to refuse Regional Center staff participation in the CFT meeting.   However, the DCFS Regional Center section will further re-enforce the message, already delivered through training and office presentations, through | AUGUST 1, 2020 | JUNE 30, 2021 |

| written communication from the DCFS Director and regular email blasts. | | |

40

| Agreement #4:  ICC and IHBS<br>Work Plan/Deliverables | START | END |
|---|---|---|
| 1.  DMH will resume the Authorization Workgroup | AUG 1, 2020 | DEC 31, 2020 |
| 2.  Develop an ICC eligibility form that identifies criteria for ICC that does not include pre-authorization or involvement in a specific program | AUG 1, 2020 | DEC 1, 2020 |
| 3.  Develop on-line training module for ICC, that any provider can easily access | AUG 1, 2020 | DEC 1, 2020 |
| 4.   Issue a QA Bulletin about the provision of ICC/IHBS and the process for obtaining those | AUG 1, 2020 | DEC 1, 2020 |
| 5.  Develop and implement a pre-authorization process for IHBS services | AUG 1, 2020 | Ongoing |
| 6.   DMH to Conduct a virtual webinar for providers to information regarding ICC/IHBS and to allow for questions from providers | AUG 1, 2020 | DEC 1, 2020 |
| 7.  Develop a bulletin to DMH on information regarding resources made available assist with the administration of providers' contracts. | SEPT 1, 2020 | DEC 1, 2020 |

| Agreement #5:  SMHS Materials and Training for County RFA Caregivers Work Plan/Deliverables | Start Date | End Date |
|---|---|---|
| 1.  DMH to develop and create an informational brochure and flyer for DCFS caregivers regarding Accessing Mental Health Services and Intensive Care Coordination (ICC) and Intensive Home Based Services (IHBS). | August 3, 2020 | August 14, 2020 |
| 2.  DMH to develop a training for caregivers on how to access mental health services including ICC/IHBS; and create a Trainer Guide for use by Community Colleges and Community-Based Organization training facilitators. | August 3, 2020 | August 31, 2020 |
| 3.  DMH to send drafts of flyer, brochure and training PowerPoint to DMH parent advocates for review and feedback. | August 17, 2020 | August 27, 2020 |
| 4.  DMH to make revisions based on feedback received from parent advocates and submit final drafts to management for review and approval. | September 8, 2020 | September 25, 2020 |
|     a.  Once approved by DMH management, all materials to be translated to Spanish. | September 25, 2020 | October 30, 2020 |
|     b.  Submit all Spanish translated materials to management for final approval. | October 30, 2020 | November 13, 2020 |
| 5.  DCFS to ensure that the training on how to access mental health services, including ICC/IHBS, is provided in the RFA pre- and post-approval trainings. | November 16, 2020 | February 1, 2021 |
|     a. DCFS contracts with the Community College Foundation (TCCF) to provide a 12-hour pre-approval RFA training to recruited parents; and will work with TCCF to add this module to the training curriculum. | November 16, 2020 | February 1, 2021 |
|     b. DCFS contracts with various Community-Based Organizations (CBO) to provide a 12-hour pre-approval RFA training to relatives and non-related extended family members; and will work with the CBOs to add this module to the training curriculum. | November 16, 2020 | February 1, 2021 |
|     c. DCFS will work with DMH and the Foster and Kinship Care Education Programs at local Community Colleges on adding this module within the 8-hour post-approval RFA training.  Approved RFA parents are allowed to self-select state-mandated post-approval trainings in which they chose to participate.  DCFS will strongly encourage County-approved RFA parents to select this module, even though it is not state-mandated. | November 16, 2020 | February 1, 2021 |
| 6.  DCFS will develop a process by which to insert the DMH brochure on accessing ICC/IHBS into each placement packet.  Technical Assistants (TAs) in each DCFS office are responsible for compiling placement packets of informational materials for provision to caregivers.   The placing CSW distributes the placement packet to each caregiver at the time of placement and explains the contents.  The special assistants to each | August 3, 2020 | November 30, 2020 |

| | | | |
|---|---|---|---|
| | DCFS Service Bureau Deputy Director will work with the Regional Administrators of each DCFS Office to ensure that the Supervisors of the TAs monitor the process of TAs including the brochure in each DCFS placement packet. | | |
| 7. | DMH will review and revise the mental health handbook based on state requirements, post on website and notify DMH providers about requirement. | August 15, 2020 | September 15, 2020 |
| 8. | The DMH Emergency Outreach and Triage Division Deputy Director will meet with Access supervisors to inform them about the updated handbook and develop a process on how staff will direct caregivers and youths to the website to access handbook or mail upon request. | September 15, 2020 | Ongoing |

| Agreement #6:  TFC<br>Work Plan/Deliverables | Start Date | End Date |
|---|---|---|
| 1. DMH will seek input from the State and CIBHS to discuss strategies for expansion of the delivery of TFC. | September 1, 2020 | Ongoing |
| 2. DMH and DCFS will convene meetings with all contracted FFAs to review TFC services and benefits to youth, as well as the rate/reimbursement structure for both TFC and ISFC; survey providers to determine which providers are qualified and willing to deliver this service and to recruit and support TFC parents; and contract with FFAs that are qualified and willing to provide TFC services. | October 1, 2020 | Ongoing |
| 3. DCFS and DMH will convene a workgroup to develop procedures and explore barriers to improving the process of porting County-approved resource parents to FFA providers as prospective TFC parents. | September 1, 2020 | March 1, 2021 |
| 4. DCFS will obtain interest from individuals (e.g. resource parents, kin, NREFMs or other individuals who have an existing relationship with a particular child and are willing to become a TFC parent) on becoming ISFC resource parents and/or providing TFC; and facilitate linkage of interested individuals to a contracted FFA/ISFC provider. | November 1, 2020 | Ongoing |
| 5. In collaboration with DCFS and resource parents, DMH will develop and implement a TFC training protocol for resource parents to meet TFC training requirements. | September 1, 2020 | Ongoing |
| 6. DMH will provide technical assistance to FFA providers, DCFS CSWs and DMH co-located staff working with prospective TFC parents regarding the provision of ICC and/or IHBS. | October 1, 2020 | Ongoing |
| 7. DCFS and DMH will train CSWs and FFA providers that: (i) formal supports, such as prospective TFC parents, should be invited to participate in CFT meetings; and (ii) prospective TFC parents should be informed that specialty mental health services, including ICC and IHBS, are available, where medically necessary, to children in the care of a prospective TFC parent. | November 1, 2020 | Ongoing |
| 8. DCFS and DMH will collaborate on developing and delivering a training for DCFS CSWs, DMH co-located staff and FFA providers regarding the benefits of recruiting resource parents with a prior relationship with a child, to become TFC parents and provide TFC. | November 1, 2020 | Ongoing |